# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

JAMES MICHAEL HAND,    )
JOSEPH JAMES GALASSO,   )
HAROLD W. GIRCSIS, JR.,    )
CHRISTOPHER MICHAEL SMITH, )
WILLIAM BASS, JERMAINE   )
JOHNEKINS, YRAIDA LEONIDES )
GUANIPA, on behalf of themselves )
and others similarly situated,   )
             )
     *Plaintiffs*,    )
             )
    v.        )
             )
RICK SCOTT, in his official capacity )
as Governor of Florida and member )
of the State of Florida's Executive )
Clemency Board, PAM BONDI, in )
her official capacity as the Attorney )
General of Florida and member of the )
Executive Clemency Board, JEFF )
ATWATER, in his official capacity )
as Chief Financial Officer and  )
member of the Executive Clemency )
Board, ADAM H. PUTNAM, in his )
official capacity as Commissioner of )
Agriculture and member of the  )
Executive Clemency Board, KEN )
DETZNER, in his official capacity as )
Secretary of State of Florida, JULIE )
L. JONES, in her official capacity as )
Secretary of the Department of  )
Corrections, MELINDA N.   )
COONROD, in her official capacity )
as Commissioner and Chair of the )
Florida Commission on Offender )
Review, RICHARD D. DAVISON, )

CIVIL ACTION NO. _____

**CLASS ACTION COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF**

1

in his official capacity as                    )
Commissioner of the Florida                    )
Commission on Offender Review,                 )
DAVID A. WYANT, in his official                )
Capacity as Commissioner of the               )
Florida Commission on Offender                 )
Review, JULIA McCALL, in her                   )
official capacity as Coordinator for           )
the Office of Executive Clemency of            )
the Florida Commission on Offender             )
Review,                                        )
                                               )
                    *Defendants*.              )
_____        )

## CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs James Michael Hand, Joseph James Galasso, Harold W. Gircsis, Jr., Christopher Michael Smith, William Bass, Jermaine Johnekins and Yraida Leonides Guanipa (collectively, "Plaintiffs") seek declaratory and injunctive relief and allege as follows:

## NATURE OF ACTION

1.    Florida is one of just four states which denies the right to vote to all convicted former felons until they successfully petition for the restoration of their civil rights.  Kentucky, Iowa and Virginia are the only other states that consign the voting rights of all convicted former felons (hereinafter "disenfranchised ex-felons"

or "ex-felons") to the unrestrained discretion of public officials.[1]  This class action challenges Florida's disenfranchisement and re-enfranchisement laws, which have made the process of voting rights restoration unconstitutionally arbitrary.

2.      Disenfranchised ex-felons who have completed their sentences and who seek to regain their voting rights in Florida must petition the Executive Clemency Board (or "the Board"), which is comprised of the Governor of Florida, the Attorney General, the Chief Financial Officer and the Commissioner of Agriculture.  Fla. R. Exec. Clemency 1.  The decision whether to grant or deny an ex-felon's restoration application rests with the unfettered discretion of these four Board members.  The application must be approved by a majority of the Board members and the Governor must be included in the majority.

3.      While the Rules of Executive Clemency set forth a procedure for applications to the Board, there are no laws, rules or regulations governing the Board's determinations, which remain wholly arbitrary.  Rule 4 explicitly provides that: "The Governor has the unfettered discretion to deny clemency at any time, for any reason."  Fla. R. Exec. Clemency 4.  Defendant Governor Rick Scott frequently

---

[1] While Virginia's current administration is restoring the voting rights of ex-felons who have completed their sentences including parole and probation, the state laws have not been changed.  In some states, ex-felons convicted of certain felonies or multiple felonies continue to be disenfranchised following the completion of their sentences and must petition a court or state officials to regain their voting rights. *See, e.g.*, ARIZ. REV. STAT. ANN. §§ 13-905, 13-906; NEV. REV. STAT. ANN. § 213.155.

states that the Executive Clemency Board acts as a "court of mercy"[2] and underscores that the Board is not bound by any law in making its decisions. Frequently the Board members state that they are looking to see if someone has "turned [his or her] life around" and if the applicant has shown remorse. By way of example, Governor Scott opened the March 3, 2016 hearing with the following declaration of limitless discretion: "This is a board of clemency. Ok? There is no law we're following. The law has already been followed by the judges. So we get to make our decisions based on our own beliefs."[3] With such vague, shifting standards based on personal beliefs, applicants may be denied for any reason, including a record of traffic violations, an admission to drinking alcohol or recreational drug use, or no reason at all, just a state official's whim, impression or gut instinct. Applicants may also be granted for any reason, including the testimony of family members, friends or pastors, an applicant's demeanor or dress, or the expression of political views which Board members favor, or no reason at all, just a state official's whim, impression or gut instinct.

---

[2] The Statement of Policy that opens the Florida Rules of Executive Clemency states that: "Clemency is an act of mercy that absolves the individual upon whom it is bestowed from all or any part of the punishment that the law imposes." Fla. R. Exec. Clemency 1.

[3] Executive Clemency Board Hearing (March 3, 2016 at 00:04:25), *available at* http://thefloridachannel.org/videos/3316-executive-clemency-board-meeting-part-1/ (last visited Mar. 9, 2017).

4.     The risk of viewpoint discrimination is highest when a government official's discretion to authorize or reject First Amendment-protected activity is entirely unconstrained by law.  In this context, officials may deny restoration of the right to vote on pretextual grounds while secretly basing their decision on the applicant's race, professions of faith (or lack thereof) or speculation as to the applicant's political affiliation or views.  This is why – under longstanding Supreme Court precedent – conditioning the enjoyment of a fundamental constitutional right on the exercise of unfettered official discretion and arbitrary decision-making imposes a prior restraint and violates the First Amendment to the United States Constitution.  This arbitrary allocation of the franchise also violates the Equal Protection Clause of the Fourteenth Amendment.

5.     Furthermore, no laws, rules or regulations set any time limits on the Board to act on an ex-felon's application for restoration of civil rights in Florida. Board hearings are held only four times per year and only in Tallahassee. The Board only hears an average of 52 restoration of civil rights cases per quarterly meeting. Under the current set of rules adopted back in 2011, the Executive Clemency Board has imposed an unjustifiable further roadblock to restoration of voting rights, forcing ex-felons who have completed their sentences to wait an additional five or seven years following the completion of their sentence before they can even apply for restoration of voting rights.  Upon information and belief, it is common for an

applicant to wait as many as ten years, if not more, without any update from the Board before he or she is finally given a hearing date or notified the application was denied or granted without a hearing.  This delay is exacerbated by the existing backlog of applications, which – as of March 1, 2017 – stood at 10,513 pending applications.[4]  The lack of a definite time limit for the adjudication of an ex-felon's application for restoration of voting rights also violates the First Amendment to the United States Constitution.  The waiting period imposes a second sentence above and beyond that imposed by a federal or state judge and a severe restriction on ex-felons seeking to regain their voting rights, which is not narrowly tailored to any legitimate government interest and therefore violates the First and Fourteenth Amendments to the U.S. Constitution.

6.     The Executive Clemency Board's restoration process has always been an unconstitutional obstacle to regaining the right to vote but this problem has become particularly acute since Defendant Governor Scott took office in 2011 and changed the rules to require lengthy waiting periods.  The Governor has also exercised his unbridled power over clemency procedures to reduce the number of civil rights restoration applications which are processed annually and reject

---

[4] On September 1, 2016, this figure was 10,588.  The backlog has only decreased by 75 pending applications in six months, demonstrating that the current system has both caused Florida's disenfranchised population to grow to 1.68 million and is utterly unsuited to addressing the ever-worsening problem.

tremendous numbers of ex-felon applicants.  The data shows that civil rights restoration grants have dramatically declined since Governor Scott assumed office in 2011: 1,428 (2001); 6,651 (2002); 14,836 (2003); 24,902 (2004); 11,638 (2005); 14,053 (2006); 38,971 (2007); 85,088 (2008); 25,347 (2009); 5,909 (2010); 78 (2011); 342 (2012); 605 (2013); 562 (2014); 428 (2015); and 473 (2016).  As a result, Florida now has an estimated 1.68 million disenfranchised ex-felons[5] or 10.4 percent of the state's voting-age population—both the highest total and the highest rate in the nation.[6]

7.    Plaintiffs bring this action under 42 U.S.C. § 1983 against Defendants' unlawful deprivation of Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution.

8.    Plaintiffs James Michael Hand, Joseph James Galasso, Harold W. Gircsis, Jr., Christopher Michael Smith, William Bass and Jermaine Johnekins are disenfranchised ex-felons who have applied for restoration of their civil rights by the Board.  All but one of their applications have been denied; William Bass's application is pending in the backlog.  Plaintiff Yraida Leonides Guanipa is not yet

---

[5] Christopher Uggen, Ryan Larson and Sarah Shannon, *6 Million Lost Voters: State-Level Estimates of Felony Disenfranchisement*, The Sentencing Project (2016) (Table 3), *available at* http://www.sentencingproject.org/wp-content/uploads/2016/10/6-Million-Lost-Voters.pdf#page=17 (last visited Mar. 7, 2017).
[6] *Id*. (Figure 2).

eligible to apply for restoration of her civil rights because seven years have not elapsed since she completed her sentence.

## JURSIDICTION AND VENUE

9.    This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343 because this case arises under the United States Constitution and seeks equitable and other relief for the deprivation of constitutional rights under color of state law.

10.    This Court has jurisdiction to award attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1920.

11.    This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

12.    This Court has personal jurisdiction over Defendant Rick Scott, the Governor of Florida, Defendant Pam Bondi, Attorney General, Jeff Atwater, Chief Financial Officer, and Adam Putnam, Commissioner of Agriculture, the members of the Cabinet and the Executive Clemency Board, who are sued in their official capacities.  Defendant Board Members Governor Scott, Bondi, Atwater and Putnam are elected state government officials who reside and work in Tallahassee, Florida.

13.    This Court has personal jurisdiction over Defendant Ken Detzner, Secretary of State of Florida, who is sued in his official capacity.  Defendant Detzner is an appointed state official who resides and works in Tallahassee, Florida.

14.     This Court has personal jurisdiction over Defendant Julie L. Jones, who is sued in her official capacity as the Secretary of the Department of Corrections. Defendant Jones is an appointed state official who resides and works in Tallahassee, Florida.

15.     This Court has personal jurisdiction over Defendant Melinda N. Coonrod, who is sued in her official capacity as Commissioner and Chair of the Florida Commission on Offender Review (formerly the Florida Parole and Probation Commission), and Richard D. Davison and David A. Wyant, who are also both sued in their official capacities as Commissioner of the Florida Commission on Offender Review.  Defendants Coonrod, Davison and Wyant are appointed state officials who reside and work in Tallahassee, Florida.

16.     This Court has personal jurisdiction over Defendant Julia McCall, who is sued in her official capacity as Coordinator for the Office of Executive Clemency of the Florida Commission on Offender Review.  Defendant McCall is a state official appointed by the Governor and Cabinet, who resides and works in Tallahassee, Florida.

17.     Venue is appropriate in the Northern District of Florida, under 28 U.S.C. § 1391(b)(1), because Defendants Scott, Bondi, Atwater, Putnam, Detzner, Jones, Coonrod, Davison, Wyant and McCall are state officials working in Tallahassee, Florida.  A substantial part of the events giving rise to these claims

occurred and will continue to occur in this district, making venue also proper under 28 U.S.C. § 1391(b)(2).

## PARTIES

18.    Plaintiff James Michael Hand is a United States citizen, 63 years old, and a resident of Cutler Bay, Florida. Mr. Hand was convicted of at least one felony in Florida state court and lost his right to vote under Florida state law. In 1986, Mr. Hand was released from prison, and he completed his sentence in 2002. After he completed his sentence, Mr. Hand applied to the Board for the restoration of his civil rights. At an Executive Clemency Board hearing on December 16, 2011, his application was denied. In rejecting his application, Governor Scott cited Mr. Hand's record of moving or traffic violations and said the following: "Congratulations on turning your life around. Congratulations on your business. In light of the significant issue—you know, traffic violations, and your inability to comply with the law in that manner, I'm going to deny you restoration of civil rights at this time."[7]

19.    Plaintiff Joseph James Galasso is a United States citizen, 46 years old, and a resident of Gainesville, Florida. Mr. Galasso was convicted of at least one felony in Florida state court and lost his right to vote under Florida state law. Mr.

---

[7] Executive Clemency Board Hearing (Dec. 16, 2011 at 2:20:08-2:30:40), *available at* http://thefloridachannel.org/videos/121611-executive-clemency-board-meeting/ (last visited Mar. 8, 2017).

