# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

| | | |
|---|---|---|
| **JAMES MICHAEL HAND, et al.,** | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **CASE NO. 4:17-cv-00128-** |
| **RICK SCOTT in his official** | ) | **MW-CAS** |
| **capacity as Governor of Florida** | ) | |
| **and member of the State of** | ) | |
| **Florida's Executive Clemency** | ) | |
| **Board, et al.,** | ) | |
| | ) | |
| *Defendant*s. | ) | |
| | ) | |

---

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

---

When government officials are given limitless power to decide if and when individual citizens may vote, such a law violates the Constitution.  This case challenges Florida laws that have long subjected ex-felons to this kind of prohibited arbitrary scheme.  It does not question whether Florida may disenfranchise felons *per se*, but rather whether the state may do so in this manner.  The laws of forty states and the District of Columbia provide for the automatic, non-arbitrary restoration of ex-felons' right to vote after either release from incarceration or the completion of parole, probation, and/or a waiting period—and two states do not disenfranchise

1

felons even during incarceration.[1]  Florida, however, remains one of just four states

using a discretionary voting rights restoration scheme for all ex-felons, while the

remaining six states apply such a scheme only to certain ex-felons.[2]

_____

[1] Maine and Vermont do not disenfranchise felons, even while they are incarcerated. ME. CONST. art. II, § 1; VT. STAT. ANN. tit. 28, § 807(a).  There are four categories of automatic restoration schemes, and none of these laws would run afoul of the constitutional prohibitions underlying Counts 1, 2 and 3 of the First Amended Complaint: (1) D.C. MUN. REGS. tit. 3 § 500.2; HAW. REV. STAT. § 831-2(a)(1); ILL. CONST. art. III, § 2, 730 ILL. COMP. STAT. 5/5-5-5; IND. CODE §§ 3-7-13-4, 3-7-13-5; MD. CODE ANN. ELEC. LAW § 3-102(b)(1); MASS. CONST. amend. art. III, MASS. GEN. Laws ch. 51, § 1; MICH. COMP. LAWS § 168.758b; MONT. CONST. art. IV, § 2, MONT. CODE ANN. § 46-18-801(2); N.H. REV. STAT. ANN. §§ 607-A:2, 607-A:3; N.D. CENT. CODE ANN. §§ 12.1-33-01, 12.1-33-03; OHIO REV. CODE ANN. § 2961.01(A); OR. REV. STAT. § 137.281(7); 25 PA. CONS. STAT. §§ 2602(t), 2602(w) 3146.1, http://www.votespa.com/en-us/Pages/Convicted-Felon.aspx; R.I. CONST. art. II, § 1; UTAH CODE ANN. § 20A-2-101.5(2) (automatic restoration upon release from incarceration); (2) CAL. ELEC. CODE § 2101(a); COLO. CONST. art. 7, § 10; COLO. REV. STAT. § 1-2-103(4); CONN. GEN. STAT. §§ 9-46, 9-46a; N.Y. ELEC. LAW § 5-106(3) (automatic restoration after completion of parole, but prior to the end of probation); (3) ALASKA STAT. § 15.05.030; ARK. CONST. amend. 51, § 11(d); DEL. CODE ANN. tit. 15, §§ 6103, 6104 (automatic restoration except permanent disenfranchisement for certain disqualifying felony convictions); GA. CONST. art. II, § I, para. III; IDAHO CODE ANN. § 18-310(2); KAN. STAT. ANN. §§ 21-6613, 22-3722; LA. CONST. art. I, §§ 10, 20; MINN. STAT. § 609.165; MO. REV. STAT. § 115.133; N.J. STAT. ANN. §§ 2C:51-3, 19:4-1(8); N.M. STAT. ANN. § 31-13-1; N.C. GEN. STAT. ANN. §§ 13-1, 13-2; OKLA. STAT. tit. 26, § 4-101; S.C. CODE ANN. § 7-5-120(B); S.D. CODIFIED LAWS § 24-5-2; TEX. ELEC. CODE ANN. § 11.002; WASH. REV. CODE § 29A.08.520(1); W. VA. CODE § 3-2-2; WIS. STAT. § 304.078(2) (automatic restoration following completion of parole and probation); and (4) NEB. REV. STAT. ANN. § 29-112 (automatic restoration two years after completion of sentence).

[2] ALA. CODE § 15-22-36 (executive restoration for felony convictions involving moral turpitude, but permanent disenfranchisement for specific felony convictions); ARIZ. REV. STAT. ANN. §§ 13-905–13-912 (judicial restoration for individuals with two or more felony convictions); FLA. CONST. art. VI, § 4 (executive restoration for all felony convictions); IOWA CODE § 914.2 (executive restoration for all felony

At the typical Florida Executive Clemency Board ("Board" or "ECB") hearing before the Governor and his Cabinet, felons who have already completed their full sentences come forward one by one to plead their cases. They publicly confess their crime and talk about their family, employment, community participation and faith in the hope that this information convinces the Board they are living on the "straight and narrow"[3] path. The Board's members – who have all won a statewide election and may seek reelection or another office – decide whether that person can vote again. Sometimes they give a reason, but often they say little or nothing before granting or denying an application. Board members may ask questions about the applicant's past, family, faith, any drug or alcohol use, driving infractions and any other information the Board believes is related to whether the applicant has "turned [his or her] life around" or has shown sufficient remorse. This

---

convictions); KY. CONST. § 145 (executive restoration for all felony convictions); MISS. CONST. art. 5, § 124; art. 12, § 253 (executive or legislative restoration for certain felony convictions, but permanent disenfranchisement for other felony convictions); NEV. REV. STAT. § 213.157 *as amended by* 2017 Nevada Laws Ch. 362 (A.B. 181) (judicial restoration for individuals with multiple felony convictions, if previously convicted for more serious, violent offenses and/or two or more offenses; otherwise, automatic restoration immediately upon release or after a two-year waiting period for Category B felonies); TENN. CODE. ANN. §§ 40-29-202–40-29-204 (executive restoration for most felony convictions; permanent disenfranchisement for serious felony convictions); VA. CONST. art. II, § 1 (executive restoration for all felony convictions); WYO. STAT. ANN. § 7-13-105 (executive restoration for all felony convictions except non-violent first-time felony convictions).

[3] DE 92-3, Executive Clemency Board Hearing (hereinafter, "Hearing") (Dec. 2000) (transcript at 99).

inquiry into whether the applicant is leading a moral life, according to the Board, functions as a modern-day moral character test for access to the ballot.

Florida law violates the First and Fourteenth Amendments because it explicitly confers "unfettered discretion" on the Board in deciding whether to grant or deny restoration of civil rights applications.  In the absence of any legal constraints, the Board invokes a variety of shifting, ad hoc, subjective and vague standards and factors.  The absence of objective, transparent legal rules for restoration opens the door to political, viewpoint, racial, religious, wealth and any other type of discrimination.  Defendant Governor Rick Scott has bluntly communicated that the process is not constrained by any law: "[T]here's no standard. We can do whatever we want";[4] and "There is no law we're following . . . So we get to make our decisions based on our own beliefs."[5]

Not only do ex-felon restoration applicants face an arbitrary decision-making process but they must wait five or seven years before they can even apply, a requirement which unduly burdens the right to vote in violation of the First and Fourteenth Amendments.  They also face administrative delay.  As of June 16, 2017, the Board had a backlog of 10,232 restoration of civil rights applications;[6] and as of

---

[4] DE 101-173 (DE-Exhibit Number), Hearing (Dec. 2016) (video, Disc 1 at 2:02:10-2:02:15).

[5] DE 101-169, Hearing (Mar. 2016) (video at 00:04:38-00:04:54).

[6] DE 85-11, 86-11, ECB Defendants' Response to Plaintiffs' First Set of Interrogatories, Interrogatory No. 3.

October 1, 2017, that figure had risen to 10,377.[7]  The current Board is reviewing fewer applications and granting fewer as well, restoring the civil rights of just 2,691 individuals between the start of 2011 and June 15, 2017, compared with over 154,000 during Governor Crist's tenure.[8]  Such wildly varying outcomes are the foreseeable consequence of giving politicians absolute power to grant or deny a license to vote.  The Constitution forbids such an arbitrary system of voting rights licensing.  Accordingly, Plaintiffs' summary judgment motion should be granted.

## STATEMENT OF FACTS

FLA. CONST. art. VI, § 4(a) provides that: "No person convicted of a felony . . . shall be qualified to vote or hold office until restoration of civil rights . . ."  It imposes both a restraint on voting for a class of persons and establishes a way to obtain permission to vote.  Florida's voter eligibility statute reflects this requirement as well: "The following persons, who might be otherwise qualified, are not entitled to register or vote: . . . A person who has been convicted of any felony by any court of record and who has not had his or her right to vote restored pursuant to law."  FLA. STAT. ANN. § 97.041(2)(b).  FLA. CONST. art. IV, § 8(a) states that "the governor

---

[7] Testimony of OEC Coordinator Julia McCall, Constitution Revision Commission Ethics and Elections Committee Hearing (Nov. 1, 2017) (video at 2:22:56-2:24:04) *available       at*   http://thefloridachannel.org/videos/11117-constitution-revision-commission-ethics-elections-committee/; DE 99, Request for Judicial Notice.
[8] DE 85-11, 86-12, 86-13, Defendants' Responses to Plaintiffs' First Set of Interrogatories, Interrogatories Nos. 4, 5.  These figures include with-hearing and without-hearing grants.

may, by executive order . . . and, with the approval of two members of the cabinet, grant full or conditional pardons, restore civil rights, commute punishment, and remit fines and forfeitures for offenses."  FLA. STAT. ANN. § 944.292(1) provides that a felon's civil rights are suspended until they are restored pursuant to FLA. CONST. art. IV, § 8(a):

> Upon conviction of a felony as defined in s. 10, Art. X of the State Constitution, the civil rights of the person convicted shall be suspended in Florida until such rights are restored by a full pardon, conditional pardon, or restoration of civil rights granted pursuant to s. 8, Art. IV of the State Constitution.