Galasso completed his sentence, including probation, in January 2004. In 2001, just prior to his release from prison, he had applied to the Executive Clemency Board for the restoration of his civil rights and had to wait twelve years before he was finally scheduled for a hearing. The Office of Clemency Investigations did not begin its investigation of Mr. Galasso's case until roughly a decade after he applied. At a Board hearing on March 20, 2013, his application was taken under advisement. Defendant Governor Scott said: "So you've really turned your life around. You've been out of prison eleven years and you've got all these traffic violations. . . . You've turned your life around but if you—if you really don't care about the law and you have all these traffic violations it's hard to say gosh you really believe in the law." Soon after the hearing, Mr. Galasso received a letter notifying him that his application had been denied.[8]

20.    Plaintiff Harold W. Gircsis, Jr. is a United States citizen, 64 years old, and a resident of Port Charlotte, Florida. Mr. Gircsis was convicted of at least one felony in the U.S. District Court for the District of Minnesota and lost his right to vote under Florida state law. Mr. Gircsis completed his sentence, including probation, on October 15, 2003. In 2006, he applied to the Executive Clemency

---

[8] Executive Clemency Board Hearing (Mar. 20, 2013) (audio only and not available online).

11

Board for the restoration of his civil rights but was not given a hearing date until 2011.  At a Board hearing on December 16, 2011, his application was denied.[9]

21.     Plaintiff Christopher Michael Smith is a United States citizen, 43 years old, and a resident of Miami, Florida.  Mr. Smith was convicted of at least one felony in Florida state court and lost his right to vote under Florida state law.  Mr. Smith completed his sentence in 1997.  In 2006, he applied to the Executive Clemency Board for the restoration of his civil rights.  In 2011, Mr. Smith refiled his application because it had been pending for five years.  The Office of Executive Clemency contacted Mr. Smith to inform him that his application was still pending and that he did not need to refile his petition.  In the spring of 2016, the Board notified Mr. Smith that he had been scheduled for a hearing in September.  At a Board hearing on September 21, 2016, his application was taken under advisement.[10]  About a week later, Mr. Smith received a letter notifying him that his restoration application had been denied.

22.     Plaintiff William Bass is a United States citizen, 64 years old, and a resident of St. Petersburg, Florida.  Mr. Bass was convicted of at least one felony in

---

[9] Executive Clemency Board Hearing (December 16, 2011 at 1:25:01-1:26:03), *available at* http://thefloridachannel.org/videos/121611-executive-clemency-board-meeting/ (last visited Mar. 9, 2017).

[10] Executive Clemency Board Hearing (September 21, 2016 at 4:23:03-4:29:37), *available         at* http://thefloridachannel.org/videos/92116-executive-clemency-board-meeting-part-2/ (last visited Mar. 10, 2017).

Florida state court and lost his right to vote under Florida state law.   Mr. Bass completed his sentence in 2008.   In either 2011 or 2012, he applied to the Executive Clemency Board for the restoration of his civil rights.   Mr. Bass subsequently contacted the Office of Executive Clemency, and they informed him that he had to wait five to seven years after completing his sentence before he could apply for restoration.   Prior to the 2016 general election, Mr. Bass re-filed his application, which remains pending in the backlog of applications before the Executive Clemency Board.   Mr. Bass recently received a letter from the Office of Executive Clemency dated January 20, 2017, notifying him that the Executive Clemency Board did not approve him for restoration of civil rights without a hearing.   The letter advised him that his case had been referred to the Florida Commission on Offender Review for a full investigation and ultimately a hearing.   Mr. Bass was informed that he could also choose to withdraw his application and a "Notice of Withdrawal of Clemency Application" form was enclosed with the letter.   Mr. Bass will not withdraw his restoration of civil rights application.

23.    Plaintiff Jermaine Johnekins is a United States citizen, 44 years old, and a resident of Pembroke Pines, Florida.   Mr. Johnekins was convicted of at least one felony in Florida state court and lost his right to vote under Florida state law.   Mr. Johnekins was sentenced to a work-release program for nine and a half months, which he completed in 1998.   In early 2012, he applied to the Executive Clemency

Board for the restoration of his civil rights.  At a Board hearing on March 22, 2012, his application was denied.[11]

24.     Plaintiff Yraida Leonides Guanipa is a United States citizen, 55 years old, and a resident of Miami, Florida.  In 1996, Ms. Guanipa was convicted of at least one felony in the U.S. District Court for the Southern District of Florida.  She was released from prison in June 2007 and completed probation in June 2012.  Under the Executive Clemency Board's current rules, Ms. Guanipa is barred from applying for a restoration of her civil rights until June 2019, seven years after the completion of her full sentence.

25.     Plaintiffs want to register and vote in future primary and general elections in the State of Florida for candidates of their choice and ballot initiatives, and to support and associate with political parties in order to advance the parties' goals.

26.     Defendant Rick Scott is the Governor of Florida and is sued in his official capacity.  The Florida Constitution vests the Governor with the authority to restore civil rights.  FLA. CONST. art. IV § 8(a).  The Governor heads the Executive Clemency Board, which is tasked with promulgating the Rules of Executive Clemency and making final determinations on all restoration of civil rights cases.

---

[11] Executive Clemency Board Hearing (March 22, 2012 at 2:08:33-2:13:44), *available           at* http://thefloridachannel.org/videos/32212-executive-clemency-board-meeting/ (last visited Mar. 20, 2017).

FLA. STAT. ANN. § 940.03.  The Governor is empowered to restore civil rights by executive order.  FLA. STAT. ANN. § 940.01(1).  The Governor may join with two other Board members to grant an application for restoration of civil rights or deny the application outright because he or she must be in the majority for any grant.  *Id.*; FLA. STAT. ANN. § 940.03; Fla. R. Exec. Clemency 4.

27.    Defendants Pam Bondi, Jeff Atwater and Adam Putnam, the remaining members of the Cabinet and the Executive Clemency Board, are sued in their official capacities.  Fla. R. Exec. Clemency 1.  As members of the Board, they have the power to grant or deny an application for restoration of civil rights by either concurring in the Governor's motion to grant or withholding their support.  Fla. R. Exec. Clemency 4.

28.    Defendant Ken Detzner is the Secretary of State of Florida and is sued in his official capacity.  As Secretary of State, Defendant Detzner is Florida's chief elections officer and administers Florida's election laws.  FLA. STAT. ANN. § 97.012.

29.    Defendant Julie L. Jones is the Secretary of the Department of Corrections and is sued in her official capacity.  The Department of Corrections has "supervisory and protective care, custody, and control of the inmates, buildings, grounds, property, and all other matters pertaining to the following facilities and programs for the imprisonment, correction, and rehabilitation of adult offenders: (a) Department of Corrections adult correctional institutions; (b) Department of

Corrections youthful offender institutions; (c) Department of Corrections Mental Health Treatment Facility; (d) Department of Corrections Probation and Restitution Center; (e) Department of Corrections community correctional centers; and (f) Department of Corrections vocational centers." FLA. STAT. ANN. § 945.025(1). The Department of Corrections is charged with "inform[ing] and educat[ing] inmates and offenders on community supervision about the restoration of civil rights." FLA. STAT. ANN. § 940.061. Additionally, every month the Department of Corrections must electronically transfer to the Florida Commission on Offender Review "a list of the names of inmates who have been released from incarceration and offenders who have been terminated from supervision who may be eligible for restoration of civil rights." *Id.*

30.    Defendant Melinda N. Coonrod is the Commissioner and Chair of the Florida Commission on Offender Review (formerly the Florida Parole and Probation Commission) and is sued in her official capacity. The Florida Commission on Offender Review, a three-member quasi-judicial body, makes decisions on granting and revoking parole, conditional medical release, control release, conditional release and addiction recovery release. FLA. STAT. ANN. §§ 947.002, 947.01.[12]    The

---

[12] *See also* Florida Commission on Offender Review: 2015-2016 Annual Report, at 5-7, *available at* https://www.fcor.state.fl.us/docs/reports/FCORannualreport201516.pdf (last visited Mar. 9, 2017).

Commission on Offender Review also "[a]cts as the administrative and investigative arm" of the Executive Clemency Board and, in this capacity, must report to the Board on "the circumstances, the criminal records, and the social, physical, mental, and psychiatric conditions and histories of persons under consideration by the board for" any form of clemency. *Id.* at 7; FLA. STAT. ANN. § 947.13(1)(e). The Commission's Chair "shall establish, execute, and be held accountable for all administrative policy decisions. The routine administrative decisions are the full responsibility of the chair." FLA. STAT. ANN. § 947.002(3).

31.    Defendants Richard D. Davison and David A. Wyant are the other two Commissioners serving on the Florida Commission on Offender Review. They are sued in their official capacities.

32.    Defendant Julia McCall is the Coordinator for the Office of Executive Clemency and is sued in her official capacity. The Office of Executive Clemency ("OEC") is an office within the Florida Commission on Offender Review and reports to the Executive Clemency Board.[13] The OEC processes executive clemency applications and prepares them for the Board's consideration. In her capacity as Coordinator for the OEC, Defendant McCall "is responsible for coordinating all

---

[13] Florida Commission on Offender Review: 2015-2016 Annual Report, at 14, *available at* https://www.fcor.state.fl.us/docs/reports/FCORannualreport201516.pdf (last visited Mar. 9, 2017).

clemency meetings, referring applications for investigation [by the Office of Clemency Investigations[14]], and serves as the official custodian of all clemency records." *Id.* The OEC also prepares the executive orders and certificates granting clemency and communicates with applicants and their counsel. *Id.*

## BACKGROUND

### A. History of Felon Disenfranchisement and Re-Enfranchisement in Florida

33.     The disenfranchisement of individuals with felony convictions has a long history in Florida. Florida adopted its first constitution in 1838, prior to its admission to the union in 1845. The 1838 Constitution vested the general power to exclude those "convicted of bribery, perjury, forgery, or other high crime, or misdemeanor" from the franchise in the General Assembly. FLA. CONST. art. VI, §§ 4, 13 (1838). The disenfranchisement language was left unchanged until 1868 when the Reconstruction Act of 1867 required Florida and ten other former Confederate

---

[14] The Office of Clemency Investigations ("OCI") is another office within the Florida Commission of Offender Review. The OCI is "charged with investigating, reviewing, evaluating, and reporting to the Clemency Board in all types of clemency cases[.]" The staff conducts an investigation of every ex-felon applicant for restoration of civil rights, reviews his or her criminal record, traffic record, family situation, employment, any alcohol or drug abuse history, any unlawful voter registration or voting activity and any military history, and produces a Confidential Case Analysis, which the Board reviews and which is sent to the applicant. Florida Commission on Offender Review: 2015-2016 Annual Report, at 15, *available at* https://www.fcor.state.fl.us/docs/reports/FCORannualreport201516.pdf (last visited Mar. 9, 2017).

states to amend their Constitutions to extend the right to vote to all men, regardless of race. While the 1868 Constitution granted suffrage to all men over the age of 21, regardless of race, color, nationality, or previous condition of servitude, it also explicitly disenfranchised "any person convicted of [a] felony" for life "unless restored to civil rights." FLA. CONST. art. XIV, §§ 2, 4 (1868). This language remained in the Constitution for the next century and was amended in 1968 to state that "[n]o person convicted of a felony . . . shall be qualified to vote or hold office until restoration of civil rights," which remains the law to this day. FLA. CONST. art. VI, § 4 (1968). The felon disenfranchisement statute accordingly disqualifies "[a] person who has been convicted of any felony by any court of record and who has not had his or her right to vote restored pursuant to law." FLA. STAT. ANN. § 97.041(2)(b).

34.    The 1868 Constitution had also provided that pardons could be granted by a board comprised of "The Governor, Justices of the Supreme Court, and Attorney General, or a major part of them, of whom the Governor shall be one." FLA. CONST. art. V, § 12 (1868). FLA. CONST. art. XIV, § 2 (1868) "allowed those who had been 'restored to civil rights' to vote, but did not indicate how this restoration might happen."[15] Since 1968, the Constitution has clearly vested the

---

[15] PIPPA HOLLOWAY, LIVING IN INFAMY: FELON DISENFRANCHISEMENT AND THE HISTORY OF AMERICAN CITIZENSHIP 106 (2014).

Governor of Florida with the power to restore an individual's civil rights.  Article

IV, Section 8(a) of the Constitution provides:

> Except in cases of treason and in cases where impeachment results in conviction, the governor may, by executive order filed with the custodian of state records, suspend collection of fines and forfeitures, grant reprieves not exceeding sixty days and, with the approval of two members of the cabinet, grant full or conditional pardons, restore civil rights, commute punishment, and remit fines and forfeitures for offenses.[16]

FLA. STAT. ANN. § 944.292(1), which was first enacted in 1974, conditions the

restoration of civil rights on a full pardon, a conditional pardon, or a grant of

restoration pursuant to the Governor's Article IV, Section 8 clemency powers.