No rule or standard for restoration of civil rights decisions is set forth in any of these constitutional and statutory provisions.  And since at least 1992, the Rules of Executive Clemency have explicitly conferred "unfettered discretion" on the Governor "to deny for any reason any request for clemency," including restoration of civil rights and, with the support of other Cabinet members, "unfettered discretion to grant, for any reason, the following acts of grace," including restoration of civil rights.  Fla. R. Exec. Clemency (hereinafter, "Rule(s)") 4.[9]  The current version states: "The Governor has the unfettered discretion to deny clemency at any time,

---

[9] DE 85-12, 85-15, Historical and Current Versions of Rules of Executive Clemency (1986-2017) ("Rules"), at 15, 22, 30, 38, 46, 54, 60, 79, 87, 105, 120.

for any reason."  Rule 4 (2017).[10]  The application must be approved by a majority of Board members, and the Governor must be included in the majority.[11]

Under the current rules, an individual seeking the restoration of civil rights must be eligible for that type of clemency and must submit an Application for Clemency.  Rules 5, 6, 9, 10.[12]  The same application is used for all types of clemency: restoration of civil rights for a Florida, federal, military or out-of-state conviction, restoration of alien status under Florida law, remission of fine or forfeiture, specific authority to own, possess or use firearms, full pardon, and pardon without firearm authority.[13]  The Application for Clemency requires each applicant to provide information and supporting documents as to each felony conviction, including certified copies of the charging document, the judgment, and the sentence, community control or probation order.  Rule 6.B (2011).[14]  Prior to the most recent revisions in early 2011, many ex-felons could regain their civil rights without submitting an application and, from 2003 through 2010, applications seeking only

---

[10] *Id*. at 120.

[11] *Id*.  Today, since there are four total Board members (down from seven), it takes two other members to form a majority.

[12] *Id*. at 122-25, 127-31.

[13] DE 85-16, Florida Commission on Offender Review's Response to First Set of Requests for Production, at 1-2; DE 85-17, Current Florida Application for Clemency; DE 85-18, Previous Florida Application for Clemency.

[14] DE 85-15, Rules, at 124-25; DE 85-17, Current Florida Application for Clemency.

civil rights restoration did not have to be accompanied by supporting documents. Rule 5.E & n.1, 6.B, 9, 10 (2001-2010).[15]

An individual is eligible to apply for restoration without a hearing "if the person has committed no crimes and has not been arrested for a misdemeanor or felony for five (5) years from the date of completion of all sentences and conditions of supervision imposed" and if a number of other requirements are met.  Rule 9.A.[16] The individual must not have been convicted of any crime on a lengthy list of felonies, including but not limited to murder, manslaughter, sexual batteries, and drug trafficking.  Rule 9.A.4.[17]

The Florida Commission on Offender Review ("FCOR") reviews all applications submitted for restoration without a hearing.[18]  Those applications that meet the requirements of Rule 9.A are included in a preliminary review list.  If the Governor and two other Board members approve an individual's restoration within 60 days, an executive order granting restoration is issued.  Those not approved in

---

[15] DE 85-15, Rules, at 54-57, 63-64, 66-69, 80-81, 88-91, 93-95, 108-09, 110-14 (2001-2010).  The Board also has unfettered discretion to revise its rules at any time. A more complete history of the evolution of the Rules is described in the First Amended Complaint.  DE 29 ¶¶ 35-50.

[16] DE 85-15, Rules, at 127-29.

[17] *Id.*

[18] DE 86-6, Florida Commission on Offender Review ("FCOR") 2015-2016 Annual Report, at 16-17.

this way are notified and may pursue restoration with a hearing pursuant to Rule 10.

Rule 9.B.[19]

An individual is eligible to apply for restoration with a hearing so long as he or she has "no new felony convictions for a period of seven (7) years or more after completion of all sentences imposed for the applicant's most recent felony conviction and all conditions of supervision for the applicant's most recent felony conviction have expired or been completed." Rule 10.A.[20] The five- and seven-year pre-application waiting periods, for restoration without and with a hearing, respectively, did not exist prior to Governor Scott's tenure.[21]

The FCOR's Office of Executive Clemency ("OEC") screens each application to verify that it meets the basic eligibility criteria under the Rules.[22] Applicants for restoration of civil rights must undergo an investigation by the FCOR's Office of Clemency Investigations ("OCI").[23] After a preliminary investigation, the Board

---

[19] DE 85-15, Rules, at 130.

[20] *Id*. at 131.

[21] *Id*. at 24-25, 32-33, 40-41, 48-49, 56-57, 66-69, 81-82, 93-96, 110-14.

[22] DE 86-7, ECB Defendants' Response to Plaintiffs' First Set, Request for Production No. 6 (Restoration of Civil Rights Application Disqualifications [2013-2017]); DE 86-10, Response to Interrogatory No. 2; DE 86-6, FCOR 2015-2016 Annual Report, at 16; DE 86-1, FCOR Annual Report 2010-2011, at 62 (describing screening of approximately 40,000 clemency applications pending at beginning of current administration and rejection of over 7,000 applications deemed ineligible under amended rules).

[23] DE 86-6, FCOR 2015-2016 Annual Report, at 17.

determines whether to approve an applicant for restoration without a hearing.[24]  If the applicant is not so approved, he or she is referred to OCI for possible restoration with a hearing,[25] and OCI prepares a report with a favorable or unfavorable recommendation, which the Board is free to accept or reject for any or no reason.[26] OEC places applicants on the Board's hearing agenda, notifies them of their hearing dates, and provides the confidential case analysis prepared by OCI.  Rules 11, 12.[27] The Rules note that "[w]hile applicants are not required to appear at the hearing, the Clemency Board encourages applicants to attend."  Rule 12.B.[28]

The Board only holds four hearings per year.  Rule 12.A.[29]  Since 2011, the Board has heard an average of only 52 applicants for restoration of civil rights per hearing.[30]  Each meeting is held in Tallahassee which requires many applicants to take two or more days off from work in order to attend and to travel significant distances, *e.g.* almost 500 miles from the Miami area.

---

[24] DE 85-6, Affidavit of William Bass ¶ 7 & Ex. A; ███████████████████████
███████████████████

[25] *Id.*

[26] DE 86-6, Florida Commission on Offender Review: 2015-2016 Annual Report, at 17.

[27] *Id.* at 16; DE 85-15, Rules, at 132-33.

[28] *Id.*

[29] *Id.* at 132.

[30] DE 89-6–89-12, ECB Hearing Annotated Agendas (2011-2017) (hereinafter, "Agenda(s)").  This figure excludes the processing of applicants who can be granted restoration without a hearing.

At the meeting, each applicant is given five minutes to speak.  Rule 12.C.[31]

The Board may grant or deny the applicant, continue the case until the next Board

meeting, or take the application under advisement to make a final determination

later.  These outcomes are often recorded by using a G, D, C or "Cont.", or UA,

respectively.[32]  All applicants who are denied must wait a minimum of two years

before reapplying.  Rule 14.[33]

## STANDING

Plaintiffs James Michael Hand, Joseph James Galasso, Harold W. Gircsis, Jr.,

Christopher Michael Smith, William Bass, Jermaine Johnekins, Virginia Kay

Atkins, James Larry Exline and Yraida Leonides Guanipa (collectively, "Plaintiffs")

all have standing to bring Claims 1, 2 and 3, because they are ex-felons who have

completed their sentences, have been denied their right to vote under Florida's

unconstitutional felon disenfranchisement and reenfranchisement scheme, and

would otherwise be eligible to vote in Florida.[34]  Plaintiff Yraida Guanipa has

---

[31] DE 85-15, Rules, at 133.

[32] DE 89-12, Agendas (2017), at 2-3, 6-7; DE 89-5, Agendas (2010), at 7-8, 12.

[33] DE 85-15, Rules, at 134.

[34] FLA. STAT. ANN. § 97.041; DE 85-2, James Michael Hand Affidavit ¶¶ 1-7; DE 85-3, Joseph James Galasso Affidavit ¶¶ 1-10; DE 85-4, Harold W. Gircsis, Jr. Affidavit ¶¶ 1-8; DE 85-5, Christopher Michael Smith Affidavit ¶¶ 1-7; DE 85-6, William Bass Affidavit ¶¶ 1-9; DE 85-7, Jermaine Johnekins Affidavit ¶¶ 1-7; DE 85-8, Virginia Kay Atkins Affidavit ¶¶ 1-7; DE 85-9, James Larry Exline Affidavit ¶¶ 1-10; DE 85-10, Yraida Leonides Guanipa Affidavit ¶¶ 1-7.  Of those eight Plaintiffs who have applied for restoration, seven have been denied by the Board; Mr. Bass's application is still pending. DE 89-6, Agenda (Dec. 2011), at 41; DE 89-

11

standing to bring Claim 4.  She is an ex-felon who has completed her sentence and is otherwise eligible to vote but has not yet completed the 5- or 7-year pre-application waiting period.[35]  These facts are undisputed.[36]

## LEGAL STANDARD

Summary judgment must be granted if the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and compels judgment as a matter of law.  *See* FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  "[I]f the record, taken as a whole, cannot lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment is proper."  *Hawaiian Airlines, Inc. v. AAR Aircraft Servs., Inc.*, 167 F. Supp. 3d 1311, 1316 (S.D. Fla. 2016).  Plaintiffs herein demonstrate that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law.

## ARGUMENT

1. **Counts 1 and 2: Unfettered discretion and arbitrary decision-making in Florida's felon disenfranchisement and reenfranchisement scheme violate the First and Fourteenth Amendments.**

---

7, Agenda (Mar. 2012), at 3; DE 89-8, Agenda (Mar. 2013; June 2013), at 3, 15, 22; DE 87-3, ECB Defendants' Response to Plaintiffs' Third Set, Interrogatory No. 1, Request for Production No. 2, at 1-4, 30-33; DE 89-11, Agenda (Sept. 2016), at 31; DE 89-12, Agenda (Mar. 2017), at 3, 7; DE 86-8, Defendants' Response to Plaintiffs' First Set of Requests for Production, Request for Production 7, at 18, 20.
[35] DE 85-10, Guanipa Affidavit ¶¶ 1-7; DE 85-15, Rules, at 127-31.
[36] DE 29, First Amended Complaint ¶ 8; DE 80, Answer ¶ 8.