35.    Under Governor Bush's administration from 1999 to 2007, there were

no waiting periods for ex-felons before they could apply for restoration of their civil

rights.  Instead, to be eligible for restoration of civil rights, the individual must have

completed all sentences and all conditions of supervision must have expired or been

completed.  Individuals were eligible for restoration of civil rights without a hearing

if they were convicted of what the Board deemed less serious felonies and had "[n]o

outstanding detainers or pending criminal charges, or terms of supervised release"

---

[16] Even in conjunction with Article VI, Section 4 above, it is not clear that Florida's Constitution gives the Governor the *exclusive* authority to restore civil rights, *i.e.* that the Legislature could not pass legislation restoring ex-felons' civil rights automatically upon sentence completion.  Indeed, FLA. STAT. ANN. § 97.041 tellingly articulates the felon disqualification as follows: "A person who has been convicted of any felony by any court of record and who has not had his or her right to vote restored *pursuant to law*."  (Emphasis added).

and no outstanding victim restitution. Fla. R. Exec. Clemency 9 (2000-2006). An application was not required of such ex-felons unless they had been convicted in a court other than a Florida state court. Fla. R. Exec. Clemency 6, 9 (2000-2003). The Department of Corrections released the names of ex-felons who had completed their sentences including any parole, probation or supervised release to the Office of Executive Clemency ("OEC") for review. Fla. R. Exec. Clemency 9.C (2000-2002). The Coordinator of the OEC would prepare for the Board a preliminary review list of ex-felons qualified for restoration without a hearing; individuals on that list would be granted restoration of civil rights unless three or more Board members objected. Fla. R. Exec. Clemency 9.B (2000-2002). In March of 2003, that threshold was reduced to two or more Board members. Fla. R. Exec. Clemency 9.B (2003). Up until 2004, the rules stated: "If determined eligible [for restoration without a hearing], an individual may, in most cases, receive a certificate evidencing restoration of civil rights . . . within one calendar year." Fla. R. Exec. Clemency 9 (2000-2003). Those convicted of any of the listed felonies the Board deemed more serious were required to submit an application and face the Board in a hearing. Fla. R. Exec. Clemency 6, 9-11 (2000-2004). Additionally, from 2000 through 2002, the Rules of Executive Clemency clearly stated that "[t]he failure to attend the hearing will not be weighed against the applicant." Fla. R. Exec. Clemency 11(B) (2000-2002). This provision was removed in 2003 and replaced with the statement that

"[a]pplicants are not required to appear at the hearing, but the Clemency Board encourages applicants to attend." Fla. R. Exec. Clemency 11(B) (2003).

36.     The revised rules promulgated in 2004 made additional categories of ex-felons eligible for restoration of civil rights without a hearing under Rule 9. Individuals who remained crime- and arrest-free for five years after completing all sentences and conditions of supervision were eligible for restoration of civil rights without a hearing so long as they did not have a conviction involving one of seven enumerated categories of felonies. Fla. R. Exec. Clemency 9.A.5 (2004-2006). All other ex-felons who had been convicted of a felony within one of the enumerated offense categories in Rule 9.A.5 were eligible for restoration without a hearing if they remained crime- and arrest-free for fifteen years after completing all sentences and conditions of supervision. Fla. R. Exec. Clemency 9.A.6 (2004-2006). As with prior versions of the rules, ex-felons eligible for restoration without a hearing on any basis did not need to submit an application, unless they had been convicted in a court other than a Florida state court. Fla. R. Exec. Clemency 6, 9 (2004-2006). These changes created new avenues for ex-felons to regain their civil rights without a hearing, thus creating a way to restore the civil rights of more ex-felons.

37.     In 2007, Governor Crist and the Board further amended the Rules of Executive Clemency to provide for an automatic path to restoration of civil rights for individuals who have completed all sentences and conditions of supervision,

have no outstanding detainers or pending criminal charges, have paid all restitution, and have neither been convicted of one of twenty-five listed felonies or felony categories nor been declared a habitual violent felony offender, three-time violent felony offender, violent career criminal, prison release reoffender, or sexual predator under Florida law.  Fla. R. Exec. Clemency 5.E, 9 (2007-2010).  For qualifying ex-felons, "automatic" restoration meant the Board's grant of civil rights was non-discretionary: "A person *shall* have his or her civil rights . . . immediately restored by automatic approval of the Clemency Board."  Fla. R. Exec. Clemency 9.A (2007-2010) (emphasis added).  The Board would receive information from the Department of Corrections for all individuals who were eligible under Rule 9.A and automatically issue executive orders restoring their civil rights.  Fla. R. Exec. Clemency 9.B (2007-2010).

38.    Additionally, under the 2007 revised rules, discretionary grants of restoration of civil rights without a hearing remained available under Rule 10 for any ex-felon who met the same criteria as an ex-felon eligible for automatic restoration, unless they had been convicted of a felony within one of eleven disqualifying felony categories (narrowed down from the list in Rule 9) or declared a sexual predator. Fla. R. Exec. Clemency 10.A (2007-2010).  Those who remained crime- and arrest-free for fifteen years could still seek restoration without a hearing, regardless of their offenses, but the availability of restoration without a hearing for those ex-felons who

23

remained crime- and arrest-free for five years was eliminated. Fla. R. Exec. Clemency 10.B (2007-2010). Contrary to the prior default rule granting restoration unless Board members objected, the Governor plus two Board members would now have to grant restoration affirmatively to anyone on the preliminary review list. Fla. R. Exec. Clemency 10.C (2007-2010). Ex-felons eligible for automatic restoration or restoration without a hearing on any basis did not need to submit an application, unless they had been convicted in a court other a Florida state court. Fla. R. Exec. Clemency 6, 9, 10 (2007-2010). Finally, any individual not eligible for automatic restoration under Rule 9 or restoration without a hearing under Rule 10 would be compelled to submit an application for restoration with a hearing. Fla. R. Exec. Clemency 6, 9.B, 11 (2007-2010).

39.    At the first Board meeting of Governor Scott's administration on March 9, 2011, the Board voted unanimously to revise the Rules of Executive Clemency, establishing the arbitrary, time-consuming, and unreasonable restoration of civil rights process which is challenged in this action. The newly promulgated rules eliminated the automatic, non-discretionary restoration process for qualifying ex-felons utilized by the previous administration and imposed strict waiting periods before ex-felons could apply for restoration of their civil rights without or with a hearing. Fla. R. Exec. Clemency 9-10. Those who committed what the Board deems less serious offenses must wait five years after the completion of their sentences to

apply for restoration of civil rights, and those convicted of more serious felonies must wait seven years.  Coupled with the fact that the Board only meets four times each year and only in Tallahassee, these waiting periods have caused the backlog of pending applications to grow to over 10,000.  Upon information and belief, many applicants wait as many as ten years, if not more, for a hearing before the current Board.  The 2011 revised rules also removed the path to restoration of civil rights without a hearing for those who have remained crime- and arrest-free for fifteen years and eliminated a longstanding provision allowing the Governor and one other Board member to waive the eligibility requirements in Rule 5, if at least two years had passed since the applicant was convicted and no restitution was owed.  Fla. R. Exec. Clemency 8 (2000-2010).  The Rules of Executive Clemency have not been modified since March 9, 2011.

## B. Current Process for Restoration of Civil Rights

40.    Under the current rules, an individual seeking the restoration of his or her civil rights must be eligible for that type of clemency and must submit an Application for Clemency.  Fla. R. Exec. Clemency 5, 6, 9, 10.  This was a significant change from prior versions of the rules, which allowed some ex-felons to regain their civil rights without submitting an application.  The same Application for Clemency is used for all types of clemency: restoration of civil rights for a Florida, federal, military or out-of-state conviction, restoration of alien status under Florida

law, remission of fine or forfeiture, specific authority to own, possess or use firearms, full pardon, and pardon without firearm authority.[17]

41.    The Application for Clemency requires each applicant to provide basic demographic information as well as information and supporting documents on each felony conviction, including certified copies of the charging document, the judgment, and the sentence, community control or probation order.  Fla. R. Exec. Clemency 6.B (2011).  It can be quite time-consuming and costly for an applicant to procure these documents.  Prior to the adoption of the current rules, applications seeking only the restoration of civil rights did not have to be accompanied by these supporting documents.  Fla. R. Exec. Clemency 6.B (2000-2010).

### i. Restoration of Civil Rights Without a Hearing

42.    An individual is eligible to apply for restoration of civil rights without a hearing pursuant to Rule 9 "if the person has committed no crimes and has not been arrested for a misdemeanor or felony for five (5) years from the date of completion of all sentences and conditions of supervision imposed" and a number of other requirements are met.  Fla. R. Exec. Clemency 9.A.[18]  The completion of all

---

[17] Florida Commission on Offender Review, Application for Clemency, *available at* https://www.fcor.state.fl.us/docs/clemency/ClemencyApplication.pdf (last visited Mar. 9, 2017).

[18] Even an arrest for a misdemeanor will reset the five-year clock or force the applicant to wait a total of seven years and apply for restoration with a hearing under Rule 10.

sentences and conditions of supervision includes imprisonment, parole, probation, community control, control release, and conditional release. Fla. R. Exec. Clemency 9.A.1. The individual must have no outstanding detainers or pending criminal charges and must have paid all restitution and other financial obligations. Fla. R. Exec. Clemency 9.A.2, 9.A.3. Finally, the individual must not have been convicted of any crime on a lengthy list of felonies, including but not limited to murder, manslaughter, sexual batteries, drug trafficking and any other first- or second-degree drug offense. Fla. R. Exec. Clemency 9.A.4. This list was significantly expanded from prior versions of the rule governing discretionary restoration without a hearing.

43. All applications submitted for restoration of civil rights without a hearing are reviewed by the Florida Commission on Offender Review. Those applications that meet the requirements of Rule 9.A are included in the preliminary review list of individuals eligible for restoration without a hearing. If the Governor and two other members of the Board approve an individual's restoration of civil rights within 60 days of the preliminary review list's issuance, an executive order granting clemency is issued. If the Governor does not approve an applicant on the preliminary review list, the applicant is notified and may pursue restoration of civil rights with a hearing pursuant to Rule 10. Fla. R. Exec. Clemency 9.B.

## ii. Restoration of Civil Rights With a Hearing

44.     An individual is eligible to apply for restoration of civil rights with a hearing pursuant to Rule 10 so long as there are "no new felony convictions for a period of seven (7) years or more after completion of all sentences imposed for the applicant's most recent felony conviction and all conditions of supervision for the applicant's most recent felony conviction have expired or been completed."  Fla. R. Exec. Clemency 10.A.  Like an applicant for restoration of civil rights without a hearing, the individual must have paid all restitution and other financial obligations.

45.     Each application for restoration of civil rights with a hearing must undergo an investigation by the Florida Commission on Offender Review which results in a report recommending the applicant favorably or unfavorably to the Board.  Once all of these steps are completed, an applicant is placed on the agenda for the next Board hearing, and the applicant is provided with a notice of appearance. Fla. R. Exec. Clemency 11, 12.  The Rules still provide that "[w]hile applicants are not required to appear at the hearing, the Clemency Board encourages applicants to attend."  Fla. R. Exec. Clemency 12.B.

46.     The Board still only holds four hearings per year.  Fla. R. Exec. Clemency 12.A.  Over the last six years, the Board has heard an average of 52 applicants for restoration of civil rights per hearing.  Each meeting is held in Tallahassee which requires many applicants to take two or more days off from work in order to attend and requires many to travel upwards of 500 miles to Tallahassee.

28

47.    At the meeting, each applicant is given five minutes to speak and essentially plead with the Board for clemency and the restoration of his or her civil rights.  Fla. R. Exec. Clemency 12.B.  The Board may grant or deny the applicant, continue the case until the next Board meeting, or take the application under advisement to make a final determination privately by mailing a letter.   All applicants who are denied must wait a minimum of two years before reapplying. Fla. R. Exec. Clemency 14.

48.    The Florida Rules of Executive Clemency do not set forth any rules governing the Board's determinations.  Rule 4 explicitly states that: "The Governor has the unfettered discretion to deny clemency at any time, for any reason."  Fla. R. Exec. Clemency 4.

### C. Effect of the Current Restoration of Civil Rights Process in Florida

49.    Since 2011, only 2,488 applications for restoration of civil rights have been granted by Defendants Scott, Bondi, Atwater, and Putnam.  This number is dramatically lower than the number of applications granted during the previous two administrations: 155,315 during Governor Crist's administration (2007-2011) and 73,508 during Governor Bush's administration (1999-2007).  Restoration of civil rights grants have declined steeply since Governor Scott assumed office in 2011: 1,428 (2001); 6,651 (2002); 14,836 (2003); 24,902 (2004); 11,638 (2005); 14,053 (2006); 38,971 (2007); 85,088 (2008); 25,347 (2009); 5,909 (2010); 78 (2011); 342

(2012); 605 (2013); 562 (2014); 428 (2015); and 473 (2016). This drop-off is largely due to rule changes narrowing the number of ex-felons who are eligible for discretionary restoration without a hearing and the elimination of automatic, non-discretionary restoration, combined with the glacial pace at which the Board processes applicants who require a hearing. The annual figures for restoration without a hearing demonstrate the severe impact of Governor Scott's rules: 1,351 (2001); 6,539 (2002); 14,729 (2003); 24,797 (2004); 11,513 (2005); 13,862 (2006); 38,907 (2007); 85,075 (2008); 25,336 (2009); 5,893 (2010); 52 (2011); 298 (2012); 537 (2013); 504 (2014); 349 (2015); and 373 (2016).