### a. The First Amendment protects the right to vote as expressive conduct and as a means of political association.

The First Amendment, U.S. CONST. amend. I, § 1, protects the right to vote because voting is both a form of expressive conduct and a means of political association. The U.S. Supreme Court has long held that, as a means for citizens to associate with political parties, ideas and causes, voting for candidates for public office and on ballot measures is protected by the First Amendment. In *Norman v. Reed*, the Court stated that:

> [T]he constitutional right of citizens to create and develop new political parties . . . derives from the First and Fourteenth Amendments and advances the constitutional interest of like-minded voters to gather in pursuit of common political ends, thus enlarging the opportunities of all voters to express their own political preferences.

502 U.S. 279, 288–90 (1992); *California Democratic Party v. Jones*, 530 U.S. 567, 574 (2000); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 354–57 (1997); *Burdick v. Takushi*, 504 U.S. 428, 434, 437–39 (1992); *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 214–17 (1986); *Munro v. Socialist Workers Party*, 479 U.S. 189, 193, 199 (1986); *Anderson v. Celebrezze*, 460 U.S. 780, 787–89 (1983); *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979); *Storer v. Brown*, 415 U.S. 724, 728-29 (1974); *Kusper v. Pontikes*, 414 U.S. 51, 56–58 (1973) (asserting that "freedom to associate with others for the common advancement of political beliefs," including associating with political party, is protected by First and Fourteenth Amendments); *Williams v. Rhodes*, 393 U.S. 23,

13

30–31 (1968) ("[T]he state laws place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.").

Additionally, the First Amendment protects voting because it is expressive conduct.  Courts have uniformly held that the First Amendment protects political expression, including expressions of support for candidates, parties and causes, regardless of the format or medium.  *See City of Ladue v. Gilleo*, 512 U.S. 43, 54–59 (1994) (First Amendment protects placing political sign in front yard); *Buckley v. Valeo*, 424 U.S. 1, 48 (1976) (advocacy of the election or defeat of candidates protected by First Amendment); *Socialist Workers Party*, 440 U.S. at 184 (describing ballot access restrictions as "impair[ing] the voters' ability to express their political preferences"); *Lynch v. Ackley*, 811 F.3d 569, 580 (2d Cir. 2016) ("Endorsements of candidates for political office are at the core of First Amendment protected speech."); *Bland v. Roberts*, 730 F.3d 368, 385–86 (4th Cir. 2013) ("liking" candidate's Facebook page constitutes pure speech and symbolic expression) ("[L]iking a political candidate's campaign page communicates the user's approval of the candidate and supports the campaign by associating the user with it."); *Canady v. Bossier Parish Sch. Bd.*, 240 F.3d 437, 440 (5th Cir. 2001) (noting "clothing functions as pure speech" when it bears a "written message[ ]

14

supporting political candidates or important social issues" and may also "symbolize . . . political and social views"); *Name.Space, Inc. v. Network Solutions, Inc.*, 202 F.3d 573, 585 (2d Cir. 2000) (domain names such as ".jones_for_president . . . may constitute protected speech"); *Coady v. Steil*, 187 F.3d 727, 731 (7th Cir. 1999) (campaign sign on top of vehicle constitutes political speech); *Hobbs v. Thompson*, 448 F.2d 456, 469–75 (5th Cir. 1971) (bumper stickers endorsing candidate protected by First Amendment). That courts have found compulsory voting violates the First Amendment also demonstrates that casting a ballot is protected political expression. In *Partnoy v. Shelley*, the district court struck down a requirement that voters must have voted on the prior recall question in order to vote in the replacement contest. 277 F. Supp. 2d 1064, 1075–79 (S.D. Cal. 2003). The court reasoned that it would "compel [voters] to vote on a separate issue upon which they do not wish to vote" and, as such, "violates [voters'] First Amendment Right of free expression." *Id.* at 1075, 1078.

Any legal consequences flowing from expressive conduct do not undermine its expressive nature or its First Amendment coverage. In *Doe v. Reed*, Chief Justice Roberts, writing for the Court, explained that: "Petition signing remains expressive even when it has legal effect in the electoral process." 561 U.S. 186, 195 (2010). It stands to reason that even though voting has the legal effect of electing a candidate to a public office, it is still expressive. And only votes for the winning candidates

15

have legal effect; the rest can only be expressive.  *Id.* at 196 n.1 (noting further that

"only *some* petition signing has legal effect," *i.e.* only if the petition qualifies for the

ballot) (emphasis in original).

> **b. The First and Fourteenth Amendment prohibit the exercise of unfettered official discretion in administrative licensing schemes regulating First Amendment-protected conduct.**

*First Amendment.* The First Amendment prohibits giving government

officials unfettered discretion to issue or withhold licenses or permits to engage in

any First Amendment-protected speech, expressive conduct, association or any other

protected activity or conduct.  *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123,

130–33 (1992) ("The First Amendment prohibits the vesting of such unbridled

discretion in a government official.").   Florida's felon disenfranchisement and

reenfranchisement scheme is just this kind of purely discretionary administrative

licensing system regulating protected speech or expression.

This ban on uncontrolled discretion in licensing covers *all* First Amendment

freedoms, including the right to vote.  "[A]n ordinance which . . . makes the peaceful

enjoyment of freedoms which the Constitution guarantees contingent upon the

uncontrolled will of an official—as by requiring a permit or license which may be

granted or withheld in the discretion of such official—is an unconstitutional

censorship or prior restraint upon the enjoyment of those freedoms."  *Staub v. City

of Baxley*, 355 U.S. 313, 322 (1958).   Since 1938, the Supreme Court has

consistently applied this doctrine to strike down a wide range of administrative licensing regimes that conferred limitless discretion on local or state officials. *Lovell v. City of Griffin*, 303 U.S. 444, 447–52 (1938) (striking down permit requirement for distribution of literature). In *City of Lakewood v. Plain Dealer Publishing Co.*, the Court struck down an ordinance containing "no explicit limits on the mayor's discretion" to grant or deny permit applications for newspaper rack placement, which made the process vulnerable to "the use of shifting or illegitimate criteria" and viewpoint discrimination. 486 U.S. 750, 757–58, 769 (1988). In *Shuttlesworth v. City of Birmingham*, a permit requirement for marches or demonstrations was invalidated because "in deciding whether or not to withhold a permit, the members of the Commission were to be guided only by their own ideas of 'public welfare, peace, safety, health, decency, good order, morals or convenience.'" 394 U.S. 147, 150–51 (1969). Likewise, in *Staub*, the Court struck down a permit scheme for union solicitation, because the Mayor and city council were "expressly authorized to refuse to grant the permit if they [did] not approve of the applicant or of the union or of the union's 'effects upon the general welfare of citizens of [the city].'" 355 U.S. at 321. *Shuttlesworth* and *Staub* illustrate that the use of subjective, ad hoc and/or vague standards is no less a First Amendment violation than the absence of any legal constraints on administrative licensing.

17

These precedents are legion and consistent. In *Niemotko v. Maryland*, the Court struck down an arbitrary permit requirement for use of the park system, noting that the hearing focused on the applicants' "alleged refusal to salute the flag, their views on the Bible, and other issues irrelevant to unemcumbered [*sic*] use of the public parks" and that the Mayor testified the applicants' demeanor at the hearing had doomed their application. 340 U.S. 268, 271–73 (1951). The scheme subjected First Amendment rights to local officials' "absolute power" to deny applications based on their "whims or personal opinions." *Id*. at 272; *see also Saia v. New York*, 334 U.S. 558, 560–62 (1948) (striking down discretionary permit scheme for loudspeaker usage) ("Annoyance at ideas can be cloaked in annoyance at sound."). Defendants have similarly imposed a standard-less process of arbitrary and discriminatory decision-making, which is untethered to any laws, rules, standards, criteria or constraints of any kind, and unconstrained by any definite time limits. This scheme permits and cloaks arbitrary, biased and/or discriminatory treatment.

In these cases, a person or group cannot do X (a constitutionally protected activity) without first obtaining a permit or license and will be prosecuted if he or she does so. In Florida, a class of individuals cannot register and vote without first obtaining a permit or license and will be prosecuted if they do so. FLA. STAT. ANN. § 104.15 (ineligible voters who willfully vote guilty of third-degree felony). That this unconstitutionally arbitrary restraint only denies the First Amendment right to

vote to a subset of residents within a given jurisdiction, and not all residents, is immaterial. Despite Defendants' hyper-formalistic argument that the Court should treat felon disenfranchisement and reenfranchisement as "distinct,"[37] there is no material or logical difference between the following statements: "Ex-felons cannot vote and they must apply to regain their right to vote"; and "Ex-felons *can* vote if they obtain prior permission from a board of state officials." The proposed Plaintiff Class has *not* lost its First Amendment rights, just their state law right to vote, and *can* engage in this First Amendment-protected conduct as long as they obtain a license or permit.

*Equal Protection.* Similarly, Plaintiffs' equal protection claim (Count 2) is based on *Bush v. Gore*'s prohibition on "arbitrary and disparate treatment" in either the "allocation of the franchise" or "the manner of its exercise." 531 U.S. 98, 104 (2000) (per curiam). Ballots cast in Florida during the 2000 presidential election were subjected to different manual recount standards and procedures in different counties and even within a county. *Id*. at 105-07. Seven Justices concluded that the "absence of specific standards" to implement the state's hopelessly vague "intent of the voter" standard was inexorably causing "arbitrary and disparate treatment" in the manual recount in violation of the Equal Protection Clause. *Id*. at 104–09; *cf. Louisiana v. U.S.*, 380 U.S. 145, 153 (1965) ("The cherished right of people in a

---

[37] DE 50, Defendants' Reply Brief in Support of Motion to Dismiss, at 5.

country like ours to vote cannot be obliterated by the use of laws like this, which leave the voting fate of a citizen to the passing whim or impulse of an individual registrar."). Circuit courts have applied this precedent to find equal protection violations in access to the ballot. In *Hunter v. Hamilton County Board of Elections*, the Sixth Circuit panel applied *Bush v. Gore* to conclude that a "lack of specific standards for reviewing provisional ballots" had resulted in unconstitutionally "arbitrary and uneven exercise of discretion." 635 F.3d 219, 235, 239–42 (6th Cir. 2011). As in *Bush v. Gore* and its progeny, Plaintiffs challenge the limitless discretion vested in Defendants to decide which ex-felons may cast a ballot and which may not.