50.    Florida's disenfranchised population is estimated at 1.68 million ex-felons.[19] 10.4 percent of Florida's voting-age population cannot vote due to a felony conviction.[20] Florida's disenfranchised population accounts for more than a quarter of all disenfranchised ex-felons in the country.[21]

51.    The restoration of the right to vote for the 1.68 million disenfranchised former felons rests with the unfettered discretion of Governor Scott and the Board. For the few ex-felons who endure the extensive delays to secure a hearing in front of the Board, what follows is a thoroughly inconsistent and arbitrary process for granting or denying applications for restoration of civil rights.

---

[19] *See supra* note 5 (Table 3).
[20] *Id*. (Figure 2).
[21] *Id*.

52.    Not only is the standard-less process prone to arbitrary and discriminatory treatment, but the Board actually does make decisions in a wholly arbitrary manner.  It grants and denies similarly situated applicants who have speeding or traffic citations, have voted illegally, or have similar post-release drug or alcohol use.  These decisions turn on Governor Scott's whim and the unregulated judgments of the Board.

### D. Unfettered Discretion and Arbitrary Treatment of Ex-Felon Applicants for Restoration of Voting Rights

53.    Members of the Executive Clemency Board routinely emphasize that the Board is "a court of mercy,"[22] and its determinations are untethered to any laws, rules, standards, criteria or constraints of any kind.  The Board frequently refers to vague, amorphous standards such as whether the applicant has "turned [his or her] life around"[23] or has shown remorse.[24]  At the December 7, 2016 Board hearing, Defendant Governor Scott stated: "Clemency is . . . is—there's no standard.  We can

---

[22] Executive Clemency Board Hearing (June 24, 2015 at 00:03:27), *available at* http://thefloridachannel.org/videos/62415-executive-clemency-board-meeting/ (last visited Mar. 9, 2017).

[23] *Id*. at 2:09:26; Executive Clemency Board Hearing (March 22, 2012 at 3:10:20), *available at* http://thefloridachannel.org/videos/32212-executive-clemency-board-meeting/ (last visited March 8, 2017).

[24] Executive Clemency Board Hearing (December 7, 2006) (transcript at 142); Executive Clemency Board Hearing (March 25, 2015 at 3:07:25), http://thefloridachannel.org/videos/32515-executive-clemency-board-meeting/ (last visited Mar. 9, 2017).

do whatever we want. But it's tied to what we said in the beginning, it's tied to remorse."[25]  Governor Scott has also cited the applicant's "attitude" as a relevant criterion for his decisions.[26]  These ad hoc standards are both unascertainable and fatal to uniform application.

54.    If disclosed, the Executive Clemency Board's reasoning in granting or denying applications is purely arbitrary and may often be pretextual.  Similarly situated individuals obtain diametrically opposite results based on the passing whims of the Board members, since nothing regulates their decision-making.  Typically, the Board members probe applicants' records for information relating to whether they are leading reformed lives.  They focus on drug and alcohol use, traffic violations such as speeding or driving with a suspended license, illegal registration and voting, employment status, family and other perceived indicia of living a moral life or having "turned [one's] life around," according to the Board members' beliefs.

55.    One of the most frequent reasons Governor Scott cites for rejecting an application for restoration of civil rights is a record of traffic or moving violations. In these cases, Governor Scott usually states that speeding tickets, driving with a

---

[25] Executive Clemency Board Hearing (December 7, 2016 at 2:02:00-2:02:07), *available at* http://thefloridachannel.org/videos/12716-executive-clemency-board-meeting/ (last visited Mar. 9, 2017).

[26] Executive Clemency Board Hearing (March 25, 2015 at 3:25-3:32), http://thefloridachannel.org/videos/32515-executive-clemency-board-meeting/ (last visited Mar. 9, 2017).

suspended license or other traffic violations are indicative of an unwillingness to abide by the law. That these are minor infractions, not felonies, and that the constitutionally-protected right to vote hangs in the balance does not deter Governor Scott and the other Board members from denying an application on this basis. For instance, at a minimum, the following voting rights restoration applicants have been denied due to their driving records: Eric Rodriguez-Schack (June 15, 2000);[27] James Lee Miller (March 2, 2006);[28] Plaintiff James Michael Hand (December 16, 2011);[29] Dennis Ortega Miller (March 22, 2012);[30] Rex L. Carver (September 20, 2012);[31] and Plaintiff Joseph James Galasso (March 20, 2013).[32] However, in haphazard and arbitrary fashion, the Board will sometimes grant applications, notwithstanding equally lengthy records for the same moving violations. For example, the following applicants were granted despite having a substantial or lengthy record of moving violations, including speeding tickets: Mark Carston Addison (September 21,

---

[27] Executive Clemency Board Hearing (June 15, 2000) (transcript at 85-91).

[28] Executive Clemency Board Hearing (Mar. 2, 2006) (transcript at 263-65).

[29] Executive Clemency Board Hearing (Dec. 16, 2011 at 2:20:08-2:30:40), *available at* http://thefloridachannel.org/videos/121611-executive-clemency-board-meeting/ (last visited Mar. 8, 2017).

[30] Executive Clemency Board Hearing (Mar. 22, 2012 at 2:45:18-2:55:40), *available at* http://thefloridachannel.org/videos/32212-executive-clemency-board-meeting/ (last visited Mar. 8, 2017).

[31] Executive Clemency Board Hearing (Sept. 20, 2012 at 2:17:10-2:21:40), *available at* http://thefloridachannel.org/videos/92012-executive-clemency-board-meeting/ (last visited Mar. 8, 2017).

[32] Executive Clemency Board Hearing (Mar. 20, 2013) (audio only and not available online).

2011);[33] Tameka S. Jordan (March 22, 2012);[34] Charles Douglas (December 13, 2012);[35] Gaston Mirabal (December 13, 2012);[36] Jeremy Lewis (September 25, 2013);[37] Gregory Louis Hansen (December 12, 2013);[38] Anthony Edward Manso (December 12, 2013, despite "so many traffic tickets");[39] Richard Allen Slaughter III (March 19, 2014);[40] Nelson Thomas Cruz (June 18, 2014);[41] Ronald Eugene Thompson (June 18, 2014);[42] Rene De Moya (December 10, 2014);[43] Michael Anson

---

[33] Executive Clemency Board Hearing (Sept. 21, 2011 at 1:51:04-2:01:23), *available at* http://thefloridachannel.org/videos/92111-executive-clemency-board-meeting/ (last visited Mar. 8, 2017)

[34] Executive Clemency Board Hearing (Mar. 22, 2012 at 1:14:12-1:20:28), *available at* http://thefloridachannel.org/videos/32212-executive-clemency-board-meeting/ (last visited Mar. 8, 2017).

[35] Executive Clemency Board Hearing (Dec. 13, 2012 at 1:22:00-1:26:30), *available at* http://thefloridachannel.org/videos/121312-executive-clemency-board-meeting/ (last visited Mar. 8, 2017).

[36] *Id.* at 2:46:23-2:53:13.

[37] Executive Clemency Board Hearing (Sept. 25, 2013 at 2:35:49-2:38:14), *available at* http://thefloridachannel.org/videos/92513-executive-clemency-board-meeting/ (last visited Mar. 8, 2017).

[38] Executive Clemency Board Hearing (Dec. 12, 2013 at 2:18:54-2:20:05), *available at* http://thefloridachannel.org/videos/121213-executive-clemency-board-meeting/ (last visited Mar. 8, 2017).

[39] *Id.* at 2:21:14-2:22:40.

[40] Executive Clemency Board Hearing (Mar. 19, 2014 at 3:09:20-3:12:16), *available at* http://thefloridachannel.org/videos/031914-executive-clemency-board-meeting/ (last visited Mar. 8, 2017).

[41] Executive Clemency Board Hearing (June 18, 2014 at 2:13:05-2:15:45), *available at* http://thefloridachannel.org/videos/61814-executive-clemency-board-meeting/ (last visited Mar. 8, 2017).

[42] *Id.* at 2:48:14-2:49:39.

[43] Executive Clemency Board Hearing (Dec. 10, 2014 at 3:19:30-3:23:05), *available at* http://thefloridachannel.org/videos/121014-executive-clemency-board-meeting/ (last visited Mar. 8, 2017).

Smith (December 9, 2015);[44] and Elizabeth Gonzalez (December 9, 2015).[45]  The
reasons for this disparate treatment are elusive.

56.    On occasion, the Board randomly imposes conditions on the restoration
of civil rights to individuals with moving violations.  The Board granted Tim Jones's
restoration application at the March 2, 2006 hearing, despite a "long list" of traffic
violations, but delayed the restoration of his right to vote until he completed a year
without a new moving violation.[46]  In June 24, 2015, Edwin Scheer, who had "the
worst" traffic record the Board had seen, was also given a conditional grant but the
probationary period was set at two years.[47]  Governor Scott and the other Board
members never explain why these individuals are more worthy of restoration or why
their lengthy list of traffic violations does not militate in favor of a denial until they
no longer violate any traffic laws.  On information and belief, conditional grants
appear to be used only for applicants with records of moving violations.  The Board
acts in a wholly arbitrary fashion with uncontrolled, standard-less discretion to
approve some applicants and deny others, even if these decisions cannot be

---

[44] Executive Clemency Board Hearing (Dec. 9, 2015 at 1:29:57-1:41:26), *available
at*   http://thefloridachannel.org/videos/12915-executive-clemency-board-meeting-
part-2/ (last visited Mar. 8, 2017).
[45] *Id*. at 00:19:13-00:21:13.
[46] Executive Clemency Board Hearing (Mar. 2, 2006) (transcript at 271-75).
[47] Executive Clemency Board Hearing (June 24, 2015 at 1:08:59-2:12:31), *available
at*   http://thefloridachannel.org/videos/62415-executive-clemency-board-meeting/
(last visited Mar. 8, 2017).

reconciled in any logical fashion to ensure any degree of horizontal equity across cases.

57.    Some ex-felon restoration applicants are denied for drug use subsequent to the completion of their sentences.  Others are granted, notwithstanding a record of post-sentence drug use.  The Executive Clemency Board arbitrarily denies restoration applicants on the basis of subsequent drug use after the completion of the applicant's sentence, regardless of whether the charges resulted in a conviction.  Governor Scott and the other Board members routinely question applicants over their past and present drug use or lack thereof, even if drugs played no role in their criminal records.  They especially probe the applicant's drug use if he or she was convicted of a drug trafficking offense or if drug use played a role in the offense.  These interrogations reveal how vulnerable the clemency process is to discrimination, including viewpoint discrimination.

58.    Examples of arbitrary determinations abound when the Board is confronted with a record of subsequent drug use.  At the December 9, 2015 Board hearing, Michael Lee Hazelwood's application was denied after he admitted that he occasionally smokes marijuana because it helps him sleep,[48] and Paul Antoine's application was denied at the March 3, 2016 hearing because of a 2008 cocaine

---

[48] Executive Clemency Board Hearing (Dec. 9, 2015 at 1:06:22-1:09:16), *available at*  http://thefloridachannel.org/videos/12915-executive-clemency-board-meeting-part-2/ (last visited Mar. 8, 2017).

possession charge, on which prosecutors took no action.[49]  At the December 16, 2011
Board hearing, Brandon Garth Bloch was denied in large part because of marijuana
possession in 2010 and post-sentence drug use.[50]  Additionally, some applicants are
even denied for drug use which precedes their sentences.  For example, after his
hearing on December 9, 2015, Kevin Michael Grenier was denied restoration of his
civil rights because he had failed a drug test prior to his incarceration over 15 years
before his hearing, and because Board members believed that he had not finished a
court-ordered drug treatment program when he was 16 years old.[51]  However, at the
September 21, 2016 Board hearing, Roger Simon admitted to continued marijuana
use following his completed sentence for drug trafficking[52] and, at the December
2016 hearing, Melissa Beth Ann-Miller admitted that she smoked marijuana as
recently as 2012.[53]  Despite these admissions of continued drug use, both Mr.

---

[49]  Executive Clemency Board Hearing (Mar. 3, 2016 at 00:42:06-00:45:23),
*available at* http://thefloridachannel.org/videos/3316-executive-clemency-board-meeting-part-3/ (last visited Mar. 8, 2017).
[50] Executive Clemency Board Hearing (Dec. 16, 2011 at 1:50:26-2:07:47), *available at* http://thefloridachannel.org/videos/121611-executive-clemency-board-meeting/ (last visited Mar. 8, 2017).
[51] Executive Clemency Board Hearing (Dec. 9, 2015 at 1:00:49-1:06:04), *available at* http://thefloridachannel.org/videos/12915-executive-clemency-board-meeting-part-2/ (last visited Mar. 8, 2017).
[52] Executive Clemency Board Hearing (Sept. 21, 2016 at 4:05:15-4:11:05), *available at* http://thefloridachannel.org/videos/92116-executive-clemency-board-meeting-part-2/ (last visited Mar. 8, 2017).
[53] Executive Clemency Board Hearing (Dec. 7, 2016 at 2:07:01-2:10:36), *available at* http://thefloridachannel.org/videos/12716-executive-clemency-board-meeting/ (last visited Mar. 8, 2017).