*Defendants' Violation.* By the express terms of the Florida Constitution, statutes and Rules of Executive Clemency, Defendants have completely unlimited discretion to deny or grant applications for the restoration of civil rights. Members of the Board routinely emphasize that it is "a court of mercy,"[38] and its determinations are untethered to any laws, rules, standards, criteria or constraints of any kind. The Board refers to ad hoc, vague and subjective standards such as whether the applicant has "turned [his or her] life around"[39] or sufficiently shown

---

[38] DE 101-165, Hearing (June 2015) (video at 00:03:14-00:03:26).
[39] *Id*. at 2:09:20-2:09:25; DE 101-146, Hearing (Mar. 2012) (video, Disc 2 at 00:37:20-00:37:25).

remorse.[40]   At a 2016 hearing, Defendant Governor Scott stated: "Clemency is . . .

is—there's no standard. We can do whatever we want. But . . . it's tied to remorse."[41]

Governor Scott also opened the March 2016 hearing with the following declaration

of limitless discretion: "This is a board of clemency. Ok? We—there is no law we're

following. The law has already been followed by the judges. So we get to make our

decisions based on our own beliefs."[42]   Previous Governors have said much the

same, demonstrating that these constitutional violations are systemic and not specific

to any particular Board members.   In 2000, Governor Bush stated: "[P]eople that

come here need to have in their hearts some sense of remorse for what they did."[43]

Governor Scott has also cited the applicant's "attitude" as a relevant criterion for his

decisions.[44]   These amorphous standards and factors are unascertainable and

preclude uniform application.

  With such vague standards based on personal beliefs, the Board may deny

applicants for any reason, including a record of traffic violations, an admission to

alcohol or drug use, a guess as to an applicant's politics, or no reason at all, just a

---

[40] *See, e.g.*, DE 101-155, Hearing (June 2013) (video at 3:39:04-3:39:12); DE 101-161, Hearing (June 2014) (video at 3:46:24-3:46:45).

[41] DE 101-173, Hearing (Dec. 2016) (video, Disc 1 at 2:02:10-2:02:17).

[42] DE 101-169, Hearing (Mar. 2016) (video at 00:04:38-00:04:54).

[43] DE 94-1, Hearing (June 2000) (transcript at 80).   At a 2002 hearing, Governor Bush denied Brian Vaun Wilder's restoration of civil rights application because of the applicant's "lack of remorse." DE 93-5, Hearing (Dec. 2002) (transcript at 102, 109); DE 88-7, Agenda, at 31.

[44] DE 101-164, Hearing (March 2015) (video at 00:03:12-00:03:25).

state official's whim or instinct.  The Board may also grant applicants for any reason, including the testimony of family members, friends or pastors, an applicant's demeanor or dress, the expression of political views that Board members favor, or no reason at all, just a state official's whim or instinct.   It is subjecting First Amendment rights to this freewheeling investigation of an applicant's life history, personal choices, views, attitude, and moral character that the Supreme Court has repeatedly rejected.[45]

FLA. CONST. art. VI, § 4(a), FLA. STAT. ANN. § 97.041(2)(b), FLA. CONST. art. IV, § 8, FLA. STAT. ANN. § 944.292(1) and the Rules of Executive Clemency require

---

[45] This is how restoration applicants understand the test as well.  For example, at a 2007 Board hearing, Maurice Joseph Scott used the phrase "good moral character" twice in his presentation.  *See, e.g.*, DE 97-2, Hearing (Mar. 2007) (transcript at 141, 143-44); DE 89-2, Agenda, at 5.  The Voting Rights Act of 1965 banned in states subject to preclearance the use of any "test or device" which included "any requirement that a person as a prerequisite for voting or registration for voting . . . (3) possess good moral character."  52 U.S.C. § 10303(a), (c). The Supreme Court upheld that ban, noting these Jim Crow-era requirements were unconstitutionally vague and arbitrarily enforced.  *See South Carolina v. Katzenbach*, 383 U.S. 301, 312–13, 333–34 (1966) ("The good-morals requirement is so vague and subjective that it has constituted an open invitation to abuse at the hands of voting officials."); *United States v. Mississippi*, 229 F. Supp. 925, 930–31 (S.D. Miss. 1964), *rev'd and remanded by* 380 U.S. 128, 133 (1965) (reversing dismissal of complaint challenging literacy, constitutional interpretation and moral character tests, which alleged the character test "provide[d] no objective reference by which the county registrar may determine good moral character and thus is so vague and indefinite as to permit registrars to arbitrarily reject Negro applicants" because it "depend[ed] solely on the registrar's own whim or caprice, ungoverned by any legal standard").  The 1970 Amendments to the Voting Rights Act extended this ban nationwide.  52 U.S.C. § 10501.

that an ex-felon obtain the Board's permission in order to vote.  In subjecting the right to vote to a licensing scheme of unfettered official discretion which necessarily leads to arbitrary decision-making, these provisions violate the First and Fourteenth Amendments to the U.S. Constitution.  Therefore, Plaintiffs are entitled to summary judgment.

### c. Examples of arbitrary, biased and/or discriminatory decision-making due to the Board's unfettered discretion, though not required, demonstrate the arbitrary nature of Defendants' scheme.

Inevitably, similarly situated individuals secure diametrically opposite results based on the passing whims of Board members, since nothing regulates their decision-making.  Because Plaintiffs assert that the absence of any legal constraints on official discretion in restoration of voting rights decisions is arbitrary on its face, they need not cite instances of actual discriminatory and/or biased treatment to establish a facial violation for Counts 1, 2 and 3.  The Supreme Court made this clear in *Forsyth County*:

> Facial attacks on the discretion granted a decisionmaker are not dependent on the facts surrounding any particular permit decision. . . . [T]he success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance preventing him from doing so.

505 U.S. at 133 n.10 (citations omitted); *Students for Life USA v. Waldrop*, 162 F. Supp. 3d 1216, 1242 (S.D. Ala. 2016) ("The thrust of the unbridled discretion doctrine, moreover, is that such discretion of itself raises an unacceptable risk of

23

viewpoint discrimination; there is no burden on the plaintiff to prove that the government has exercised, or will exercise, its unbridled discretion in a viewpoint-biased manner."). Nevertheless, below Plaintiffs set forth evidence of probable and actual arbitrary, biased and/or discriminatory treatment to demonstrate that Florida's disenfranchisement and reenfranchisement scheme is also arbitrary in its operation. If disclosed, the Board's reasoning in granting or denying applications is purely arbitrary and may be pretextual. And even when Board members remain silent, they may be denying or granting an applicant for discriminatory, biased and/or arbitrary reasons.

### 1. *Partisan and/or Ideological Bias*

One of the pillars of the Supreme Court's justification for prohibiting unfettered discretion in administrative licensing schemes regulating First Amendment-protected conduct is the threat of viewpoint discrimination. The Court has stated that: "[A] law or policy permitting [a protected First Amendment activity] in a certain manner for some but not for others raises the specter of content and viewpoint censorship. This danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official." *Plain Dealer*, 486 U.S. at 763.

Since the fate of every applicant's right to vote rests in the unconstrained discretion of four state officials, the restoration process is highly vulnerable to

viewpoint discrimination including discrimination on the basis of political party affiliation or political viewpoints.  The Board can try to infer an applicant's political leanings based on his or her statements, residence address, race or ethnicity and even information outside OCI's case analysis, and then make its decision on that basis.  It is therefore unsurprising that certain applicants and their supporting witnesses make partisan appeals to the Board.  Some applicants and witnesses have sought to curry favor by identifying themselves with a Board member's political party or by signaling political leanings and policy preferences.  These statements may well make the difference or give Board members a reason to grant an application, even though they have denied similarly or even more favorably positioned applicants.  These risks are inherent in the process, regardless of the Board members' particular party affiliations.

The rights restoration process has seen a number of incidents that give rise to the inference that politics or ideology actually played a role in the Board's decision. At the December 14, 2000 Board hearing, just days after *Bush v. Gore* was decided, restoration of civil rights applicant Paul Daniel Maloney appeared before the Board, stated that he was pro-life, and congratulated former Governor Jeb Bush on his brother's victory in the presidential election.[46]  Notwithstanding OCI's unfavorable recommendation, the Board took his case under advisement at the hearing and

---

[46] DE 92-3, Hearing (Dec. 2000) (transcript at 99-101).

ultimately restored his civil rights.[47]  One could reasonably infer that Mr. Maloney's statements of support for President George W. Bush's election and the pro-life cause, signals of his partisan and ideological affiliations, played a role in the favorable outcome of his case.

In 2003, George Michael Grabek told Governor Bush that he was "proud of [his] brother, President Bush" and was granted.[48]  In 2001, Robert Kenneth Travis told Governor Bush how much he admired Barbara Bush, as well as former Governor Bob Martinez and former Attorney General Jim Smith because they had switched from the Democratic Party to the Republican Party.  Mr. Travis identified himself as a registered Republican and implied he would vote that way if granted restoration, which the Board approved.[49]  As an example of ideological signaling and possible bias, at a 2006 hearing, Melvin Drew Pilgrim's restoration application was granted after he signaled his opposition to tax increases: "I pay a lot of taxes . . . . And feel like I should vote for those that raise them, against them anyway." Verifying the applicant's fiscal conservatism, Governor Bush responded, "Or who cut them," which the applicant repeated verbatim.[50]

---

[47] DE 88-5, Agenda, at 15; DE 87-3, Defendants' Responses to Plaintiffs' Third Set of Interrogatories and Requests for Production, at 1-3, 7-8 (Interrogatory No. 1, Request for Production No. 2; Executive Order 2001C-13).

[48] DE 93-6, Hearing (Mar. 2003) (transcript at 112-16); DE 88-8, Agenda, at 4.

[49] DE 93-1, Hearing (Dec. 2001) (transcript at 75-79); DE 88-6, Agenda, at 20.

[50] DE 96-2, Hearing (Mar. 2006) (transcript, Vol. 2 at 100-06); DE 89-1, Agenda, at 6.