Simon's and Ms. Ann-Miller's applications for restoration of civil rights were nevertheless granted.  Similarly, at the September 20, 2012 hearing, Brian Ohle's voting rights were restored notwithstanding the fact that he had used drugs in 2007 following his conviction for a crime committed while intoxicated.[54]  At the March 19, 2014 hearing, it was noted that Danny Cuesta, who had previously been convicted of a federal drug offense, was re-arrested in 2001 for possession of cocaine at a nightclub.[55]  Despite this fact, the Board restored Mr. Cuesta's civil rights. Governor Scott will also arbitrarily ask certain applicants whether they still use drugs and then skip this question for others.  It is impossible to reconcile all of these cases other than by reference to the passing whims of the Board members and the undisclosed reasons for rejecting particular applicants.   An applicant's race, ethnicity, religion, failure to identify with any religion, dress, manner of speech, as well as a guess as to the applicant's political inclinations and views, might all play a role in these seemingly random denials.  A system of absolute discretion in licensing is a license to discriminate.

---

[54] Executive Clemency Board Hearing (Sept. 20, 2012 at 1:49:48-1:56:38), *available at* http://thefloridachannel.org/videos/92012-executive-clemency-board-meeting/ (last visited Mar. 8, 2017).
[55] Executive Clemency Board Hearing (Mar. 19, 2014 at 2:11:37-1:13:59), *available at* http://thefloridachannel.org/videos/031914-executive-clemency-board-meeting/ (last visited Mar. 8, 2017).

59.    Alcohol use is another frequent focus of the Board members' interrogations.  The Executive Clemency Board arbitrarily denies applicants for restoration of civil rights on the basis of subsequent alcohol use after the completion of the sentence.  Restoration applicants routinely face questioning by Governor Scott and the other Board members over their use of alcohol, even if alcohol played no role in their criminal record but especially if they were convicted of DUI manslaughter or any other offense in which intoxication played a substantial role. For some applicants who were previously convicted of DUI manslaughter, Governor Scott has zero tolerance for even infrequent, responsible drinking at social occasions like weddings.  At the June 2, 2011, December 13, 2012 and September 25, 2013 hearings, the Board denied Ronald Kessler,[56] Brent Walter Rouse[57] and Robert Allen Parsons'[58] applications, respectively, citing their continued drinking following sentences for DUI manslaughter, even if the applicants represented that their drinking was rare and responsible.  For example, Governor Scott told Mr. Rouse that if he had his criminal background, he would never drink again: "[U]ntil you stop

---

[56] Executive Clemency Board Hearing (June 2, 2011 at 1:39:41-1:46:22), *available at*   http://thefloridachannel.org/videos/621111-executive-clemency-board-meeting/ (last visited Mar. 8, 2017).

[57] Executive Clemency Board Hearing (Dec. 13, 2012 at 3:24:55-3:35:30), *available at*   http://thefloridachannel.org/videos/121312-executive-clemency-board-meeting/ (last visited Mar. 8, 2017).

[58] Executive Clemency Board Hearing (Sept. 25, 2013 at 4:16:34-4:21:42), *available at*   http://thefloridachannel.org/videos/92513-executive-clemency-board-meeting/ (last visited Mar. 8, 2017).

drinking I would never ever—if I was in an accident and somebody died I would never touch alcohol again."[59]

60. At other times, Governor Scott questions applicants who were intoxicated at the time of their offenses and, after confirming that their present drinking is minimal, occasional and/or responsible, moves to grant the application. For example, at the June 2, 2011 Board hearing, James Labossiere's restoration application was granted despite stating that he still drinks following his conviction for a crime he committed while intoxicated.[60] At the March 22, 2012 hearing, the Board restored Gerald Bryan Kelly's voting rights even though he informed Governor Scott that he drinks on occasion after having served time for a DUI manslaughter conviction.[61] At the September 20, 2012 hearing, Brian Ohle's application was granted even though he admitted to both alcohol and drug use after his conviction for his crime and as recently as five years prior to his hearing.[62] At

---

[59] Executive Clemency Board Hearing (Dec. 13, 2012 at 3:35:10), *available at* http://thefloridachannel.org/videos/121312-executive-clemency-board-meeting/ (last visited Mar. 8, 2017).

[60] Executive Clemency Board Hearing (June 2, 2011 at 2:44:17-3:00:10), *available at* http://thefloridachannel.org/videos/621111-executive-clemency-board-meeting/ (last visited Mar. 8, 2017).

[61] Executive Clemency Board Hearing (Mar. 22, 2012 at 2:20:56-2:33:07), *available at* http://thefloridachannel.org/videos/32212-executive-clemency-board-meeting/ (last visited Mar. 8, 2017).

[62] Executive Clemency Board Hearing (Sept. 20, 2012 at 1:49:48-1:56:38), *available at* http://thefloridachannel.org/videos/92012-executive-clemency-board-meeting/ (last visited Mar. 8, 2017).

the June 26, 2013 hearing, another DUI manslaughter ex-felon Ronald Burgess

Kilpatrick's application was granted, even though he drinks on occasion.[63]  Finally,

at the December 2016 hearing, Jason Lehlbeck, who was convicted of DUI reckless

driving, was re-enfranchised despite his admission that he drinks about four to six

drinks per week.[64]  Governor Scott's zero tolerance policy for drinking by those

convicted of DUI crimes is randomly applied.  It may be just another pretextual

reason and it once again underscores the erratic, arbitrary nature of the Board's

decision-making.

61.    The Executive Clemency Board has been similarly inconsistent in

handling applicants who have unlawfully registered and voted, even though in

almost all cases the applicant represents that they did not do so knowingly.  In 2011,

Governor Scott rejected at least five different applicants because they had unlawfully

registered and voted as ex-felons, even when these individuals pleaded that they did

not do so knowingly and that they were given misinformation by local and state

officials.  They include: Dorothy Tabb Bucknor (February 24, 2011);[65] Leon Gillis

---

[63] Executive Clemency Board Hearing (June 26, 2013 at 2:19:19-2:27:35), *available at* http://thefloridachannel.org/videos/62613-executive-clemency-board-meeting/ (last visited Mar. 8, 2017).

[64] Executive Clemency Board Hearing (Dec. 7, 2016 at 2:48:08-2:53:55), *available at* http://thefloridachannel.org/videos/12716-executive-clemency-board-meeting/ (last visited Mar. 8, 2017).

[65] Executive Clemency Board Hearing (Feb. 24, 2011 at 1:50:32-1:56:00), *available at* http://thefloridachannel.org/videos/22411-executive-clemency-board-meeting/ (last visited Mar. 8, 2017).

III (June 2, 2011);[66] Tiffany Paramore (December 16, 2011);[67] Donald Charles Green (December 16, 2011);[68] and Elston Roberto Joyner (December 16, 2011).[69] For Ms. Paramore, Governor Scott said he would be more comfortable when she re-applied in two years, begging the question why the Board would excuse her illegal voting in two years, if it was unprepared to do so at the 2011 hearing.  Following statements by Defendants CFO Atwater and Commissioner Putnam criticizing the Department of Corrections and the County Supervisors of Elections for their failure to educate ex-felons on their disenfranchisement, it appears Governor Scott's Executive Clemency Board has not denied anyone solely for illegal voter registration and/or voting.  However, upon information and belief, the Board did not seek to revisit and reverse the denials of those applicants rejected in 2011 for illegal voting. For those applicants, their uncorrected denials remain irreconcilable and arbitrary.

62.    Since the fate of every applicant's right to vote rests in the unconstrained discretion of four governmental officials, the clemency process is vulnerable to viewpoint discrimination including discrimination on the basis of

---

[66] Executive Clemency Board Hearing (June 2, 2011 at 2:09:06-2:16:49), *available at*   http://thefloridachannel.org/videos/621111-executive-clemency-board-meeting/ (last visited Mar. 8, 2017).

[67] Executive Clemency Board Hearing (Dec. 16, 2011 at 3:10:13-3:19:59), *available at*   http://thefloridachannel.org/videos/121611-executive-clemency-board-meeting/ (last visited Mar. 8, 2017).

[68] *Id*. at 2:11:23-2:19:40.

[69] *Id*. at 2:46:39-2:51:43.

political party affiliation.  There are no rules prohibiting such discriminatory treatment and no way to police the process for such discrimination because the Executive Clemency Board members do not always disclose their reasons for granting or denying an application.  The Board can try to infer an applicant's political leanings based on his or her statements, residence address, race or ethnicity and even perhaps information outside the case file presented by the Office of Clemency Investigations, and then act on that ulterior basis.  Given these circumstances, it is unsurprising that certain applicants and their supporting witnesses make partisan appeals to the Governor and other Board members.

63.    Applicants and witnesses on their behalf signal political leanings and policy preferences, sometimes quite explicitly.  For instance, a 25-year veteran of law enforcement testified on behalf of Patrick Durden at the March 3, 2016 hearing, stating that Mr. Durden should be able "to vote, to be a part of the process—to be a part of the political process, whether it's seeking office or to vote or to serve on a jury, this is the type of person that we want out there doing . . . Beyond his conservative views which are in all of our favor. . . ."[70]  Mr. Durden's civil rights were restored.  Some applicants have sought to curry favor by identifying themselves with the current Governor's political party in subtle or more overt ways.  These

---

[70] Executive Clemency Board Hearing (Mar. 3, 2016 at 00:58:32-1:08:30), *available at*  http://thefloridachannel.org/videos/3316-executive-clemency-board-meeting-part-3/ (last visited Mar. 9, 2017).

statements may well make the difference or give board members a reason to grant an application, even though similarly situated applicants have been denied. A system of unregulated discretion to license ex-felons to vote allows current and future Board members of *any* political party to use the clemency power for partisan ends. Such a system is highly vulnerable to viewpoint discrimination, which can be easily camouflaged by a variety of stated, pretextual reasons for denying or granting particular applicants. At the December 12, 2013 hearing, applicant Stephen A. Warner was challenged on his recent illegal voting in 2010, and he responded by saying he had voted for Governor Scott: "I voted for you." Notwithstanding the illegal voting on his record and the fact that other applicants had been denied on this basis in 2011, the Board proceeded to grant Mr. Warner's application for restoration of civil rights.[71] At the December 7, 2016 hearing, a Tallahassee police officer spoke in favor of Robert Arnold Martin's application and also sought to appeal to the Board's political preferences by stating "he is very conservative"—Mr. Martin's application was granted.[72] And at the June 24, 2015 Board hearing, Scott Moore

---

[71] Executive Clemency Board Hearing (Dec. 12, 2013 at 3:47:38-3:50:19), *available at* http://thefloridachannel.org/videos/121213-executive-clemency-board-meeting/ (last visited Mar. 9, 2017).

[72] Executive Clemency Board Hearing (Dec. 7, 2016 at 2:02:53-2:06:45), *available at* http://thefloridachannel.org/videos/12716-executive-clemency-board-meeting/ (last visited Mar. 9, 2017).

regained his right to vote after his wife testified to "his conservative principles."[73] By contrast, on September 20, 2012, Rex L. Carver, a military veteran, spoke forcefully at his hearing on the injustice of felon disenfranchisement and the need to protect the fundamental right to vote.[74]  Discounting the evidence that Mr. Carver had indeed turned away from crime and was gainfully employed, Governor Scott simply noted that the applicant had a record of traffic violations and stated: "If you look at it from our standpoint, you look at it and you say, gosh this is an individual that doesn't worry about complying with the law."[75]  Mr. Carver's application was denied.  While these are examples from a Republican administration, in the future, the Executive Clemency Board may be controlled by a Democratic or Libertarian administration.  From 1991 to 1998, Florida's Governor was a Democrat.  The problem with these discretionary restoration decisions exists no matter who is in office.  This is precisely why politicians should not be given unfettered discretion to decide who can vote.

64.    Further examples of the Board's arbitrariness abound.  Even though Governor Scott's Executive Clemency Board adopted five- and seven-year waiting

---

[73] Executive Clemency Board Hearing (June 24, 2015 at 2:37:47-2:42:51), *available at*   http://thefloridachannel.org/videos/62415-executive-clemency-board-meeting/ (last visited Mar. 9, 2017).

[74] Executive Clemency Board Hearing (September 20, 2012 at 2:17:10-2:21:40), *available at* http://thefloridachannel.org/videos/92012-executive-clemency-board-meeting/ (last visited Mar. 9, 2017).

[75] *Id*. at 2:21:08.

periods before ex-felons could even apply for restoration of civil rights, the Governor nevertheless frequently denies applicants by noting simply and cryptically that "more time needs to pass."[76]    There is no consistency in these snap determinations as to what constitutes an adequate amount of time between the completion of a sentence and re-enfranchisement.    At the December 16, 2011 hearing, the Board noted it had been less than ten years since Timothy John Faulker[77] and Plaintiff Harold William Gircsis, Jr.[78] were released.    At the June 2, 2011 hearing, Governor Scott told Anna McFarland Wood that she needs to be crime-free for a longer period of time than four years,[79] and he told Stephen Edward Crain that he would like to wait a little longer.[80]  Every year applicants are denied because the Governor on whim determines that not enough time has passed since the sentence was completed: Shawn Hughes (December 16, 2011);[81] Michael L. Price (March 22,

---

[76] Executive Clemency Board Hearing (December 9, 2015 at 1:23:40-1:23:45), *available at* http://thefloridachannel.org/videos/12915-executive-clemency-board-meeting-part-2/ (last visited Mar. 10, 2017).