These episodes betray the vulnerability of the Board's arbitrary process to political favoritism and discrimination and show how a process marked by unfettered discretion subjects the constitutional rights of ex-felons to arbitrary, biased and/or discriminatory treatment. The constitutional problem with these discretionary restoration decisions exists no matter who is in office or his or her political party. At a 1997 hearing, the Board restored the rights of Raymond Neil Oberman, after his uncle ingratiated himself with Governor Lawton Chiles by reminding him they had seen each other at "the convention," almost certainly referencing the 1996 Democratic National Convention.[51]

Further examples of applicants seeking to curry favor with the Board by signaling their political views abound. In 2016, a 25-year veteran of law enforcement testified on behalf of Patrick Durden, stating that Mr. Durden should be able "to vote, to be a part of the process—to be a part of the political process, whether it's seeking office or to vote or to serve on a jury, this is the type of person that we want out there doing . . . Beyond his conservative views which are in all of our favor. . . ."[52]  His civil rights were restored.  Also in 2016, a police officer spoke in favor of Robert Arnold Martin's application and sought to appeal to what he perceived to be the Board's politics by stating Mr. Martin "is very conservative"—

---

[51] DE 90-1, Hearing (Dec. 1997) (transcript at 153-58); DE 88-2, Agenda, at 22.
[52] DE 101-169, Hearing (Mar. 2016) (video at 3:58:56-4:09:00; 4:06:56); DE 89-11, Agenda, at 8.

the application was granted.[53]  Stephen A. Warner was confronted with his illegal

voting at a 2013 Board hearing, and he responded by saying he had voted for

Governor Scott: "Actually I voted for you."[54]  The Board proceeded to restore Mr.

Warner's civil rights,[55] notwithstanding his voting as an ex-felon and the fact that

they denied other applicants in part on this basis in 2011.[56]  Additionally, in 2015,

Scott Moore regained his right to vote after his wife testified to "his conservative

principles."[57]

By contrast, in 2012, Rex L. Carver, a military veteran, spoke about the

injustice of felon disenfranchisement and the need to protect the right to vote.[58]

---

[53] DE 101-174, Hearing (Dec. 2016) (video, Disc 2 at 00:00:17-00:04:12; 00:03:58); DE 89-11, Agenda, at 42.

[54] DE 101-159, Hearing (Dec. 12, 2013) (video at 3:47:56-3:50:48).

[55] DE 89-8, Agenda, at 37.

[56] Leniency towards unwitting unlawful registration and voting has fluctuated. Governor Bush usually granted such individuals.  Noting it is "common" for ex-felons to be misinformed or confused about their ineligibility, Governor Bush restored Benny Lewis Campbell's civil rights in 2006.  DE 96-3, Hearing (June 2006) (transcript at 104-08); DE 89-1, Agenda, at 32.  But in 2011, Governor Scott rejected at least five different applicants, after the Board focused on their unwitting unlawful registration and/or voting as ex-felons.  They include: Dorothy Tabb Bucknor; Leon Gillis III; Donald Charles Green; Elston Roberto Joyner; and Tiffany Paramore.  DE 101-140, Hearing (Feb. 2011) (video at 1:50:24-1:56:00); DE 101-142, Hearing (June 2011) (video at 2:08:55-2:16:43); DE 101-144, Hearing (Dec. 2011) (video at 2:11:20-2:19:40; 2:19:30); id. at 2:46:35-2:51:43; id. at 3:10:11-3:19:59; DE 89-6, Agendas, at 3, 13, 41-42.  The Board has never revisited and reversed those denials.  DE 85-11, ECB Defendants' Responses to Plaintiffs' First Set of Discovery Requests, Interrogatory No. 12.

[57] DE 101-165, Hearing (June 2015) (video at 2:37:40-2:42:49; 2:41:56); DE 89-10, Agenda, at 10.

[58] DE 101-151, Hearing (Sept. 2012) (video, Disc 2 at 00:14:12-00:18:45).

Discounting evidence that Mr. Carver had indeed turned away from crime, Governor Scott simply noted that the applicant had a record of traffic violations and stated: "If you look at it from our standpoint, you look at it and you say, gosh this is an individual that doesn't worry about complying with the law."[59]   Mr. Carver's application was denied.[60]

## 2. Religion

Invocations of religious faith or testimony as to participation in church or a prison ministry will not always persuade the Board to grant restoration of civil rights. Nevertheless, that applicants are even citing their devoutness and Defendants are weighing that information underscores how arbitrary and anti-democratic the restoration process is.  In 2002, Governor Bush focused on Joseph Richard Lane's professions of faith, asking "When did you have your born-again experience?" and "When did the Holy Ghost come into your life?"   Ultimately, the Board was unconvinced and denied him.[61]   In 2003, Eric L. Robinson had more luck talking about the role the church had played in his life, and the Board granted his restoration application.  Governor Bush's parting words were: "And just keep focused on the Lord and keep focused on your fatherhood and taking care of those kids."[62]  In 2006,

---

[59] *Id*. at 00:18:10-08:18:17.
[60] DE 89-7, Agenda, at 26.
[61] DE 93-2, Hearing (Feb. 2002) (transcript at 96-104); DE 88-7, Agenda, at 3.
[62] DE 94-2, Hearing (Sept. 2003) (transcript at 86-90); DE 88-8, Agenda, at 21.

Ricky Thompson Sr. identified himself as "a praying man" who has been "preaching the Gospel of Jesus Christ" and stated that God took away his desire to drink. The Board granted his application.[63]  In 2012, Jason Miller and his adoptive father spoke to Mr. Miller's Christian faith and the value of his service with the prison ministry. The Board restored his civil rights, and Governor Scott thanked the applicant for his work with the prison ministry.[64]

### 3. *Speeding tickets and other moving violations*

One of the most frequent reasons the Board cites for rejecting a civil rights restoration application is a record of traffic or moving violations. Governor Scott usually states that speeding tickets, driving with a suspended license, seat belt violations, failure to yield the right of way, running a red light, among others, are indicative of an unwillingness to abide by the law.[65] ███████████████

██████████████████████████████████ ██████████

█████████████████████████████████████████████

██████████████████████████████████ That these are

---

[63] DE 96-4, Hearing (Sept. 2006) (transcript at 177-81); DE 89-1, Agenda, at 49.

[64] DE 101-151, Hearing (Sept. 2012) (video, Disc 2 at 1:14:11-1:24:06); DE 89-7, Agenda, at 26.

[65] DE 101-144, Hearing (Dec. 2011) (video at 2:20:05-2:30:38) (Plaintiff James Hand); DE 100-1, ██████████████; DE 101-153, Hearing (Mar. 2013) (audio at 3:09:16-3:19:20; 3:16:59) (Plaintiff Joseph Galasso); DE 100-2, ██████████████ ██████; DE 101-144, Hearing (Dec. 2011) (video at 3:16:09-3:16:30).

overwhelmingly civil infractions, and that the constitutionally-protected right to vote hangs in the balance does not deter Governor Scott and the other Board members from denying an application on this basis.

The following voting rights restoration applicants have been denied due to their driving records: Leonard Dent;[67] Michael Brick;[68] Eric Rodriguez-Schack;[69] James Lee Miller;[70] Plaintiff James Michael Hand;[71] Shawn Hughes;[72] Dennis Ortega Miller;[73] Rex L. Carver;[74] and Plaintiff Joseph James Galasso.[75] However, in haphazard and arbitrary fashion, the Board will sometimes grant applications, notwithstanding equally lengthy records of moving violations. The following applicants were granted despite having a substantial or lengthy record of moving

---

[67] DE 89-16, Hearing (Sept. 1997) (transcript at 50-54); DE 88-2, Agenda, at 18.

[68] DE 90-2, Hearing (Mar. 1998) (transcript at 113-16); DE 88-3, Agenda, at 6.

[69] DE 92-1, Hearing (June 2000) (transcript at 85-91); DE 88-5, Agenda, at 7.

[70] DE 96-2, Hearing (Mar. 2006) (transcript, Vol. 2 at 109-11); DE 89-1, Agenda, at 6.

[71] *See supra* n.65; DE 89-6, Agenda, at 45.

[72] DE 101-144, Hearing (Dec. 2011) (video at 2:30:46-2:37:22); DE 89-6, Agenda, at 41.

[73] DE 101-146, Hearing (Mar. 2012) (video, Disc 2 at 00:12:01-00:22:41); DE 89-7, Agenda, at 3.

[74] DE 101-151, Hearing (Sept. 2012) (video, Disc 2 at 00:14:12-00:18:45); DE 89-7, Agenda, at 26.

[75] *See supra* n.65; DE 89-8, Agenda, at 6; DE 87-3, Defendants' Response to Plaintiffs' Third Set of Interrogatories and Requests for Production, at 1-4, 32-33, Interrogatory No. 1, Request for Production No. 2 (Galasso Denial Letter).

violations: Mark Carston Addison;[76] Tomeka S. Jordan;[77] Charles R. Douglas ("so many traffic tickets" including speeding tickets);[78] Jeremy Lewis ("so many speeding tickets");[79] Gregory Louis Hansen ("all these traffic violations");[80] Anthony Edward Manso ("so many traffic tickets");[81] Richard Allen Slaughter III ("so many traffic violations");[82] Nelson Thomas Cruz ("horrible" driving record);[83] Ronald Eugene Thompson;[84] and Rene De Moya ("a lot of traffic tickets").[85]

On occasion, the Board randomly imposes conditions on the restoration of civil rights without ever explaining why they are singling out these individuals for more favorable treatment.  The Board granted both Frank Sacco's and Christopher

---

[76] DE 101-143, Hearing (Sept. 2011) (video at 1:49:50-2:00:23; 1:59:30); DE 89-6, Agenda, at 27.

[77] DE 101-145, Hearing (Mar. 2012) (video, Disc 1 at 2:14:10-2:20:30); DE 89-7, Agenda, at 7.

[78] DE 101-152, Hearing (Dec. 2012) (video, Disc 1 at 1:22:00-1:26:36); DE 89-7, Agenda, at 37.

[79] DE 101-157, Hearing (Sept. 2013) (video, Disc 2 at 1:22:13-1:24:40); DE 89-8, Agenda, at 29.

[80] DE 101-159, Hearing (Dec. 2013) (video at 2:18:52-2:20:07); DE 89-8, Agenda, at 36.

[81] DE 101-159, Hearing (Dec. 2013) (video at 2:21:11-2:22:38); DE 89-8, Agenda, at 36.

[82] DE 101-160, Hearing (Mar. 2014) (video at 3:09:18-3:12:18); DE 89-9, Agenda, at 4.