[77] Executive Clemency Board Hearing (December 16, 2011 at 1:24:01-1:24:58), *available at* http://thefloridachannel.org/videos/121611-executive-clemency-board-meeting/ (last visited Mar. 9, 2017).

[78] *Id.* at 1:25:01-1:26:03.

[79] Executive Clemency Board Hearing (June 2, 2011 at 4:05:18-4:16:35), *available at* http://thefloridachannel.org/videos/621111-executive-clemency-board-meeting/ (last visited Mar. 9, 2017).

[80] *Id.* at 2:02:04-2:08:23.

[81] Executive Clemency Board Hearing (December 16, 2011 at 2:30:50-2:37:22), *available at* http://thefloridachannel.org/videos/121611-executive-clemency-board-meeting/ (last visited Mar. 9, 2017).

2012; "needs a little more time");[82] Luis Frederico Zouain (March 22, 2012; "it's only been eleven years");[83] Charles Williamson (December 13, 2012; "more time ought to pass");[84] Virginia Atkins (June 26, 2013; "at this point I don't feel comfortable" despite her release from incarceration 10 years earlier);[85] and Gene Alan Rothstein (December 12, 2013; "more time needs to pass").[86]  At the March 19, 2014 Board hearing, Governor Scott denied Vinicio Marmolejos's application, telling him that he had started heading in the right direction but that he would "like more time to change your life and to show that you have changed."[87]  Governor Scott and the other Board members effectively substitute their own judgment for that of the courts and the Florida Commission on Offender Review which decide how long a criminal sentence or period of post-sentence supervision should be.  The Board is

---

[82] Executive Clemency Board Hearing (March 22, 2012 at 3:06:48-3:10:38), *available at* http://thefloridachannel.org/videos/32212-executive-clemency-board-meeting/ (last visited Mar. 9, 2017).

[83] *Id*. at 3:17:32-3:22:48.

[84] Executive Clemency Board Hearing (December 13, 2012 at 3:46:23-3:51:31), *available at* http://thefloridachannel.org/videos/121312-executive-clemency-board-meeting/ (last visited Mar. 9, 2017).

[85] Executive Clemency Board Hearing (June 26, 2013 at 2:52:17-2:56:02), *available at* http://thefloridachannel.org/videos/62613-executive-clemency-board-meeting/ (last visited Mar. 9, 2017).

[86] Executive Clemency Board Hearing (December 12, 2013 at 3:21:53-3:26:52), *available at* http://thefloridachannel.org/videos/121213-executive-clemency-board-meeting/ (last visited Mar. 9, 2017).

[87] Executive Clemency Board Hearing (March 19, 2014 at 2:52:51-2:55:20), *available at* http://thefloridachannel.org/videos/031914-executive-clemency-board-meeting/ (last visited Mar. 9, 2017).

essentially given the unchecked power to indefinitely extend a sentence when it comes to that ex-felon's civil rights.

65.    Finally, the Executive Clemency Board also arbitrarily enforces its own rules for processing and adjudicating clemency applications.  As previously noted, an applicant for restoration of civil rights is only eligible for restoration without a hearing under Rule of Executive Clemency 9, if he or she has not been convicted of a crime on a list of selected felonies.  Fla. R. Exec. Clemency 9.A.4.  Otherwise, if the applicant has been convicted of a felony on that list, he or she must be processed under Rule of Executive Clemency 10, which requires a seven-year waiting period and a hearing.  Plaintiff William Bass has recently been denied for restoration without a hearing and referred to the Office of Clemency Investigations for an investigation and ultimately a hearing on his application.  However, the requirements of Rules 9 and 10 seem to be arbitrarily waived for certain applicants.  Roderick Kemp, who – on information and belief – had pled guilty to a second-degree felony for possession with intent to deliver under FLA. STAT. ANN. §§ 893.13(1)(a)(1), 893.03(2)(a) back in 1986 and who had applied for a pardon in 2015, suddenly received a letter in the mail with an enclosed certificate announcing his civil rights had been restored by executive order dated January 13, 2017.  While Mr. Kemp has waited much more than 5 or 7 years after completing his sentence, no hearing had ever been scheduled for his case, and he was granted restoration without a hearing,

even though individuals convicted of "second degree felonies described in F.S. Chapter 893" are ineligible for restoration without a hearing under Rule 9. The Executive Clemency Board's selective leniency and fast-tracking in this case appears to be a direct result of the fact that Mr. Kemp's case had garnered public attention in the media and a recent documentary film produced by the Florida Center for Investigative Reporting. Of course, not all of the estimated 1.68 million disenfranchised ex-felons in Florida will be able to garner media attention if that compels the Board's attention and a waiver of its own rules. Similarly, the Board sometimes creates ad hoc rules. At the March 3, 2016 hearing, the Board denied two applicants and imposed a 50-year waiting period before they could reapply, effectively disenfranchising applicant David Bruce Easterling – who was 54 years old at the time – for life.[88]

## CLASS ACTION ALLEGATIONS

### *PLAINTIFF CLASS (COUNTS 1-3)*

66.    Plaintiffs bring this action on behalf of themselves and all those similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2). The Plaintiff Class is defined as:

---

[88] Executive Clemency Board Hearing (March 3, 2016 at 1:08:37-1:16:23), *available at* http://thefloridachannel.org/videos/3316-executive-clemency-board-meeting-part-3/ (last visited Mar. 9, 2017).

49

> Any current or future resident of the State of Florida who is a United States citizen, at least 18 years of age, not disqualified under the mental incapacitation provisions in FLA. CONST. art. VI, § 4(a) and FLA. STAT. ANN. § 97.041(2)(a), who is disenfranchised under Florida state law by reason of a prior felony conviction under FLA. CONST. art. VI, § 4(a) and FLA. STAT. ANN. § 97.041(2)(b) and who has completed his or her full sentence for all felony convictions including any period of parole, probation, supervised release and/or community control and any other condition of supervision.

67.    It is estimated that 1.68 million Floridians are disenfranchised by reason of a prior felony conviction.[89]  10,513 applicants for restoration of civil rights were pending in the Executive Clemency Board's backlog as of March 1, 2017.  More ex-felons complete their sentences including parole, probation and/or supervised release every month.  According to the Florida Department of Corrections, "[a]pproximately 39,727 (46.1%) offenders completed their sentences successfully" in FY 2014-2015.[90]   In FY 2015-2016, the Office of Executive Clemency received 6,462 clemency applications.[91]

68.    Questions of law are common to the class including: (1) whether Florida state law governing felon disenfranchisement and re-enfranchisement by

---

[89] *See supra* note 5 (Table 3).

[90] Florida Department of Corrections, Annual Report Fiscal Year 2014-2015, at 54, *available at* http://www.dc.state.fl.us/pub/annual/1415/FDC_AR2014-15.pdf (last visited Mar. 10, 2017).

[91] Florida Commission on Offender Review: 2015-2016 Annual Report, at 8, *available                                                                                                          at* https://www.fcor.state.fl.us/docs/reports/FCORannualreport201516.pdf (last visited Mar. 9, 2017).

way of the Executive Clemency Board's restoration process violates the First Amendment's guarantee against prior restraints vesting government officials with unfettered discretion to arbitrarily issue or deny licenses or permits to engage in speech, association and/or any other activity or conduct protected by the First Amendment to the United States Constitution; (2) whether Florida state law governing felon disenfranchisement and re-enfranchisement violates the Fourteenth Amendment's prohibition on arbitrary allocation of the franchise; and (3) whether the lack of any definite time limits in Florida state law governing felon disenfranchisement and re-enfranchisement for processing and making decisions on applications for the restoration of voting rights violates the First Amendment requirement that government officials authorized to license speech, association and/or any other activity or conduct protected by the First Amendment to the United States Constitution process applications and make their determinations within a defined time period. The factual questions that are relevant to these three legal questions reflecting Claims 1, 2 and 3 are all common to the class and will have answers that are common to the class as a whole as well.

69.    Plaintiffs' claims are typical of the class. Since this is a facial challenge to a set of unconstitutional laws and procedures, Plaintiffs all suffer the same constitutional injury regardless of whether their applications for restoration of civil rights have been denied, are still pending or have not yet been filed. All the Plaintiffs

and all members of the proposed Plaintiff Class are subjected to a set of felon disenfranchisement and re-enfranchisement laws and procedures which condition the restoration of their First Amendment-protected right to vote on the unfettered discretion of the Executive Clemency Board.  As a consequence of this unlawful prior restraint, all Plaintiffs' voting rights are subject to the Board's unconstitutionally arbitrary decision-making or arbitrary allocation of the franchise; and all Plaintiffs are subjected to a scheme which lacks definite time limits on the licensing authority's ultimate determinations.

70.    Plaintiffs will fairly and adequately represent the interests of all members of the proposed class because they seek relief on behalf of the class as a whole and have no interests antagonistic to other members of the class.  Plaintiffs, like other members of the proposed Plaintiff Class, face a set of felon disenfranchisement and re-enfranchisement laws and procedures which condition the restoration of their First Amendment-protected right to vote on the unconstitutionally unfettered discretion of government officials, a voter-licensing scheme which arbitrarily allocates the franchise and lacks any time limits on the processing and adjudication of applications.  They seek to have FLA. CONST. art. VI, § 4(a), FLA. STAT. ANN. § 97.041(2)(a), FLA. CONST. art. VI, § 4, FLA. CONST. art. IV, § 8, FLA. STAT. ANN. § 944.292(1) and the Florida Rules of Executive Clemency declared unlawful and permanently enjoined so that upon any ex-felon's completion

of his or her full sentence including any period of parole, probation and/or supervised release, he or she will be automatically and immediately restored to his or her voting rights. This will obviate the need – pursuant to FLA. CONST. art. VI, § 4(a), FLA. STAT. ANN. § 97.041(2)(a), FLA. CONST. art. VI, § 4, FLA. CONST. art. IV, § 8, FLA. STAT. ANN. § 944.292(1) and the Florida Rules of Executive Clemency – to petition the Executive Clemency Board for and secure the restoration of their voting rights by a full pardon, conditional pardon or restoration of civil rights pursuant to Art. IV, Sec. 8 of the Florida Constitution.

71. Proposed class counsel will fairly and adequately represent the class. Proposed class counsel is experienced with civil rights litigation, including voting rights cases and class actions.

72. Defendants have acted and will continue to act on grounds generally applicable to the Plaintiff Class in requiring disenfranchised ex-felons – pursuant to FLA. CONST. art. VI, § 4(a), FLA. STAT. ANN. § 97.041(2)(a), FLA. CONST. art. VI, § 4, FLA. CONST. art. IV, § 8, FLA. STAT. ANN. § 944.292(1) and the Florida Rules of Executive Clemency – to petition the Executive Clemency Board for and secure the restoration of voting rights by a full pardon, conditional pardon, or restoration of civil rights granted pursuant to Art. IV, Sec. 8 of the Florida Constitution, before they can register to vote and vote. Final declaratory and injunctive relief is appropriate with respect to the Plaintiff Class.

## SUBCLASS A (COUNT 4)

73.     Plaintiff Yraida Leonides Guanipa seeks to represent a subclass (Subclass A), which is a subset of the Plaintiff Class and defined as:

> Any current or future resident of the State of Florida who is a United States citizen, at least 18 years of age, not disqualified under the mental incapacitation provisions in FLA. CONST. art. VI, § 4(a) and FLA. STAT. ANN. § 97.041(2)(a), who is disenfranchised under Florida state law by reason of a prior felony conviction under FLA. CONST. art. VI, § 4(a) and FLA. STAT. ANN. § 97.041(2)(b) and who has completed his or her full sentence for all felony convictions including any period of parole, probation, supervised release and/or community control and any other condition of supervision, but who has not yet waited 5 or 7 years – whichever is applicable to the individual – since the completion of his or her sentence as required to apply for restoration of civil rights under Florida Rules of Executive Clemency 9 and 10, respectively.

74.     Again, it is estimated that 1.68 million Floridians are disenfranchised by reason of a prior felony conviction.[92]   10,513 applicants for restoration of civil rights were pending in the Executive Clemency Board's backlog as of March 1, 2017.   More ex-felons complete their sentences including parole, probation and/or supervised release every month.   According to the Florida Department of Corrections, "[a]pproximately 39,727 (46.1%) offenders completed their sentences successfully" in FY 2014-2015.[93]   Accordingly, at a minimum, there are at least tens

---

[92] *See supra* note 5 (Table 3).

[93] Florida Department of Corrections, Annual Report Fiscal Year 2014-2015, at 54, *available at* http://www.dc.state.fl.us/pub/annual/1415/FDC_AR2014-15.pdf (last visited Mar. 10, 2017).

of thousands of Subclass A members who have not yet completed their 5- or 7-year waiting periods following the completion of their sentences in accordance with Florida Rules of Executive Clemency 9 and 10.