[83] DE 101-161, Hearing (June 2014) (video at 2:13:00-2:15:47); DE 89-9, Agenda, at 21.

[84] DE 101-161, Hearing (June 2014) (video at 2:48:12-2:49:40); DE 89-9, Agenda, at 21.

[85] DE 101-163, Hearing (Dec. 2014) (video at 3:29:43-3:33:40); DE 89-9, Agenda, at 34.

Allan Williams's restoration applications at a 2001 hearing on condition that they complete a 6-month probationary period without any traffic tickets and a driving course.[86]  In 2003, David Lee Carroll's rights were restored on condition that he complete a driver improvement course.[87]  The Board granted Tim Jones's restoration application, despite a "long list" of traffic violations, but delayed restoration until he completed a year without a new violation.[88]  Finally, in 2015, Edwin Scheer, who may have had "the worst" traffic record the Board members had ever seen, was granted restoration, if he successfully completed a two-year probationary period.[89]  Mr. Scheer was charged with reckless driving in 2016, so the Board is reviewing this information to decide whether his conditional grant should be revoked.[90]

### 4. Drug Use

Some ex-felon restoration applicants are denied for drug use subsequent to completing their sentences, regardless of whether they were charged or prosecutors took further action.  Others are granted, notwithstanding a record of post-sentence

---

[86] DE 92-5, Hearing (June 2001) (transcript at 110-16, 130-32); DE 88-6, Agenda, at 6.

[87] DE 93-6, Hearing (Mar. 2003) (transcript at 75-79); DE 88-8, Agenda, at 3.

[88] DE 89-1, Agenda, at 6; DE 96-2, Hearing (Mar. 2006) (transcript, Vol. 2 at 117-21).  Governor Bush stated: "[I]t's one signal of whether you respect the rules of society. . . . [I]t kind of is a big deal." *Id*. at 120.

[89] DE 101-165, Hearing (June 2015) (video at 2:08:53-2:12:27); DE 89-10, Agenda, at 9.

[90] DE 87-3, ECB Defendants' Responses to Plaintiffs' Third Set, Interrogatory No. 2.

drug use.  Board members question many but not all applicants over their past and present drug use or lack thereof.

In 2015, Michael Lee Hazelwood was denied restoration of his civil rights after he admitted that he occasionally smokes marijuana because it helps him sleep,[91] and Paul Antoine's application was denied in 2016 because of a 2008 cocaine possession charge, on which prosecutors took no action.[92]  It can be reasonably inferred that Brandon Garth Bloch was denied in part for smoking marijuana a year before his 2011 hearing and post-sentence drug use.[93]  In 2015, Kevin Michael Grenier was denied restoration because over 18 years before his hearing he had failed a drug test, violating his community control and resulting in his incarceration, and because Board members believed that he had not finished a drug treatment program when he was 17 years old.[94] ███████████████████████████

███████████████████████████████████████████████████

--------

[91] DE 101-168, Hearing (Dec. 2015) (video at 3:24:21-3:27:18); DE 89-10, Agenda, at 24.

[92] DE 101-169, Hearing (Mar. 2016) (video at 3:42:30-3:45:53); DE 89-11, Agenda, at 12; DE 87-4, Certified Report of Miami-Dade County Criminal Records from 2008 for Paul Jonathan Antoine, at 1; DE 98, Request for Judicial Notice.

[93] DE 101-144, Hearing (Dec. 2011) (video at 1:50:20-2:07:47); DE 89-6, Agenda, at 45.

[94] DE 101-168, Hearing (Dec. 2015) (video at 3:16:54 (announced), 3:18:50-3:24:10); DE 89-10, Agenda, at 24; DE 85-12, 86-8, Defendants' Response to Plaintiffs' First Set of Requests for Production, Request for Production 7, at 14 (Correspondence Reflecting Denial); DE 88-1, Certified Copies of Brevard County Criminal Records for Kevin Michael Grenier, at 8, 17-20, 30, 39-42; DE 98, Request for Judicial Notice.

██████████████████████████████████████████

████████████████████ It is unclear how ████████████ Mr. Grenier's pre-conviction drug use and Mr. Grenier's pre-incarceration violation related to their *post-sentence* rehabilitation, if that is in fact one of the Board's metrics.

By contrast, in a case that is very similar to that of Paul Antoine, in 1997, Manuel Eduardo Pinate's application was granted, notwithstanding a dismissed cocaine possession charge just three years prior to his hearing. Governor Chiles noted that they were making an exception for him.[96] Similarly, following the September 8, 2005 hearing, Semitra Brown's civil rights were restored, despite her arrest just two years earlier for drug possession, and it was uncertain whether she had finished her drug treatment program.[97] Additionally, at hearings in 2016, Roger Simon admitted to continued marijuana use following his completed sentence for drug trafficking,[98] and Melissa Beth Ann-Miller admitted that she smoked marijuana as recently as 2012.[99] Despite these admissions, both applicants' restoration

---

[95] ████████████████████████████

[96] DE 89-13, Hearing (Jan. 1997) (transcript at 89-92); DE 88-2, Agenda, at 3.

[97] DE 95-4, Hearing (Sept. 2005) (transcript at 121-25); DE 88-10, Agenda, at 12; DE 87-3, Defendants' Responses to Plaintiffs' Third Set of Interrogatories and Requests for Production, at 1-3, 12-16 (Interrogatory No. 1; Request for Production No. 2; Executive Order 2005C-259; Correspondence).

[98] DE 101-172, Hearing (Sept. 2016) (video, Disc 3 at 3:09:40-3:15:35); DE 89-11, Agenda, at 27.

[99] DE 101-174, Hearing (Dec. 2016) (video, Disc 2 at 00:04:23-00:08:02); DE 89-11, Agenda, at 38.

applications were granted.   In 2012, Brian Ohle's voting rights were restored notwithstanding the fact that he had used drugs in 2007 following his conviction for a crime committed under the influence of drugs and alcohol.[100]   At a 2014 hearing, the Board noted that Danny Cuesta, who had previously been convicted of a federal drug offense, was re-arrested in 2001 for possession of cocaine.[101]   Nevertheless, the Board restored his civil rights.   At least one applicant, John William Watson, has been granted restoration on condition of drug testing.[102]

It is impossible to reconcile all of these cases.   An applicant's race, ethnicity, religion, failure to identify with any religion, dress, manner of speech, a guess as to the applicant's political inclinations or Board member whim might all play a role in these random decisions.   A system of absolute discretion in licensing is a license to treat applicants in an arbitrary, biased and/or discriminatory manner.

### 5.  Alcohol Use

The Board also arbitrarily denies restoration applicants on the basis of post-sentence drinking, which is of course legal for persons at least 21 years old. Restoration applicants routinely face questioning by Governor Scott and the other Board members over their use of alcohol.   For some applicants who were convicted

---

[100] DE 101-150, Hearing (Sept. 2012) (video, Disc 1 at 1:49:48-1:56:38); DE 89-7, Agenda, at 30.

[101] DE 101-160, Hearing (Mar. 2014) (video at 2:11:33-2:14:02); DE 89-9, Agenda, at 15.

[102] DE 90-1, Hearing (Dec. 1997) (transcript at 160-64); DE 88-2, Agenda, at 22.

of DUI offenses, the Board has zero tolerance for even infrequent, responsible drinking at social occasions like weddings.  Others are granted.

In 2006, Governor Bush denied David Richard Elliott, because he drinks "socially and occasionally" following a conviction for DUI with serious bodily injury, even though he stated he does not drink and drive.[103]  The Board denied Ronald Kessler,[104] Brent Walter Rouse,[105] Robert Allen Parsons,[106] and James Traina's[107] applications, citing their continued drinking following convictions for felonies committed while intoxicated including DUI manslaughter, even if the applicants represented that their drinking was rare and responsible.  For example, Governor Scott scolded Mr. Rouse for drinking, given his criminal record: "[U]ntil you stop drinking . . . I would never ever—if I was in an accident and somebody died I would never touch alcohol again."[108]  Mr. Traina told the Board that he drinks

---

[103] DE 96-2, Hearing (Mar. 2006) (transcript, Vol. 2 at 52-55); DE 89-1, Agenda, at 5; DE 87-3, Defendants' Responses to Plaintiffs' Third Set of Interrogatories and Requests for Production, at 1-3, 18-20 (Interrogatory No. 1; Request for Production No. 2; Correspondence and Denial Letter).

[104] DE 101-142, Hearing (June 2011) (video at 1:39:35-1:46:22); DE 89-6, Agenda, at 22.

[105] DE 101-153, Hearing (Dec. 2012) (video, Disc 2 at 1:41:49-1:52:29); DE 89-7, Agenda, at 38.

[106] DE 101-158, Hearing (Sept. 2013) (video, Disc 3 at 1:34:08-1:39:20); DE 89-8, Agenda, at 30.

[107] DE 101-167, Hearing (Sept. 2015) (video, Disc 2 at 2:33:48-2:37:26); DE 89-10, Agenda, at 18; DE 86-8, Defendants' Response to Plaintiffs' First Set, Request for Production No. 7, at 12.

[108] *See supra* n.105 at 1:52:15-1:52:29.

"very, very rarely," noting he had a little champagne at his granddaughter's wedding, and never drives when intoxicated.[109]

However, at other times, Governor Scott questions applicants who were intoxicated at the time of their offenses and, after confirming that their present drinking is minimal, occasional and/or responsible, moves to grant the application. The Board restored Gerald Bryan Kelly's civil rights even though he informed Governor Scott that he drinks on occasion after having served time for a DUI manslaughter conviction.[110]  Brian Ohle's application was granted even though he admitted to both alcohol and drug use after his conviction and as recently as five years prior to his hearing.[111]  In 2013, another DUI manslaughter ex-felon Ronald Burgess Kilpatrick's application was granted, even though he drinks on occasion.[112] Finally, in 2016, though Jason Lehlback was appearing before the Board for a different crime, he also had a reckless driving conviction (reduced from a DUI).  Mr. Lehlback was reenfranchised despite stating that he drinks about four to six drinks per week.[113]  Defendant Attorney General Pam Bondi praised his honesty and noted

---

[109] *See supra* n.107 at 2:36:10-2:37:26.

[110] DE 101-145, Hearing (Mar. 2012) (video, Disc 1 at 2:20:54-2:33:07; 2:31:46); DE 89-7, Agenda, at 3.