75.    Questions of law and fact are common to Subclass A including: whether the requirement under Florida Rules of Executive Clemency 9 and 10 for ex-felons to wait 5 or 7 years following sentence completion before applying for restoration of voting rights, constitutes an undue burden on the right to vote not justified by the state's interests and therefore violates the First and Fourteenth Amendments to the U.S. Constitution.  These waiting periods are "severe restriction[s]" which are not "narrowly drawn to advance a state interest of compelling importance." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).  Even if the Court were to find they constitute "reasonable, nondiscriminatory restrictions," they are not justified by "the State's important regulatory interests."  *Id*.  The balancing of the restriction against the state's interests is a common question of fact and law for the entirety of Subclass A, since the burden of the 5- and 7-year waiting periods after the completion of a sentence does not vary from subclass member to subclass member.  Each Subclass A member suffers the same injury in being required effectively to serve an unnecessary, de facto second sentence before applying for the restoration of his or her voting rights.

76.     Plaintiff Yraida Leonides Guanipa's claim is typical of Subclass A's members' claims under Count Four.  Subclass A members all suffer the same injury of being forced to endure an unnecessary, de facto second sentence before applying for restoration of their voting rights.  Ms. Guanipa and all members of the proposed Subclass A are subjected to the severe restriction of a pre-application 5- or 7-year waiting period, which is not narrowly drawn to advance a state interest of compelling importance.  Nor does it further an important regulatory interest.

77.     Plaintiff Yraida Leonides Guanipa will fairly and adequately represent the interests of all members of the proposed subclass because she seeks relief on behalf of Subclass A as a whole and has no interests antagonistic to other members of the subclass.  Ms. Guanipa, like other members of proposed Subclass A, faces an unconstitutionally severe restriction in the waiting period requirements imposed by the Executive Clemency Board in 2011.  Ms. Guanipa and the members of proposed Subclass A seek to have the 5- and 7-year waiting period requirements imposed in Florida Rules of Executive Clemency 9 and 10 declared unlawful and permanently enjoined as undue burdens on the right to vote in violation of the First and Fourteenth Amendments to the U.S. Constitution.

78.     Proposed class counsel will fairly and adequately represent the class. Proposed class counsel is experienced with civil rights litigation, including voting rights and First Amendment cases.

79.    Defendants have acted and will act on grounds generally applicable to Subclass A in requiring disenfranchised ex-felons who have completed their full sentences to wait 5 or 7 years, pursuant to Florida Rules of Executive Clemency 9 and 10, respectively, before applying for the restoration of their voting rights.  Final declaratory and injunctive relief is appropriate with respect to Subclass A.

## CLAIMS

### COUNT ONE
### (All Plaintiffs and Plaintiff Class)
### (Unfettered Official Discretion and Arbitrary Treatment in Violation of First Amendment to the United States Constitution and 42 U.S.C. § 1983)

80.    The factual allegations contained in the preceding paragraphs are incorporated into Count One, as though fully set forth herein.

81.    Plaintiffs assert a claim pursuant to 42 U.S.C. § 1983 for violation of the First Amendment to the U.S. Constitution.

82.    The First Amendment provides that: "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. CONST. amend. I, § 1.

83.    The First Amendment protects the right to vote because voting is both a form of speech or expressive conduct and a means of political association.  *Doe v. Reed*, 561 U.S. 186, 195-96 & n.1 (2010); *id.* at 224 (Scalia, J., concurring) ("We have acknowledged the existence of a First Amendment interest in voting . . .")

(citing *Burdick v. Takushi*, 504 U.S. 428 (1992)); *California Democratic Party v. Jones*, 530 U.S. 567, 574 (2000); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 354-57 (1997); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341-43 (1995); *Burdick v. Takushi*, 504 U.S. 428, 434, 437-39 (1992); *Norman v. Reed*, 502 U.S. 279, 288-90 (1992); *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 214-17 (1986); *Munro v. Socialist Workers Party*, 479 U.S. 189, 193, 199 (1986); *Anderson v. Celebrezze*, 460 U.S. 780, 787-89 (1983); *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979); *Storer v. Brown*, 415 U.S. 724, 728-29 (1974); *Kusper v. Pontikes*, 414 U.S. 51, 56-58 (1973); *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968).  Because registration is a prerequisite to and/or enables voting in primary and general elections, it too is protected by the First Amendment.  *See Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 400 (2000) (Breyer, J., concurring) ("[A] decision to contribute money to a campaign is a matter of First Amendment concern—not because money *is* speech (it is not); but because it *enables* speech.") (emphasis in original).

84.    The First Amendment forbids vesting government officials with unfettered discretion to issue or deny licenses or permits to engage in any First Amendment-protected speech, expressive conduct, association or any other protected activity or conduct.  *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130-33 (1992) ("The First Amendment prohibits the vesting of such unbridled

discretion in a government official."); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763-64 (1988) ("[A] law or policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship. This danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official."); *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 153 (1969) ("[A government] may not empower its licensing officials to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade according to their own opinions regarding the potential effect of the activity in question on the 'welfare,' 'decency,' or 'morals' of the community."); *Cox v. State of Louisiana*, 379 U.S. 536, 554-58 (1965); *Staub v. City of Baxley*, 355 U.S. 313, 322 (1958) ("It is settled by a long line of recent decisions of this Court that an ordinance which, like this one, makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms."); *Niemotko v. State of Md.*, 340 U.S. 268, 271-73 (1951) (striking down prior restraint on use of parks, noting that hearing focused on "alleged refusal to salute the flag, their views on the Bible, and other issues irrelevant to unemcumbered [*sic*] use of the public parks" and that Mayor testified applicant's

demeanor at hearing doomed application); *Saia v. People of State of New York*, 334 U.S. 558, 560-62 (1948) (striking down prior restraint scheme of "uncontrolled discretion" to grant or deny permits for use of loud-speakers) ("Annoyance at ideas can be cloaked in annoyance at sound.").

85.     Similarly, the First Amendment requires that any time, place and manner regulation not be arbitrary or arbitrarily administered.  If decisions as to the time, place and manner of voting are left to the whims of government officials, then the regulation is invalid.  "A government regulation that allows arbitrary application is 'inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'"  *Forsyth Cnty.*, 505 U.S. at 130-31 (quoting *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981)); *Poulos v. State of New Hampshire*, 345 U.S. 395, 405-08 (1953).  Florida's felon disenfranchisement and re-enfranchisement laws together operate as an invalid prior restraint, not a valid time, place and manner regulation.

86.     Defendant-Members of the Executive Clemency Board are vested with the authority to deny or grant applications for the restoration of civil rights but its discretion in issuing licenses to vote is absolute.  The Board's decisions are unconstrained by any laws or rules and guided by only the vaguest and most

subjective of uncodified standards. This scheme therefore constitutes an unconstitutional prior restraint.

87. First Amendment doctrine does not require plaintiffs to demonstrate actual evidence of discriminatory and/or arbitrary treatment. The risk of such discriminatory and/or arbitrary treatment in the absence of any constraints is sufficient. *Forsyth Cnty.*, 505 U.S. at 133 n.10; *City of Lakewood*, 486 U.S. at 769-70. Nevertheless, this Complaint has alleged numerous actual instances of arbitrary and/or discriminatory treatment which directly result from a procedure marked by unconstrained official discretion in the restoration of voting rights to ex-felons.

88. FLA. CONST. art. VI, § 4(a), FLA. STAT. ANN. § 97.041(2)(a), FLA. CONST. art. VI, § 4, FLA. CONST. art. IV, § 8, FLA. STAT. ANN. § 944.292(1) and the Florida Rules of Executive Clemency require that an ex-felon obtain the Executive Clemency Board's permission in order to regain his or her right to vote, and therefore function as a prior restraint on First Amendment-protected voting. Florida state law and administrative rules and procedures contain no constraints on the Board's discretionary power to grant or deny applications for the restoration of voting rights, making the system prone to arbitrary or discriminatory treatment. As a licensing scheme of standard-less, unfettered official discretion, it violates the First Amendment to the U.S. Constitution.

89. At all relevant times, Defendants have acted under color of state law.

90.     Defendants, acting under color of state law, have deprived and will continue to deprive Plaintiffs and the Plaintiff Class of their right to be free from unconstitutional prior restraints and/or unconstitutional time, place and manner regulations in seeking the restoration of their voting rights.  This right is guaranteed to Plaintiffs and the Plaintiff Class by the First Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

**COUNT TWO**
**(All Plaintiffs and Plaintiff Class)**
**(Arbitrary Allocation of the Franchise in Violation of Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983)**

91.     The factual allegations contained in the preceding paragraphs are incorporated into Count Two, as though fully set forth herein.

92.     Plaintiffs assert a claim pursuant to 42 U.S.C. § 1983 for violation of the Fourteenth Amendment to the U.S. Constitution.

93.     The Fourteenth Amendment to the U.S. Constitution forbids states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.

94.     The Equal Protection Clause of the Fourteenth Amendment protects the right to vote and applies to both "the initial allocation of the franchise" and "the manner of its exercise." *Bush v. Gore*, 531 U.S. 98, 104 (2000).

95.    Defendant-Members of the Executive Clemency Board are vested with the authority to deny or grant applications for the restoration of civil rights. The board's discretion in allocating the franchise to ex-felons is absolute and purely arbitrary in that the Board's decisions are unconstrained by any laws or rules.

96.    Not only is this restoration scheme prone to arbitrary treatment but this Complaint has alleged numerous actual instances of "arbitrary and disparate treatment," *Bush v. Gore*, 531 U.S. at 104, which is the inevitable result of a voting rights restoration or licensing scheme devoid of any legal constraints on official discretion.

97.    FLA. CONST. art. VI, § 4(a), FLA. STAT. ANN. § 97.041(2)(a), FLA. CONST. art. VI, § 4, FLA. CONST. art. IV, § 8, FLA. STAT. ANN. § 944.292(1) and the Florida Rules of Executive Clemency require that an ex-felon obtain the Executive Clemency Board's permission in order to regain his or her right to vote, and therefore turn over the allocation of the franchise to the arbitrary determinations of state officials. Florida state law and administrative rules and procedures do not in any way regulate or limit the Board's discretionary authority to grant or deny applications for the restoration of voting rights. As a voter licensing scheme of standard-less, unfettered official discretion, it also violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

98.    At all relevant times, Defendants have acted under color of state law.

99.    Defendants, acting under color of state law, have deprived and will continue to deprive Plaintiffs and the Plaintiff Class of their right to non-arbitrary treatment in the state government's allocation of the right to vote to ex-felons.  This right is guaranteed to Plaintiffs and the Plaintiff Class by the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

## COUNT THREE
### (All Plaintiffs and Plaintiff Class)
### (Lack of Definitive Time Limits for Determinations on Voting Rights Restoration Applications in Violation of the First Amendment to the United States Constitution and 42 U.S.C. § 1983)

100.    The factual allegations contained in the preceding paragraphs are incorporated into Count Three, as though fully set forth herein.

101.    Plaintiffs assert a claim pursuant to 42 U.S.C. § 1983 for violation of the First Amendment to the U.S. Constitution.

102.    The First Amendment provides that: "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. CONST. amend. I, § 1.

103.    The First Amendment protects the right to vote because voting is both a form of speech or expressive conduct and a means of political association.  *Doe v. Reed*, 561 U.S. 186, 195-96 & n.1 (2010); *id.* at 224 (Scalia, J., concurring) ("We have acknowledged the existence of a First Amendment interest in voting . . .")

(citing *Burdick v. Takushi*, 504 U.S. 428 (1992)); *California Democratic Party v. Jones*, 530 U.S. 567, 574 (2000); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 354-57 (1997); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341-43 (1995); *Burdick v. Takushi*, 504 U.S. 428, 434, 437-39 (1992); *Norman v. Reed*, 502 U.S. 279, 288-90 (1992); *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 214-17 (1986); *Munro v. Socialist Workers Party*, 479 U.S. 189, 193, 199 (1986); *Anderson v. Celebrezze*, 460 U.S. 780, 787-89 (1983); *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979); *Storer v. Brown*, 415 U.S. 724, 728-29 (1974); *Kusper v. Pontikes*, 414 U.S. 51, 56-58 (1973); *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968). Because registration is a prerequisite to and/or enables voting in primary and general elections, it too is protected by the First Amendment. *See Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 400 (2000) (Breyer, J., concurring) ("[A] decision to contribute money to a campaign is a matter of First Amendment concern—not because money *is* speech (it is not); but because it *enables* speech.") (emphasis in original).

104. First Amendment doctrine clearly holds that "a prior restraint that fails to place limits on the time within which the decisionmaker must issue the license is impermissible." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226 (1990) (citing *Freedman v. State of Maryland*, 380 U.S. 51, 59 (1965)). "Where the licensor has unlimited time within which to issue a license, the risk of arbitrary suppression is as

great as the provision of unbridled discretion. A scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech." *Id*. at 227; *see also Riley v. Nat'l Fed'n of the Blind of North Carolina, Inc.*, 487 U.S. 781, 802 (1988) ("[D]elay compels the speaker's silence. Under these circumstances, the licensing provision cannot stand."); *United States v. Frandsen*, 212 F.3d 1231, 1238-40 (11th Cir. 2000).