[111] *See supra* n.100.

[112] DE 101-155, Hearing (June 2013) (video at 2:19:17-2:27:33); DE 89-8, Agenda, at 14.

[113] DE 89-11, Agenda, at 39; DE 101-174, Hearing (Dec. 2016) (video, Disc 2 at 00:45:32-00:52:21).

that he was drinking "responsibly."[114]  Governor Scott's purported "zero tolerance" policy for drinking by those convicted of DUI crimes is randomly applied and may be just another pretextual reason.  These examples underscore the erratic, arbitrary nature of the Board's decision-making.

### 6.  Insufficient Time Since Sentence Completion

The Board also rejects restoration applicants based on their random, inconsistent opinions as to whether sufficient time has passed since the applicant completed his/her sentence.  Governor Bush denied applicants on this basis, for example: Jason Scott Cole ("There needs to be a little bit more time . . ."); John Paul William Paramore ("You're doing the right thing.  It's just we need a little bit more time."); Roger Dean Travis ("the short-time nature of your recovery"); and Richard Little ("[W]e need a little bit more time.").[115]

This has continued to the present day.  Even though Governor Scott's Board have imposed five- and seven-year waiting periods before ex-felons can even apply for restoration of civil rights, the Governor nevertheless frequently denies applicants by noting simply that "more time needs to pass."[116]  There is no consistency in these

---

[114] *Id.* at 00:52:00-00:52:10.

[115] DE 91-4, Hearing (Oct. 1999) (transcript at 106-08); DE 88-4, Agenda, at 26; DE 91-6, Hearing (Feb. 2000) (transcript at 116-17); DE 88-5, Agenda, at 3;  DE 92-5, Hearing (June 2001) (transcript at 167-70); DE 88-6, Agenda, at 6; DE 96-4, Hearing (Sept. 2006) (transcript at 146-49); DE 89-1, Agenda, at 41.

[116] DE 101-168, Hearing (Dec. 2015) (video at 3:41:44-3:41:47).

snap determinations as to what constitutes an adequate amount of time between the completion of a sentence and reenfranchisement. In 2011, the Board noted it had been less than ten years since Timothy John Faulkner[117] and Plaintiff Harold William Gircsis, Jr.[118] were released before denying them. Governor Scott also told Anna McFarland Wood that she needs to be crime-free for a longer period than four years,[119] and he told Stephen Edward Crain that he would like to wait a little longer.[120] Every year applicants are denied because the Governor on whim determines that not enough time has passed since their sentences were completed: Shawn Hughes ("It's not enough time for me.");[121] Michael L. Price ("It takes a little more time before I feel comfortable.");[122] Luis Frederico Zouain ("[I]t's only been eleven years");[123] Charles E. Williamson ("[M]ore time ought to pass");[124] Plaintiff

---

[117] DE 101-144, Hearing (Dec. 2011) (video at 1:23:57-1:24:57); DE 89-6, Agenda, at 45.

[118] DE 101-144, Hearing (Dec. 2011) (video at 1:24:58-1:26:03); DE 89-6, Agenda, at 45.

[119] DE 101-142, Hearing (June 2011) (video at 4:05:18-4:16:35); DE 89-6, Agenda, at 12.

[120] DE 101-142, Hearing (June 2011) (video at 2:01:56-2:08:17); DE 89-6, Agenda, at 23.

[121] DE 101-144, Hearing (Dec. 2011) (video at 2:30:46-2:37:20; 2:36:58); DE 89-6, Agenda, at 41.

[122] DE 101-146, Hearing (Mar. 2012) (video, Disc 2 at 00:33:45-00:37:41); DE 89-7, Agenda, at 4.

[123] DE 101-146, Hearing (Mar. 2012) (video, Disc 2 at 00:44:28-00:49:48); DE 89-7, Agenda, at 4.

[124] DE 101-153, Hearing (Dec. 2012) (video, Disc 2 at 2:03:20-2:08:32); DE 89-7, Agenda, at 43.

Virginia Kay Atkins ("At this point I don't feel comfortable" despite completing her sentence 10 years earlier);[125] Gene Alan Rothstein ("[M]ore time needs to pass");[126] Vinicio Marmolejos ("I want you to have more time to change your life and show you've changed.").[127]   Moreover, as previously noted, Kevin Grenier was denied because of a drug-related community control violation over 18 years before his hearing.[128]   The Board effectively substitutes its own judgment for that of the courts and the Florida Commission on Offender Review.   The Board is essentially given the unchecked power to indefinitely extend the deprivation of an ex-felon's civil rights.

Finally, the Board sometimes creates ad hoc rules.   At the March 3, 2016 hearing, the Board denied David Bruce Easterling's application and imposed a 50-year waiting period before he could reapply, potentially disenfranchising the 54-year-old for life.[129]

### 7. *Miscellaneous*

---

[125] DE 101-155, Hearing (June 2013) (video at 2:52:16-2:56:02); DE 89-8, Agenda, at  22. ██████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████

[126] DE 101-159, Hearing (Dec. 2013) (video at 3:22:12-3:27:13); DE 89-8, Agenda, at 37.

[127] DE 101-160, Hearing (Mar. 2014) (video at 2:52:48-2:55:20); DE 89-9, Agenda, at 15.

[128] *See supra* at 34.

[129] DE 101-169, Hearing (Mar. 2016) (video at 4:09:01-4:13:50); DE 89-11, Agenda, at 8.

A public official's intervention may help an applicant, where similarly or more favorably situated applicants are denied.   In 2011, Rufus Humphrey's application was granted, notwithstanding that: (1) he had been convicted of multiple murders; (2) Attorney General Bondi expressed concern that Mr. Humphrey was not present at the hearing; and (3) Governor Scott did not see anything in the record to show Mr. Humphrey was remorseful.  This happened because Florida State Senator Gary Siplin testified on Mr. Humphrey's behalf and negotiated for his constituent to secure restoration following a phone call to the Board.[130]   Mr. Humphrey's application was taken under advisement and ultimately granted.[131]  That same year, no one testified on behalf of Plaintiff Harold Gircsis, Jr., who was convicted of a federal drug offense and absent from his hearing.  Mr. Gircsis was denied,[132] despite a favorable recommendation from OCI, ██████████████████████████

██████████████████████████████████.[133] ████████████████

---

[130] DE 101-143, Hearing (Sept. 2011) (video at 2:25:40-2:29:38); DE 89-6, Agenda, at 41.  Aside from Mr. Humphrey, the record evidence, including hearing transcripts, audio and video recordings from 1997 to the present, does not reflect that any other applicant has ever been provided an opportunity for a telephonic hearing.

[131] DE 87-3, ECB Defendants' Responses to Plaintiffs' Third Set of Interrogatories and Requests for Production, at 1-3, 24-27 (Interrogatory No. 1; Request for Production No. 2; Executive Order 2011C-62; Correspondence).

[132] With rare exception, applicants who do not appear at their hearings are routinely denied, even though the Rules do not mandate attendance.  *See, e.g.*, DE 89-12, Agenda (Mar. 2017), at 7 (Nos. 56-61); DE 101-176, Hearing (Mar. 2017) (video, Disc 2 at 2:27:37-2:28:32).

[133] DE 101-144, Hearing (Dec. 2011) (video at 1:24:58-1:26:03); DE 89-6, Agenda, at 41; DE 85-4, Gircsis Affidavit ¶¶ 1-7; ██████████████████████████.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████

### d. The Remedy

Concurrent with filing this summary judgment motion, Plaintiffs have moved to certify a class of all ex-felons who have finished their full sentences and would be eligible to vote but for Florida's unconstitutional felon disenfranchisement and reenfranchisement scheme.  Plaintiffs request that the Court certify the proposed class, and declare unlawful and enjoin Defendants from enforcing FLA. CONST. art. VI, § 4(a), FLA. STAT. ANN. § 97.041(2)(b), FLA. CONST. art. IV, § 8, FLA. STAT. ANN. § 944.292(1) and the Florida Rules of Executive Clemency as to the Plaintiff Class.  Plaintiffs would not oppose a request for a stay of any injunction issued by this Court, pending the final resolution of any appeal.

Defendants have previously argued that even if Plaintiffs prevail, they would only be entitled to a remedy of objective, specific standards for the restoration of civil rights.[134]  First, this argument is contradicted by the line of cases previously cited in which the Supreme Court fully invalidated such restraints on First

---

[134] *Id.* at 7.
[135] DE 50, Defendants' Reply in Support of Motion to Dismiss, at 4-5.

43

Amendment activity and their corresponding permit and license requirements.  *See supra* at 16-18.  The Court expressly rejected Defendants' argument in *Hague v. CIO*, 307 U.S. 496 (1939).  In *Hague*, the Supreme Court granted declaratory and injunctive relief against a prior restraint scheme, which allowed for the "arbitrary suppression of free expression."  *Id.* at 516-18.  The Court went on to hold the lower court had been "wrong" to preserve the permit requirement and simply impose "conditions under which a permit may be granted or denied":

> As the ordinance is void, the respondents are entitled to a decree so declaring and an injunction against its enforcement by the petitioners.  They are free to hold meetings without a permit and without regard to the terms of the void ordinance.  *The courts cannot rewrite the ordinance, as the decree, in effect, does.*

*Id.* at 518 (emphasis added); *see also Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610, 622 (1976) (invalidating unconstitutionally vague ordinance) ("[W]e are without power to remedy the defects by giving the ordinance constitutionally precise content.").  Second, neither Defendants nor the Florida Legislature have sought to cure the constitutional violations Plaintiffs assert.  It is not for this Court to "remedy the defects" in the challenged constitutional provisions, statutes, and rules.  *See also Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988) ("[W]e will not rewrite a state law to conform it to constitutional requirements.").

Accordingly, if the Court grants this Motion, the remedy for this challenge to unfettered discretion in voting rights restoration is striking down the requirement to obtain a license or permit before voting.  Plaintiffs request that this relief be limited to the parties before this Court, *i.e.* the members of the proposed Plaintiff Class, which includes all ex-felons in Florida who have completed their sentences.  *See United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 477–78 (1995) (limiting relief to certified class, even though facial violation established).  This will preserve Florida's power to disenfranchise felons while they are still serving out their sentences.

## 2.  Count 3: A lack of definite time limits for Board decisions on restoration of civil rights applications violates the First Amendment.