105.   Florida's Executive Clemency Board is not bound by any reasonable, definite time limits in processing and reaching final decisions on applications for the restoration of civil rights.  Florida state law and the Rules of Executive Clemency are devoid of any such time limits for granting or denying ex-felon applicants their right or license to vote.

106.   Upon information and belief, ex-felon applicants for restoration of voting rights may wait as many as ten years to finally receive notice of a hearing and/or a determination on their applications.  The backlog stood at 10,513 applicants as of March 1, 2017.  Other restoration applicants may be scheduled for a hearing within months of applying.  Though the significant backlog of applicants is making longer delays more common, the Executive Clemency Board and the Office of Executive Clemency may still process individual restoration applications at their own chosen speed and may deliberately fast-track selective applicants while delaying others.

107. Since no provision in Florida state law, including the Rules of Executive Clemency, requires the Board to process and adjudicate an application for restoration of civil rights within a definite, reasonable time period, FLA. CONST. art. VI, § 4(a), FLA. STAT. ANN. § 97.041(2)(a), FLA. CONST. art. VI, § 4, FLA. CONST. art. IV, § 8, FLA. STAT. ANN. § 944.292(1) and the Florida Rules of Executive Clemency create the risk of arbitrary delays and arbitrary continued disenfranchisement and therefore violate the First Amendment.

108. FLA. CONST. art. VI, § 4(a), FLA. STAT. ANN. § 97.041(2)(a), FLA. CONST. art. VI, § 4, FLA. CONST. art. IV, § 8, FLA. STAT. ANN. § 944.292(1) and the Florida Rules of Executive Clemency require that an ex-felon obtain the Executive Clemency Board's permission in order to regain his or her right to vote, and therefore function as a prior restraint on First Amendment-protected voting. Florida state law and administrative rules and procedures contain no time constraints on the Board's processing of and determinations regarding applications for the restoration of voting rights, making the system prone to arbitrary treatment. As a scheme of standard-less, unfettered official discretion with no reasonable time limits, Florida's voting rights restoration process violates the First Amendment to the U.S. Constitution.

109. At all relevant times, Defendants have acted under color of state law.

110. Defendants, acting under color of state law, have deprived and will continue to deprive Plaintiffs and the Plaintiff Class of their right to an ex-felon

voting rights restoration scheme with definite time limits on the Board's ultimate

determinations, which is guaranteed to Plaintiffs and the Plaintiff Class by the First

Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

## COUNT FOUR
### (Plaintiff Yraida Leonides Guanipa and Subclass A)
### (Undue Burden on the Right to Vote in Violation of the First and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983)

111.   The factual allegations contained in the preceding paragraphs are

incorporated into Count Four, as though fully set forth herein.

112.   Under the First and Fourteenth Amendments to the U.S. Constitution,

any burden on the right to vote must be balanced against a state's interest in that

requirement.  The Supreme Court has set forth the following test:

> [T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 289, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992). But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions. *Anderson*, 460 U.S., at 788, 103 S.Ct., at 1569–1570; *see also id.*, at 788–789, n. 9, 103 S.Ct., at 1569–1570, n. 9.

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

113.   Florida Rules of Executive Clemency 9 and 10 impose 5- and 7-year

waiting periods, respectively, on ex-felons who seek to regain their right to vote.  An

ex-felon must wait out this de facto second sentence before he or she can even apply

for restoration of his or her right to vote. This is a severe restriction on the right to vote which is not justified by or narrowly drawn to any state interest of compelling importance. At a minimum though, the pre-application waiting periods restrict the right to vote but cannot be justified by any important regulatory interest.

114. These ex-felons have already served their court-imposed sentences including any period of parole, probation, supervised release and/or community control. Additionally, applicants for restoration of civil rights often languish in the Executive Clemency Board's backlog for years after they apply. Therefore, the state's interest in imposing an additional waiting period before the disenfranchised ex-felon can apply for re-enfranchisement is neither compelling nor important.

115. Florida Rules of Executive Clemency 9 and 10 impose severely restrictive waiting periods on Plaintiff Yraida Leonides Guanipa and Subclass A members before they can even seek the Executive Clemency Board's permission in order to regain their voting rights. Since these waiting periods are not justified by any compelling or important state interest, they violate the First and Fourteenth Amendments to the U.S. Constitution.

116. But for the waiting periods imposed by Florida Rules of Executive Clemency 9 and 10, Plaintiff Ms. Guanipa and Subclass A members would be able to apply to the Executive Clemency Board for the restoration of their voting rights upon the completion of their sentence, including any period of parole, probation,

supervised release and/or community control.  At present, they are barred from applying until 5 or 7 additional years elapse and therefore deprived of even an opportunity to regain their voting rights.

117.   At all relevant times, Defendants have acted under color of state law.

118.   Defendants, acting under color of state law, have unduly burdened and will continue to unduly burden Plaintiff Yraida Leonides Guanipa and Subclass A members' rights to vote, thereby depriving them of an opportunity to regain their voting rights.  The right to vote free of undue burdens is guaranteed to Plaintiff Ms. Guanipa and Subclass A by the First and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

Plaintiffs, the Plaintiff Class, and Subclass A respectfully request that this Court:

(a) Assume jurisdiction over this matter;

(b) Certify this matter as a class action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure;

(c) Appoint counsel as class counsel pursuant to Federal Rule of Civil Procedure 23(g);

(d) Declare that Florida's requirement in FLA. CONST. art. VI, § 4(a), FLA. STAT. ANN. § 97.041(2)(a), FLA. CONST. art. VI, § 4, FLA. CONST. art. IV,

§ 8, FLA. STAT. ANN. § 944.292(1) and the Florida Rules of Executive Clemency that a disenfranchised ex-felon must petition the Governor and his Cabinet sitting as the Executive Clemency Board for the restoration of his or her right to vote, violates the First and Fourteenth Amendments to the United States Constitution as to the right to vote;

(e) Issue a permanent injunction, enjoining Defendants Governor of Florida Rick Scott, Attorney General of Florida Pam Bondi, Chief Financial Officer of Florida Jeff Atwater, Commissioner of Agriculture Adam H. Putnam, the members of the State Executive Clemency Board, Secretary of State Ken Detzner, Secretary of the Department of Corrections Julie L. Jones, Commissioner and Chair of the Florida Commission on Offender Review Melinda N. Coonrod, Commissioner of the Florida Commission on Offender Review Richard D. Davison, Commissioner of the Florida Commission on Offender Review David A. Wyant, and Coordinator for the Office of Executive Clemency of the Florida Commission on Offender Review Julia McCall, their respective agents, officers, employees, successors, and all persons acting in concert with them (collectively, "Defendants") from enforcing FLA. CONST. art. VI, § 4(a), FLA. STAT. ANN. § 97.041(2)(a), FLA. CONST. art. VI, § 4, FLA. CONST. art. IV, § 8, FLA.

STAT. ANN. § 944.292(1) and the Florida Rules of Executive Clemency as to Plaintiff Class members' right to vote;

(f) Issue a permanent injunction, enjoining Defendants from requiring Plaintiff Class members to petition the Executive Clemency Board for and secure the restoration of their voting rights – pursuant to FLA. CONST. art. VI, § 4(a), FLA. STAT. ANN. § 97.041(2)(a), FLA. CONST. art. VI, § 4, FLA. CONST. art. IV, § 8, FLA. STAT. ANN. § 944.292(1) and the Florida Rules of Executive Clemency.

(g) Issue a permanent injunction, enjoining Defendants from denying any member of the Plaintiff Class the right to register to vote and cast a ballot in the State of Florida on the grounds of his or her prior felony convictions;

(h) Issue a permanent injunction requiring Defendants Governor of Florida Rick Scott, Attorney General of Florida Pam Bondi, Chief Financial Officer of Florida Jeff Atwater, Commissioner of Agriculture Adam H. Putnam, the members of the State Executive Clemency Board, their respective agents, officers, employees, successors, and all persons acting in concert with them, to revise the Florida Rules for Executive Clemency, the Application for Clemency, and the Executive Clemency Board's website to reflect that Plaintiff Class members may register to vote and vote upon completion of their sentences;

(i) Issue a permanent injunction requiring Defendant Secretary of State Detzner, his respective agents, officers, employees, successors, and all persons acting in concert with him, including but not limited to all of Florida's County Supervisors of Elections, to revise all paper and electronic materials including the Florida Voter Registration Application, the Secretary of State's website, and the County Supervisors of Elections websites to reflect that Plaintiff Class members may register to vote and vote upon completion of their sentences; to provide revised training and guidance for the County Supervisors of Elections and their staff on the judgment in this case; to e-mail and mail notices to the County Supervisors of Elections announcing the judgment in this case; and to issue a directive to the County Supervisors of Elections ordering them not to reject the voter registration applications of any Plaintiff Class members on account of their prior felony convictions;

(j) Issue a permanent injunction requiring Secretary of the Department of Corrections ("DOC") Julie L. Jones, her respective agents, officers, employees, successors, and all persons acting in concert with her, to inform all individuals released from DOC custody with no further period of parole, probation, supervised release and/or community control that they can register to vote and vote; to inform all individuals released from DOC

custody subject to a period of parole, probation, supervised release and/or community control that they will be able to register to vote and vote once they complete their sentences including parole, probation, supervised release and/or community control; and on a monthly basis, to send to the Florida Secretary of State's office and the Florida Commission on Offender Review e-mailed and paper copies of the full list of names and personally identifying information of all ex-felons who have completed their sentences including any period of parole, probation, supervised release and/or community control in the previous month;

(k) Issue a permanent injunction requiring Commissioner and Chair of the Florida Commission on Offender Review Melinda N. Coonrod, Commissioner of the Florida Commission on Offender Review Richard D. Davison and Commissioner of the Florida Commission on Offender Review David A. Wyant, their respective agents, officers, employees, successors, and all persons acting in concert with them, to ensure all communications with ex-felons inform all pending and new applicants for restoration of civil rights that their rights to vote have been automatically restored upon completion of sentence, their applications are moot as to the right to vote but not as to the right to serve on a jury or the right to run for public office, and that they are now qualified to register to vote and vote

in the State of Florida; and directing the Commissioners to revise the website of the Florida Commission on Offender Review to reflect the judgment in this case;

(l) Issue a permanent injunction requiring Coordinator for the Office of Executive Clemency of the Florida Commission on Offender Review Julia McCall, her respective agents, officers, employees, successors, and all persons acting in concert with her, to inform all pending and new applicants for restoration of civil rights that their rights to vote have been automatically restored upon completion of their sentences, their applications are moot as to the right to vote but not as to the right to serve on a jury or the right to run for public office, and that they are now qualified to register to vote and vote in the State of Florida;

(m)   In the alternative – and only if the Court rules in favor of Plaintiffs *solely* on Count Four – declare the 5- and 7-year waiting periods in Florida Rules of Executive Clemency 9 and 10 unconstitutional in violation of the First and Fourteenth Amendments to the U.S. Constitution as to members of Subclass A of the Plaintiff Class; permanently enjoin the enforcement of these requirements by Defendants as to members of Subclass A of the Plaintiff Class; and require the Florida Department of Corrections, Commission on Offender Review and Office of Executive Clemency to

revise all communications, materials, websites, applications and any other relevant internal or public-facing documents and/or materials to reflect that Subclass A members may apply for restoration of their voting rights upon completion of their sentences;

(n) Retain jurisdiction to enforce its order;

(o) Grant Plaintiffs their reasonable attorneys' fees and costs incurred in bringing this action pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 1920, and as otherwise permitted by law; and

(p) Grant such other relief as this Court deems just and proper.

DATED: March 13, 2017                    Respectfully submitted,

                                         /s/ Brittnie R. Baker

                                         Brittnie R. Baker
                                         Florida Bar No. 119058
                                         D.C. Bar No. 1033708
                                         Jon Sherman*
                                         D.C. Bar No. 998271
                                         New York Bar No. 4697348
                                         Tiffany Davis**
                                         New York Bar No. 5248000
                                         Fair Elections Legal Network
                                         1825 K St. NW, Suite 450
                                         Washington, DC 20006
                                         jsherman@fairelectionsnetwork.com
                                         bbaker@fairelectionsnetwork.com
                                         tdavis@fairelectionsnetwork.com
                                         Phone: (202) 331-0114

                                         Theodore Leopold
                                         Florida Bar No. 705608

Diana L. Martin
Florida Bar No. 624489
Cohen Milstein Sellers & Toll PLLC
2925 PGA Boulevard | Suite 200
Palm Beach Gardens, FL 33410
phone 561.515.1400
fax 561.515.1401

*Pro Hac Vice to Practice in the United States District Court for the Northern District of Florida to Be Filed*

** *Pro Hac Vice to Practice in the United States District Court for the Northern District of Florida to Be Filed and Working Under the Direct Supervision of an Enrolled, Active Member of the District of Columbia Bar*