Plaintiffs also challenge the lack of definitive time limits for the Board to process and reach a decision on a restoration of civil rights application.   First Amendment doctrine holds that "a prior restraint that fails to place limits on the time within which the decisionmaker must issue the license is impermissible."  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226 (1990) (citing *Freedman v. State of Maryland*, 380 U.S. 51, 59 (1965)).   "Where the licensor has unlimited time within which to issue a license, the risk of arbitrary suppression is as great as the provision of unbridled discretion. A scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech."  *Id.* at 227; *see also Riley v. Nat'l Fed'n of the Blind of North Carolina, Inc.*, 487 U.S.

781, 802 (1988) ("[D]elay compels the speaker's silence.   Under these circumstances, the licensing provision cannot stand.").

The Board is not bound by any reasonable, definite time limits in processing and reaching final decisions on restoration applications.  The Florida Constitution, state statutes, and the Rules of Executive Clemency are devoid of any such time limits for processing and granting or denying ex-felon applicants their right or license to vote.  Ex-felon applicants for restoration of civil rights may wait as many as ten years to receive notice of a hearing and/or a determination on their applications.[136]  On June 16, 2017, the Board had a backlog of 10,232 restoration of civil rights applications and, as of October 1, 2017, that figure was 10,377.[137]  But it only hears an average of 52 cases per quarter.[138]  As of November 1, 2017, the Board's oldest case had been pending for over nine years.[139]  Though the significant backlog of applicants is making longer delays more common, in the absence of reasonable time limits, the Board and OEC may still process individual restoration

---

[136] DE 85-3, Galasso Affidavit ¶¶ 5-7 (multiple years between application and start of OCI investigation); DE 85-5, Smith Affidavit ¶¶ 4-5 (approximately ten years between application and hearing date); DE 85-9, Exline Affidavit ¶ 6 (three years to hear application disqualified due to unelapsed 5-year waiting period); *id*. ¶¶ 7-8 (almost two years between second restoration of civil rights application and notification of hearing date).

[137] *See supra* n.7.

[138] DE 85-11, 86-11, Defendants' Response to Plaintiffs' First Set of Interrogatories, Interrogatory No. 3.  This figure excludes applicants whose civil rights may be restored without a hearing.

[139] *See supra* n.7 at 2:19:20-2:20:14.

applications at their own chosen speed and may deliberately fast-track certain applicants while delaying others.

Since there is no requirement under Florida law that the Board process and adjudicate an application for restoration of civil rights within a definite, reasonable time period, FLA. CONST. art. VI, § 4(a), FLA. STAT. ANN. § 97.041(2)(b), FLA. CONST. art. IV, § 8, FLA. STAT. ANN. § 944.292(1) and the Florida Rules of Executive Clemency create the risk of arbitrary delays and arbitrary continued disenfranchisement and therefore violate the First Amendment.

### 3. Count 4: The five- and seven-year waiting periods unduly burden the right to vote in violation of the First and Fourteenth Amendments.

Finally, Count 4 challenges the five- and seven-year waiting period requirements, which were first imposed in 2011,[140] as undue burdens on the right to vote.  These waiting periods deny Plaintiff Yraida Guanipa and members of Subclass A of the Plaintiff Class even the opportunity to regain their voting rights.  *See Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) (premising standing on opportunity to compete).

Under the First and Fourteenth Amendments to the U.S. Constitution, any burden on the right to vote must be balanced against a state's interest in that requirement.  The Supreme Court has set forth the following test:

---

[140] DE 85-15, Rules, at 127-31.

> [T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 289, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992). But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions. *Anderson*, 460 U.S., at 788, 103 S.Ct., at 1569–1570; *see also id*., at 788–789, n. 9, 103 S.Ct., at 1569–1570, n. 9.

*Burdick*, 504 U.S. at 434. In their motion to dismiss, Defendants appeared to argue that the state has a legitimate interest in delaying restoration for five or seven years as a wait-and-see period on top of parole or probation. DE 36 ¶¶ 28–29. But second-guessing the sentence, which a legislature and a court have already determined is the necessary punishment and time period for rehabilitation, is not a rational basis for delaying reenfranchisement. Continued denial of the right to vote for years and decades indefinitely delays the point of social reintegration and is, therefore, counterproductive to the state's purported interest in ensuring rehabilitation. *Cf. Green Party of Tenn. v. Hargett*, 767 F.3d 533, 549 (6th Cir. 2014) (liberal ballot access for independent candidates undermines state's purported interest in avoiding voter confusion); *One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 934 (W.D. Wis. 2016) (state interest in alleviating burdens on clerks undermined by changes to absentee voting laws).

48

Rules 9 and 10 impose 5- and 7-year waiting periods, respectively, on ex-felons who seek to regain their right to vote.  An ex-felon must wait out this de facto second sentence before he or she can even apply for restoration.  This prolonged denial is a severe restriction on the right to vote which is not justified by or narrowly drawn to any state interest of compelling importance.  At a minimum, the pre-application waiting periods restrict the right to vote and cannot be justified by any important regulatory interest.  These ex-felons have already served their sentences including any period of parole, probation, supervised release and/or community control.

Former Board members have stated that there is no important regulatory interest or legitimate, rational basis in delaying the restoration of civil rights for an ex-felon who has completed his or her sentence.  In early 2007, the Board considered the adoption of new rules that would make restoration mandatory and automatic for many ex-felons.  Then-Governor Crist stated:

> If you believe that when somebody has committed a crime and that individual is sentenced by a judge and jury to a time to serve and/or a probation thereafter and when they have completed that sentence—when they have completed that punishment—that they have in fact, in fact paid their debt to society, then don't we owe them the opportunity to come back? . . . I believe that we do . . . I believe that we sitting here, don't have the right—the moral right—to add five years to that sentence given by a judge, to add five weeks to that sentence, or to add five minutes to it.  A judge and jury have made a determination about what the appropriate punishment is.[141]

---

[141] DE 101-113, Hearing (Apr. 2007) (video at 1:07:28-1:08:28).

Even Defendants' predecessors did not believe there was a rational basis to delay the restoration of civil rights to many ex-felons.

Because the state's interest in imposing an additional waiting period before the disenfranchised ex-felon can apply for reenfranchisement is neither compelling nor important, these waiting periods therefore violate the First and Fourteenth Amendments to the U.S. Constitution.  Plaintiff Yraida Guanipa and members of Subclass A request that this Court grant this Motion as to Count 4.

*          *          *

Executive clemency originated with the English monarchy in the 8th Century. *See Herrera v. Collins*, 506 U.S. 390, 412 (1993) ("In England, the clemency power was vested in the Crown and can be traced back to the 700's.  Blackstone thought this 'one of the great advantages of monarchy in general, above any other form of government; that there is a magistrate, who has it in his power to extend mercy, wherever he thinks it is deserved . . .'") (citation omitted); *Bowens v. Quinn*, 561 F.3d 671, 676 (7th Cir. 2009) (describing clemency as "one of the traditional royal prerogatives . . . borrowed by republican governments").  Perhaps then it should be no surprise that its application to the right to vote has worked such a perversion of our democracy.  Untold numbers of Floridians have long finished their sentences but their civil death persists.  A system devised to ensure there was an avenue for mercy

outside the court system today serves as a tool for prolonged mass disenfranchisement in a shrinking minority of states.

Plaintiffs respectfully request that their Motion for Summary Judgment be granted and that the challenged scheme as reflected in FLA. CONST. art. VI, § 4(a), FLA. STAT. ANN. § 97.041(2)(b), FLA. CONST. art. IV, § 8, FLA. STAT. ANN. § 944.292(1) and the Florida Rules of Executive Clemency be declared unconstitutional and permanently enjoined as to all members of the Plaintiff Class. Plaintiffs also request that the Court order such additional equitable relief as may be necessary to effectuate the judgment.[142]

DATED:  November 13, 2017   Respectfully submitted,

/s/ Jon Sherman
Jon Sherman*
D.C. Bar No. 998271
Michelle Kanter Cohen*
D.C. Bar No. 989164
Massachusetts Bar No. 672792 (inactive)
Fair Elections Legal Network
1825 K St. NW, Suite 450
Washington, DC 20006
jsherman@fairelectionsnetwork.com
mkantercohen@fairelectionsnetwork.com
Phone: (202) 331-0114
*Appearing *Pro Hac Vice* in the United States District Court for the Northern District of Florida

Theodore Leopold
Florida Bar No. 705608
Diana L. Martin

---

[142] *See* DE 29, First Amended Complaint at 73-79 (Prayer for Relief).

Florida Bar No. 624489
Poorad Razavi
Florida Bar No. 022876
Cohen Milstein Sellers & Toll PLLC
2925 PGA Boulevard | Suite 200
Palm Beach Gardens, FL 33410
tleopold@cohenmilstein.com
dmartin@cohenmilstein.com
prazavi@cohenmilstein.com
phone 561.515.1400
fax 561.515.1401

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2017, a true and correct copy of the foregoing document was served upon counsel for Defendants, including those listed below, by filing it with the Court's NextGen CM/ECF system.

Amit Agarwal
Solicitor General
Fla. Bar No. 125637
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
Tel. (850) 414-3300
Fax (850) 410-2672
amit.agarwal@myfloridalegal.com
Jennifer.bruce@myfloridalegal.com

Jonathan Alan Glogau
Chief, Complex Litigation
Florida Bar # 371823
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
850-414-3300
Jon.glogau@myfloridalegal.com
chanda.johnson@myfloridalegal.com

Jordan E. Pratt
Office of the Attorney General – Tallahassee FL
The Capitol STE PL-01
400 S Monroe St.
Tallahassee, FL 32399
850-414-3300
Email: jordan.pratt@myfloridalegal.com

Lance Eric Neff (FBN 0026626)
Senior Assistant Attorney General
Office of the Attorney General

The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3681
(850) 410-2672 (fax)
lance.neff@myfloridalegal.com

*Attorneys for Defendants*

November 13, 2017                                                    /s/ Jon Sherman
                                                                    *Attorney for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to N.D. Fla. Loc. R. 7.1(F), I certify that the foregoing Motion to Compel and Incorporated Memorandum of Law contains 12,993 words.

November 13, 2017                                    /s/ Jon Sherman
                                                    *Attorney for Plaintiffs*