# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

JAMES MICHAEL HAND, et al.,

        *Plaintiffs*,

v.                                      **Case No. 4:17cv128-MW/CAS**

RICK SCOTT, in his official
capacity as Governor of
Florida and member of the
State of Florida's Executive
Clemency Board, et al.,

        *Defendants*.

_____/

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Florida strips the right to vote from every man and woman who commits a felony. To vote again, disenfranchised citizens must kowtow before a panel of high-level government officials over which Florida's Governor has absolute veto authority. No standards guide the panel. Its members alone must be satisfied that these citizens deserve restoration. Until that moment (if it ever comes), these citizens cannot legally vote for presidents, governors, senators, representatives, mayors, or school-board members. These citizens are subject to the consequences of bills, actions, programs, and policies that their elected leaders enact and enforce. But these citizens cannot ever legally vote unless Florida's Governor approves restoration of this fundamental right.

Florida's Executive Clemency Board has, by rule, unfettered discretion in restoring voting rights. "We can do whatever we want," the Governor said at one clemency hearing. ECF No. 29, at ¶ 55 n.26. One need not search long to find alarming illustrations of this scheme in action. In 2010, a white man, Steven Warner, cast an illegal ballot. Three years later, he sought the restoration of his voting rights. He went before the state's Executive Clemency Board, where Governor Scott asked him about his illegal voting.

"Actually, I voted for you," he said. The Governor laughed. "I probably shouldn't respond to that." A few seconds passed. The Governor then granted the former felon his voting rights. ECF No. 101-159; ECF No. 29, at ¶ 65.

This is a facial challenge to Florida's re-enfranchisement scheme.[1] Plaintiffs and Defendants both move for summary judgment on cross motions.[2]

---

[1] Throughout this order, "re-enfranchisement" and "vote-restoration" are used interchangeably. This is not to be confused with other types of clemency that Florida offers. For example, the restoration of an individual's right to keep and bear arms is guided by a different set of rules and involves a different set of considerations—such as considerations of public safety—that have zero bearing on re-enfranchisement. *See* Fla. R. Exec. Clemency 4 (listing the types of clemency).

[2] Plaintiffs are a group of nine former felons who have completed their sentences, including any probationary requirements, but are not eligible to vote. ECF No. 29, at ¶¶ 18–26. Seven of the Plaintiffs have had their restoration applications rejected. *Id.* at ¶¶ 18–21, 23–25. An eighth Plaintiff's application has been pending for several years. *Id.* at ¶ 22. A final Plaintiff is not eligible to apply for restoration until June 2019. *Id.* at ¶ 26. Defendants are members of Florida's Executive Clemency Board ("Board"): the Governor, Attorney General, Chief Financial Officer, and Commissioner of Agriculture ("Defendants"). There is no dispute over standing. This Court accepts the facts in the light most favorable to the non-movant. *See Galvez v. Bruce*, 552 F.3d 1238, 1239 (11th Cir. 2008). All reasonable doubts about the facts shall be resolved in favor of the non-movant. *Id.* The standards governing cross-motions for summary judgment are the same, although the court must construe the motions independently, viewing the evidence presented by each moving party in the light most favorable to the non-movant. *Lozman v. City of Riviera Beach*, 39 F. Supp. 3d 1392, 1404 (S.D. Fla. 2014) (citations omitted). The parties agree to all material facts. The only disputes relate to questions of law. "'Where the unresolved issues are primarily

This Court has considered, without hearing, the parties' motions for summary judgment, their replies, and the record before it. In Florida, elected, partisan officials have extraordinary authority to grant or withhold the right to vote from hundreds of thousands of people without any constraints, guidelines, or standards. The question now is whether such a system passes constitutional muster. It does not.

## I

Florida automatically disenfranchises any individual who has been convicted of a felony. FLA. CONST. art. VI, § 4(a); FLA. STAT. ANN. § 97.041(2)(b). But the Florida Constitution authorizes the Governor, with the approval of at least two other Board members, to restore civil rights. FLA. CONST. art. IV § 8(a); FLA. STAT. ANN. § 944.292(1). The Office of Executive Clemency "was created to assist in the orderly and expeditious exercise of this executive power." Fla. R. Exec. Clemency 2(B).

The Board is guided by the Rules of Executive Clemency ("Rules"). The Rules are not "intended to limit the authority or discretion" of the Board. Fla. R. Exec. Clemency 2(A). The Governor *alone* "has the unfettered discretion to deny clemency at any time, for any reason." Fla. R. Exec. Clemency 4. The

---

legal rather than factual, summary judgment is particularly appropriate.'" *Bruley v. Vill. Green Mgmt. Co.*, 592 F. Supp. 2d 1381, 1388 (M.D. Fla. 2008) (quoting *Uhl v. Swanstrom*, 79 F.3d 751, 754 (8th Cir. 1996)).

3

Governor and two Board members have "the unfettered discretion to grant, at any time, for any reason" several types of clemency, including the restoration of voting rights. *Id*.

The Rules outline the procedures former felons must undertake to have their voting rights restored. ECF No. 103, Ex. J, at 20. Former felons must wait either five or seven years from the completion of their sentence—including probation, parole, and fines—to apply for restoration, depending on the severity of the crime. *See* Fla. R. Exec. Clemency 9(A)(4) (listing crimes ineligible for a five-year pre-application waiting period).

The Florida Commission on Offender Review ("FCOR") reviews all applications and provides a non-binding recommendation to the Board. FCOR "operates as the administrative and investigative arm of the Board." FCOR Annual Rep. 2016–17, at 5 ("Annual Rep."). It investigates all applicants who require a hearing before the Board. In doing so, it considers various factors, such as criminal and traffic records, the applicant's payment of fines, alcohol and substance use, voter registration information, and any input from the judiciary, state attorneys, and victims. *Id*. at 15. After its investigation, FCOR creates a report called the Confidential Case Analysis ("CCA"). ECF No. 103, at 7. The Board can consider information in the CCA. *Id*.; *see also* Annual Rep., at 15 (describing "the Commission's advisory recommendation . . . to the Board").

4

The Board generally meets four times a year. Fla. R. Exec. Clemency 12(A). Applicants are not required to attend their hearings, but the Rules "encourage" applicants to attend. Fla. R. Exec. Clemency 12(B). If applicants attend, they may speak for no more than five minutes. Fla. R. Exec. Clemency 12(C). Others may speak in the applicant's favor, but the applicant's whole presentation cannot exceed ten minutes. *Id*.

In making its decisions, the Board can examine—but does not have to— assorted factors. These factors include drug and alcohol use, traffic violations, whether the applicant has voted despite legally being disenfranchised, employment status, family, and the Board's perceptions on the applicant's attitude, level of remorse, and whether she has turned her life around. ECF No. 103, at 8 (citations omitted). If an applicant is denied restoration, she cannot reapply for at least two years. Fla. R. Exec. Clemency 14.

## II

### A

An individual's status as a former felon does not deprive her of a vote-restoration process free from the First Amendment's protections. Defendants' assert that once a felon loses the right to vote, she loses all interests associated with that right, including those under the First Amendment, until her voting rights are restored. ECF No. 103, at 30–32; ECF No. 137, at 24–25; ECF No. 141, at 18–19. This Court finds Defendants' reasoning to be nonsensical.

5

It is well-settled that a state can disenfranchise convicted felons under Section Two of the Fourteenth Amendment. *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974). "Florida's discretion to deny the vote to convicted felons is fixed by the text of § 2 of the Fourteenth Amendment." *Johnson v. Bush*, 405 F.3d 1214, 1228 (11th Cir. 2005) (en banc).

But it is also well-settled that a state cannot disenfranchise a convicted felon if motivated by racial animus. *Hunter v. Underwood*, 471 U.S. 222, 233 (1985). "We are confident," the Supreme Court stated, "that § 2 was not designed to permit the purposeful racial discrimination . . . which otherwise violates § 1 of the Fourteenth Amendment." *Id*. Nor may a state disenfranchise a convicted felon for any arbitrary reason. *Shepherd v. Trevino*, 575 F.2d 1110, 1114 (5th Cir. 1978) ("Nor can we believe that section 2 would permit a state to make a completely arbitrary distinction between groups of felons with respect to the right to vote.").[3] State laws and regulations cannot, for example, "disenfranchise similarly situated blue-eyed felons but not brown-eyed felons." *Owens v. Barnes*, 711 F.2d 25, 27 (3d Cir. 1983).

If a state cannot disenfranchise for arbitrary reasons, a state cannot disenfranchise convicted felons in a manner repugnant to the First

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

Amendment. A state cannot yank the right to vote from a Republican felon but retain voting rights for Democratic felons. Imagine a state bold enough to set in place a process—perhaps concurrent with criminal sentencing—where a panel of elected officials, empowered with boundless discretion but with a clear interest in shaping the electorate, decide that some felons can retain voting rights but others would be permanently barred from choosing their elected representatives. Such a scheme might be arbitrary.[4] It might also violate the First Amendment. Neither would be constitutional.

A similar logic applies to restoration of voting rights.[5] When a state institutes a process to restore voting rights to felons who have completed their

---

[4] This hypothetical scheme is similar to a Mississippi disenfranchisement structure that the Fifth Circuit found problematic. *Williams v. Taylor*, 677 F.2d 510 (5th Cir. 1982). A county election board denied a black felon voting rights pursuant to state law but the record showed "other felons in the community who [had] not been disenfranchised although they f[e]ll within the statute." *Id.* at 513. The Fifth Circuit concluded the county election board "cannot discriminate arbitrarily among felons who fall within the group classified for mandatory disenfranchisement." *Id.* at 515. While a felon "has no right to vote . . . he has the right not to be the arbitrary target of the Board's enforcement of the statute." *Id.* at 517. This reasoning is persuasive.

[5] It would be tomfoolery of the highest order if, for example, the Constitution prohibits a state from racially discriminating in the *disenfranchisement* of felons but allows it to racially discriminate in the *re-enfranchisement* of former felons. If anything, the constitutional limitations for vote-restoration should be construed more broadly than those for disenfranchisement because vote-restoration involves the allocation (or re-allocation, as the case may be) of a fundamental right. This Court, however, acknowledges non-binding authority from some circuit courts stating that former felons do not have a fundamental right to vote. *Harvey v. Brewer*, 605 F.3d 1067, 1079 (9th Cir. 2010); *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010). Accordingly, this Court analyzes Florida's vote-restoration process with the same constitutional limitations as states' disenfranchisement laws.

Additionally, this Court notes that *Harvey* and *Bredesen* are distinguishable from Plaintiffs' First Amendment claims because plaintiffs there invoked the Twenty Fourth Amendment, which applies to citizens who have voting rights. *See* U.S. CONST. amend. XXIV, § 1 ("The right of citizens . . . to vote . . . shall not be denied or abridged by the United States or any State by reason of

sentences, that process cannot "permit . . . purposeful racial discrimination." *Hunter*, 471 U.S. at 233; *see also Harvey*, 605 F.3d at 1079 ("[A] state could not choose to re-enfranchise voters of only one particular race."). Restoration cannot be arbitrary. A state cannot "re-enfranchise only those felons who are more than six-feet tall," who are blue-eyed, who were born in August, who root for the Florida Gators, or who call heads during a coin flip. *Id*. Nor can it violate the First Amendment.

Defendants essentially argue that vote-restoration for former felons can *only* occur on the state's terms. ECF No. 103, at 30–31. Once a felon loses the right to vote, only the state may grant it back in a manner of its choosing. *Id*. A person convicted of a crime may have long ago exited the prison cell and completed probation. Her voting rights, however, remain locked in a dark crypt. Only the state has the key—but the state has swallowed it. Only when the state has digested and passed that key in the unforeseeable future—maybe in five years, maybe in 50—along with the possibility of some virus-laden stew of viewpoint discrimination and partisan, religious, or racial bias, does the state in an "act of mercy," unlock the former felon's voting rights from its hiding place. Fla. R. Exec. Clemency 1.

---

failure to pay any poll tax or other tax."). Nothing in our Nation's case law, traditions, or values limits the First Amendment's application to voters or non-voters.

Former felons' pathway back to full citizenship—one in which these members of Florida's communities have a voice in the selection of their government—cannot be tainted by even the slightest stench of viewpoint discrimination. A state may disenfranchise convicted felons. A particularly punitive state might even disenfranchise convicted felons permanently. But once a state provides for restoration, its process cannot offend the Constitution.

**B**

Plaintiffs have the right to free association and expression under the First Amendment. Because the First Amendment protections in the context of felony re-enfranchisement is a matter of first impression, this Court first identifies the scope of these protections. If Plaintiffs were, for example, alleging First Amendment violations based on the discretion a police officer has in penalizing a speeding driver with a friendly warning or a steep monetary fine, the inquiry would be brief: there is no First Amendment protection against an officer issuing a fine versus a warning. Here, however, Florida's vote-restoration scheme violates two First Amendment rights; namely, free association and free expression.

**1.  The Right to Free Association.**

"It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which

9

embraces freedom of speech." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958). Associational rights are grounded on the principle that there is safety—and power—in numbers. People "associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Conversely, protecting associational rights "is crucial in preventing the majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647–48 (2000). "Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *Patterson*, 357 U.S. at 460.

The right to associate is afforded particular protection in the realm of political association. "[P]olitical belief and association constitute the core of those activities protected by the First Amendment." *Elrod v. Burns*, 427 U.S. 347, 356 (1976). "[T]he right of individuals to associate for the advancement of political beliefs . . . rank[s] among our most precious freedoms." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968); *see also Kusper v. Pontikes*, 414 U.S. 51, 56–57 (1973) ("There can no longer be any doubt that freedom to associate with others for the common advancement of political beliefs and ideas is a form of 'orderly group activity' protected by the First and Fourteenth Amendments.") (quoting *NAACP v. Button*, 371 U.S. 415, 430 (1963)). Political association is—like associational rights generally—based on the principle that like-minded

10

individuals can act in concert to influence policy in the political and electoral spheres. *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000) ("Representative democracy in any populous unit of governance is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views.").

A common thread runs through associational rights cases. Courts are deeply averse to state laws, regulations, and schemes that threaten political associations by favoring one association—or political party—over others. The Supreme Court struck down an Ohio law that "g[a]ve the two old, established parties a decided advantage over any new parties struggling for existence and thus place[d] substantially unequal burdens on both the right to vote and the right to associate." *Rhodes*, 393 U.S. at 31. The Court also invalidated an Ohio law that "amount[ed] to a desire to protect existing political parties from competition—competition for campaign workers, voter support, and other campaign resources—generated by independent candidates who have previously been affiliated with the party." *Anderson v. Celebrezze*, 460 U.S. 780, 801 (1983). In *Tashjian v. Republican Party of Connecticut*, the Supreme Court struck down a Connecticut law requiring would-be primary voters to register with a party before voting in that party's primary. 479 U.S. 208, 229 (1986). Such a scheme was an impermissible burden on associational rights because it "limit[ed] the Party's associational opportunities at the crucial

11

juncture at which the appeal to common principles may be translated into concerted action, and hence to political power in the community." *Id*. at 216.[6] The Court, in short, has repeatedly recoiled from anything that resembles a thumb on the scales of association and, by extension, the democratic process.

### 2. The Right to Free Expression.

An individual also has the right to express her views without risk of censorship.[7] Government suppression of political expression based on its actual or perceived content is one of the most repugnant actions that the First Amendment prevents. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972); *see also Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

---

[6] Suspect actors are not limited to state legislatures. Judge Tjoflat explained during the 2000 election that a state supreme court can endorse a scheme violating the freedom of association. "By deciding that [ballots containing] dimples were valid votes but that those votes would be counted only in counties selected by the candidates, the Florida Supreme Court's decision disenfranchised dimple voters in the remaining counties and thereby trampled the right of association enjoyed by plaintiffs and all Florida voters." *Touchston v. McDermott,* 234 F.3d 1133, 1154 (11th Cir. 2000) (Tjoflat, J., dissenting). Such a recount method placed a thumb on the scales of association: "the selective dimple model denies plaintiffs' and other Bush voters the fruits of their association, to wit: their political impact." *Id*.

[7] Exceptions exist, of course, though they are not implicated here. *See United States v. Stevens*, 559 U. S. 460, 468 (2010) (listing familiar categories of speech and activity not protected under the First Amendment, such as fraud, defamation, obscenity, and incitement).

The Supreme Court has not clearly characterized voting as a form of expression and explicitly declined to do so in 1966. *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966) ("We do not stop to canvass the relation between voting and political expression."). On the one hand, the Court observed that an election's primary purpose is to choose candidates rather than "provide a means of giving vent to 'short-range political goals, pique, or personal quarrel[s].'" *Burdick v. Takushi*, 504 U.S. 428, 438 (1992) (quoting *Storer v. Brown*, 415 U.S. 724, 735 (1974)). "Ballots serve *primarily* to elect candidates, not as forums for political expression." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 363 (1997) (emphasis added). More recently, a majority of the Court rejected a public official's First Amendment challenge to a Nevada law prohibiting him from voting because of a conflict of interest. *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 127 (2011). Although the Court rejected the official's argument holding that "legislative power . . . is not personal to the legislator but belongs to the people," it also cited from *Burdick* and *Timmons* and concluded "a legislator has no right to use official powers for expressive purposes." *Id*. at 126, 127.

On the other hand, the Court has never unequivocally severed the right to vote from the right to expression.[8] It has occasionally identified expressive

---

[8] The closest it has come was in *Carrigan*, where the Court's majority remarked in dicta that it had "rejected the notion that the First Amendment confers a right to use governmental mechanics to convey a message." 564 U.S. at 127. But this cramped characterization of voting's expressive

elements in voting. The right of citizens "to create and develop new political parties," the Court has stated, "derives from the First and Fourteenth Amendments and advances the constitutional interest of like-minded voters to gather in pursuit of common political ends, thus enlarging the opportunities of all voters *to express their own political preferences*." *Norman v. Reed*, 502 U.S. 279, 288 (1992) (emphasis added). Citizens have strong interests "to associate together to *express* their support" for a candidate and her views. *Anderson*, 460 U.S. at 806 (emphasis added). "[V]oting is, among other things, a form of speech." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 425 (Stevens, J., concurring in part and dissenting in part).

The Supreme Court has identified an array of political activities as deserving protection under the First Amendment. In *Citizens United*, the Court overruled precedent and struck down a federal law prohibiting corporate independent expenditures within certain time periods before elections because it was "a ban on speech." *Id*. at 339. In *Doe v. Reed*, the Supreme Court recognized petition-signing in the context of Washington's ballot referendums as "express[ing] the political view that the question should be considered 'by

---

features is further distinguishable by the facts of that case—there, the public official's vote was a "core legislative function." *Id*. at 121 (internal quotation marks omitted). This Court finds Justice Alito's reasoning convincing. "If an ordinary citizen casts a vote in a straw poll on an important proposal pending before a legislative body, that act indisputably constitutes a form of speech." *Id*. at 134 (Alito, J., concurring). This rationale can apply in equal, if not greater, force to voting in general and primary elections for local, state, and federal office.

the whole electorate.'" 586 U.S. 186, 195 (2010) (quoting *Meyer v. Grant*, 486 U.S. 414, 421 (1988)). Even though this expressive act "may ultimately have the legal consequence" of requiring Washington to hold a referendum, the Court did "not see how adding such legal effect to an expressive activity somehow deprives that activity of its expressive component, taking it outside the scope of the First Amendment." *Id*. Partisan redistricting also has First Amendment implications. "The First Amendment may be the more relevant constitutional provision in future cases that allege unconstitutional partisan gerrymandering" because such schemes implicate voters' "First Amendment interest of not burdening or penalizing citizens because of . . . their association with a political party, or their expression of political views." *Vieth v. Jubelirer*, 541 U.S. 267, 314 (2004) (Kennedy, J., concurring). Recently, a three-judge panel struck down North Carolina's congressional redistricting maps partly because it violated voters' First Amendment rights. *Common Cause v. Rucho*, 2018 WL 341658, at *63 (M.D.N.C. Jan. 9, 2018) (finding, *inter alia*, that North Carolina's maps discriminated against and burdened voters who opposed Republican candidates along viewpoint, speech, and associational lines). Finally, this Court has determined that voter registration and related actions constitute "core First Amendment activity." *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1158 (N.D. Fla. 2012).

15

In the absence of binding precedent holding that the right to vote is wholly independent of the right to free expression, this Court finds persuasive the idea that "[t]he First Amendment protects more than just the individual on a soapbox and the lonely pamphleteer." *Citizens United*, 558 U.S. at 373 (Roberts, C.J., concurring). After all, "[l]aws enacted to control or suppress speech may operate at different points in the speech process." *Id*. at 336 (majority opinion). It is inconsistent to find that corporate expenditures spent during a campaign or filling out a voter-registration form are core expressive activities, but that voting—the end-result of these other protected activities— is non-expressive. There is some measure of expressive activity in "winnow[ing] out and finally reject[ing] all but the chosen candidates." *Storer*, 415 U.S. at 735. To declare voting a non-expressive activity would relegate this crucial right to a lower form of First Amendment protection than those very activities that are intricately intertwined with voting.[9]

"No right is more precious in a free country than that of having a voice in the election of those who make the laws." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). In our democratic society where the people are sovereign, voting is the citizen's ultimate form of political expression. By first seeking the vote and

---

[9] As Justice Stevens has observed, "voting is not speech in a pure or formal sense, but then again neither is a campaign expenditure; both are . . . communicative acts aimed at influencing electoral outcomes." *Citizens United*, 558 U.S. at 425 n.52 (Stevens, J., concurring in part and dissenting in part).

then choosing to cast a ballot, a citizen expresses support for the franchise as a legitimate institution—the beating heart of our democratic government. By choosing not to vote, she may express dissatisfaction with the government or a particular outcome. And by voting, a citizen expresses her political point of view.

**C**

In Count One, Plaintiffs claim that Florida officials' unfettered discretion in restoring voting rights violates the First Amendment. This Court agrees.

Unfettered executive discretion imposes serious burdens on Plaintiffs' First Amendment rights to free association and free expression. Plaintiffs wish to register and vote in future primary and general elections "for candidates of their choice and ballot initiatives" as well as "to support and associate with political parties in order to advance the parties' goals." ECF No. 29, at ¶ 27. A former felon may deeply believe in the ideas of one political party and genuinely wish to associate with it. She may wish to express her support for the party's policies to her community, to the public, and elected officials by voting for the party's candidates. But the state requires her to complete her sentence, including any terms of parole and probation, wait five or seven years, submit documentation, and is encouraged to appear before one of four semi-annual meetings of the Board in Tallahassee to plead her case. This process,

17

to say the least, is burdensome—even if it were neutral, transparent, and uniform to all former felons.[10]

But Florida goes several steps further. The ultimate re-enfranchisement decision is in the hands of four high-level elected officials. The Governor must assent to the restoration. The Board has, *by rule*, "unfettered discretion" in making these consequential decisions "at any time, for any reason." Fla. R. Exec. Clemency 4. So the state then requires the former felon to conduct and comport herself to the satisfaction of the Board's subjective—and, frankly, mythical—standards. *See id.* (stating that the Governor may deny clemency "*for any reason*") (emphasis added). Only then is she free to associate with her party of choice and express through voting her support for her party's policies.

Courts view unfettered governmental discretion over protected constitutional rights with profound suspicion. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. Bd. of Ed. v. Barnette*, 319 U.S. 624, 642–43 (1943). The Supreme Court has consistently struck down laws consigning First Amendment-protected activities "to the whim of the administrator." *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 133 (1992). "The First

---

[10] Because Florida does not have system of vote-restoration that is neutral, transparent, or uniform, this Court does not comment on the permissibility of such a scheme.

Amendment prohibits the vesting of such unbridled discretion in a government official." *Id*.; see also *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988) (listing a "long line of precedent" outlining the Supreme Court's skepticism in "placing unbridled discretion in the hands of a government official or agency").

This Court reviews laws permitting such official discretion, when they burden citizens' First Amendment rights, under an exacting standard of scrutiny. *Patterson*, 371 U.S. at 460–61 ("[S]tate action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny."). "As our past decisions have made clear, a significant encroachment upon associational freedom cannot be justified upon a mere showing of a legitimate state interest." *Kusper*, 414 U.S. at 58; *see also Boy Scouts of Am.*, 530 U.S. at 648 (explaining how "the freedom of expressive association . . . could be overridden 'by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms'" (quoting *Roberts*, 468 U.S. at 623)). In the Eleventh Circuit, a Florida scheme bestowing state officials "unfettered discretion" to reconsider excluded candidates from the presidential ballot withered under strict scrutiny. *Duke v. Smith*, 13 F.3d 388, 395 (11th Cir. 1994). The state's Presidential Candidate Selection Committee's lack of standards guiding government officials "subjected [candidates] to

severe restrictions." *Id*. The risk of "arbitrary and discriminatory enforcement . . . cannot be squared with our constitutional standards." *Id*. (quoting *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170–71 (1972)).

The question is whether the Clemency Board's limitless power over Plaintiffs' vote-restoration violates their First Amendment rights to free association and free expression. It does. This should not be a close question.

Defendants argue that the vote-restoration's structure furthers a state interest in "limiting the franchise to responsible voters." ECF No. 103, at 18 (quoting *Shepherd,* 575 F.2d at 1115). And, according to Defendants, individualized review allows the Board to "gauge the progress and rehabilitation" of former felons. *Id*. (quoting *Shepherd*, 575 F.2d at 1115).[11] Nonetheless, the means Florida employs to achieve these ends does not survive strict scrutiny.

A state may have a legitimate interest in limiting the franchise to responsible individuals.[12] *Johnson v. Bush*, 405 F.3d at 1225 ("Florida has a

---

[11] Because Defendants largely reject the applicability of Plaintiffs' First Amendment arguments, *see* ECF No. 103, at 30–31, this Court looks to defendants' relevant arguments regarding the state's interests in maintaining the vote-restoration scheme from their briefs on the equal protection claim.

[12] While this Court is bound by *Shepherd*, this Court also acknowledges that "responsible voters" is a nebulous term a state can abuse. A "responsible voter" might be one who has failed to brush his teeth, sped through a school zone, and parked across three parking spaces at the polling place. Meanwhile an "irresponsible voter" may have been released from prison thirty years ago, been an upstanding citizen since that day, but is nonetheless denied the vote because the Board "can do whatever [they] want". ECF No. 29, at ¶ 55 n.26.

legitimate reason for denying the vote to felons."). Indeed, 48 states bar, in some form or another, incarcerated men and women from casting ballots during elections.[13] ECF No. 102, at 1–2. At the time the Fourteenth Amendment passed, 29 states prohibited (or authorized their legislatures to prohibit) convicted felons from voting. *Richardson*, 418 U.S. at 48. Limiting the vote to non-felons has been a state interest for many years, including in Florida. *Johnson v. Bush*, 405 F.3d at 1218–22 (outlining Florida's history of felon disenfranchisement).

But Florida does not use the least-restrictive means to pursue its interests in preventing possibly irresponsible citizens from choosing their leaders. "[E]ven when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty." *Kusper*, 414 U.S. at 58–59. "[W]e have required that States adopt the least drastic means to achieve their ends." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 185 (1979).

Florida's vote-restoration scheme is crushingly restrictive. The scheme crumbles under strict scrutiny because it risks—if not covertly authorizes the practice of—arbitrary and discriminatory vote-restoration. When a scheme allows government officials to "do whatever [they] want," viewpoint

---

[13] Only Vermont and Maine permit incarcerated individuals to vote. *See* ME. REV. STAT. tit. 21-A, § 112-14 (2009) *and* VT. STAT. ANN. tit. 17 § 2121 (West 2011).

discrimination can slip through the cracks of a seemingly impartial process. ECF No. 29, at ¶ 55. Such discrimination can lead to a denial of "the fruits of their association, to wit: [former felons'] political impact"—or widespread, insidious bias to benefit the Governor's political party. *Touchston*, 234 F.3d at 1154 (Tjoflat, J., dissenting). State officials' potential political, racial, or religious biases cannot poison the well of vote-restoration.

Viewpoint discrimination is deeply antithetical to the Constitution and our Nation's longstanding values. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015) ("Government discrimination among viewpoints—or the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker'—is a 'more blatant' and 'egregious form of content discrimination.'") (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)); *see also Citizens United*, 558 U.S. at 340 (stating that First Amendment "restrictions based on the identity of the speaker are all too often simply a means to control content"). Moreover, even the *risk* of viewpoint discrimination runs afoul of the First Amendment. *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 641 (1994) (stating that "[g]overnment action that stifles speech on account of its message . . . pose[s] the *inherent risk* that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion") (emphasis added); *see also Forsyth*

22

*Cty*, 505 U.S. at 133 n.10 ("[T]he success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance preventing him from doing so.").

In Florida, the risk of viewpoint discrimination is distressingly real. Plaintiffs identify several instances of former felons who professed political views amenable to the Board's members who then received voting rights, while those who expressed contrary political views to the Board were denied those same rights. Applicants—as well as their character witnesses—have routinely invoked their conservative beliefs and values to their benefit. *See* ECF No. 102, at 27–28 (listing examples of former felons having their rights restored after invoking their political beliefs).

Similar disparities arise when applicants criticize the system. For example, a Navy veteran decried felon disenfranchisement before the Governor rejected his application because of traffic infractions. *Id.* at 28–29. But ten former felons—who did *not* speak out against felony disenfranchisement—were re-enfranchised despite less-than-perfect traffic records. *Id.* at 31–32.

That's not all. Similar conduct can lead to different results in front of the Board. The Governor asked one former felon, Steven Warner, about an illegal vote he cast in 2010—before his voting rights were restored. ECF No. 29, at ¶

23

65; ECF No. 101-159. "Actually, I voted for you," Warner responded. *Id*. The Governor restored Warner's voting rights. *Id*. But Plaintiffs identify five former felons who, at other points, were questioned about illegal ballots cast and then rejected on that basis. ECF No. 29, at ¶ 63. It is not lost on this Court that four of the five rejected applicants are African-American.[14]

It is of no consequence to this Court that "Plaintiffs have not pled any claim or advanced any argument that Defendants have ever actually engaged in such invidious discrimination." ECF No. 137, at 12. It is exactly that "Board members *could* engage in [unconstitutional, viewpoint-based] discrimination," *id*., that is so troublesome. *See Forsyth Cty.*, 505 U.S. at 133 n.10.

The Governor has, by rule, "unfettered discretion to deny clemency at any time, *for any reason*." Fla. R. Exec. Clemency 4 (emphasis added). This language indicates—in the clearest terms English allows—that nothing prevents this one official from abusing broad discretion. What's more, Plaintiffs offer more than enough examples for this Court to infer that such discrimination is not some cockamamie idea Plaintiffs cooked up.

The Defendants claim that individualized review is a laudable feature of the vote-restoration scheme. *See, e.g.*, ECF Nos. 103, at 27 *and* 141, at 10.

---

[14] The Supreme Court, among other august institutions, has observed the strong correlation between race and voting. *E.g.*, *Cooper v. Harris*, 137 S.Ct. 1455, 1473 n.7 (2017) (explaining that "the sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics.").

Individualized review would certainly be less restrictive than unfettered discretion if, at the end of the day, such review meant anything. But the final decision-maker is the Clemency Board, and the Governor has de facto veto authority over anyone's restoration. All the component parts of the vote-restoration process that Defendants wave like shiny objects to distract from potential viewpoint discrimination—the investigations, case analyses, and hearings—mean nothing if the Governor *alone* has final authority to restore Plaintiffs' rights. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 582 (1972) ("When a violation of First Amendment rights is alleged, the reasons for dismissal . . . must be examined to see if the reasons given are only a cloak for activity or attitudes protected by the Constitution.").

The Defendants' most compelling argument to support the vote-restoration scheme is its classification as a form of executive clemency. This placement, Defendants argue, more or less immunizes the scheme from judicial review. ECF Nos. 103, at 14–16 *and* 141, at 9. It is, after all, well-settled that executive clemency *decisions*—including pardons—"are rarely, if ever, appropriate subjects for judicial review." *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 275 (1998) (quoting *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464 (1985)). Here, however, this Court is not examining any specific decision of Florida's Clemency Board, but rather its structure and unfettered discretion in the re-enfranchisement context.

25

Even so, executive clemency is not immune from judicial review if it violates the Constitution. More than a century ago, the Supreme Court invalidated a pardon that President Wilson issued. *Burdick v. United States*, 236 U.S. 79, 95 (1915). The Court observed that while the Constitution provides the President a broad pardon power, individuals also have rights under the Fifth Amendment that cannot be violated. *Id*. at 93–94. A court's role should be "to preserve both [constitutional provisions],—to leave to each its proper place." *Id*. More recently, Chief Justice Burger echoed this reasoning, writing that executive officials may impose conditions on clemency decisions so long as "any condition . . . does not otherwise offend the Constitution." *Schick v. Reed*, 419 U.S. 256, 266 (1974). By extension, the clemency decision itself— the object of any condition—must abide by the Constitution.

Justice O'Connor has warned that executive clemency powers are not unlimited. "[A]lthough it is true that 'pardon and commutation decisions have not traditionally been the business of courts,' . . . some *minimal* procedural safeguards apply to clemency proceedings. Judicial intervention might, for example, be warranted in the face of a scheme whereby a state official flipped a coin to determine whether to grant clemency, or in a case where the State arbitrarily denied a prisoner any access to its clemency process." *Woodard*, 523 U.S. at 289 (quoting *Dumschat*, 452 U.S. at 464) (O'Connor, J., concurring)

(emphasis in original). Clemency decisions perhaps driven by unconstitutional factors—race, religion, gender, or viewpoint—are worse than flipping coins.

Executive clemency by its mere existence cannot serve as a legitimate, let alone compelling, state interest. No serious person would argue that an act of executive clemency that, for example, is motivated by race cannot run afoul of the Constitution simply because it is an act of executive clemency. This Court recognizes the novelty of a challenge to an executive clemency scheme. But "it is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). And so, if a court finds unconstitutionality in an executive clemency scheme, its role is to strike the acts permitting the constitutional violation—not to declare its hands tied.

The unfettered discretion that the Clemency Board possesses over a former felon's re-enfranchisement violates the First Amendment. Accordingly, Plaintiffs' motion for summary judgment on Count One is **GRANTED** and Defendants' motion as it relates to Count One is **DENIED**.

## D

In Count Three,[15] Plaintiffs argue that the Board's lack of clear time limits in processing and deciding clemency applications violates the First

---

[15] This Court addresses Plaintiffs' Count Two in Section III, *infra* at 32–37.

27

Amendment. ECF No. 29, at ¶¶ 102–12. Specifically, the absence of time limits "create[s] the risk of arbitrary delays and arbitrary continued disenfranchisement." *Id.* at ¶ 109. Defendants contend that the lack of time constraints "rationally advance[s] the State's valid interest 'in limiting the franchise to responsible voters.'" ECF No. 103, at 20 (quoting *Shepherd*, 575 F.2d at 1115). Determining who is a responsible voter cannot occur "without the passage of time." ECF No. 103, at 20.

No one disputes that government investigations and decision-making require *some* time. The concern is whether the absence of *any* time constraints, coupled with the "unfettered discretion" the Governor has "to deny clemency at any time, for any reason," can mask unconstitutional viewpoint discrimination. Fla. R. Exec. Clemency 4. Kicking the can down the road to get a better view of the applicant's remorse, lifestyle, or even to assuage a Board member's comfort level can disguise unconstitutional motives.

"A scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 227 (1990). This potential suppression includes the First Amendment right to free association and expression. Laws, regulations, and rules that "'make[] the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld

in the discretion of such official—is an unconstitutional censorship . . . upon the enjoyment of those freedoms.'" *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969) (quoting *Staub v. City of Baxley*, 355 U.S. 313, 322 (1958)). An official's "delay compels the speaker's silence." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 802 (1988).[16]

Here, Plaintiffs' protected expressive and associational activities are at risk of viewpoint discrimination because the Board may defer restoration of rights for years—or forever. Defendants cannot—whether arbitrarily or motivated by political, racial, or religious bias—kick the can down the road for so long that they violate former felons' rights to free association and free expression without offending the Constitution.

Indefinite can-kicking is not some Floridian fairytale like a line-less Space Mountain. The Board regularly invokes some unknown future date as the appropriate time to revisit a restoration denial. This date must be no earlier than two years from the effective denial but is nonetheless unspecified

---

[16] The Eleventh Circuit has struck down multiple schemes as violations of the First Amendment because they lacked time constraints or contained toothless time limitations. *See United States v. Frandsen*, 212 F.3d 1231, 1240 (11th Cir. 2000) (holding that a regulation to issue permits "without unreasonable delay" violates the First Amendment "because it fails adequately to confine the time within which the decision maker must act"); *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1363 (11th Cir. 1999) (invaliding an ordinance that conferred zoning board "discretion to delay a decision indefinitely or to covertly deny applications for content-sensitive reasons"); *Redner v. Dean*, 29 F.3d 1495, 1500–01 (11th Cir. 1994) (finding a 45-day time period for official to grant or deny a license illusory because ordinance's language created "risk that expressive activity will be suppressed for indefinite time periods").

at the time of denial. Fla. R. Exec. Clemency 14. Plaintiffs identify multiple instances when Governor Bush required "more time" before rights are restored. ECF No. 102, at 39 (listing Board members' statements). In recent years, Governor Scott has also required more time before reapplication, from four years to 11, and, in one particularly punitive example, 50 years for a 54 year-old man. *Id*. at 39–41 (listing Board members' statements).

Sometimes Board members defer specifying *any* restoration timeline. *See id*. (listing Board members' statements). For example, ten years after her release from incarceration and shortly after her pregnant daughter spoke on her behalf before the Board, Governor Scott informed Plaintiff Virginia Kay Atkins that he did not feel "comfortable" restoring her rights. *Id*. at 41; ECF No. 101-155. Leon Gillis III explained to the Board that he was released from prison in 1985 but was nonetheless denied restoration on June 6, 2011 based on his illegal voting during the intervening 26 years. He pressed the Governor on when he could reapply: "What else am I supposed to do if I'm doing everything I'm supposed to do . . . how long am I supposed to wait?" The Governor responded, "I could tell you that answer, but today I'm not, I don't feel comfortable doing it." ECF No. 101-140.

The lack of time limits in processing and deciding vote-restoration applications risks viewpoint discrimination and is therefore unconstitutional.

Accordingly, Plaintiffs' motion for summary judgment on Count Three is **GRANTED** and Defendants' motion as it relates to Count Three is **DENIED**.

*     *     *

This Court finds untenable Defendants' belief that all the cherished First Amendment rights, values, traditions, and protections from state intrusion laid out in Section II.B, *supra*, are negated by the squid-like tendrils of an asterisk next to former felons' names—the asterisk of disenfranchisement authorized by three words in the Fourteenth Amendment's Section Two that, if Defendants had their way, would exclude millions of American men and women from basic First Amendment protection.

Only one wedded to the rotten landscape of a hyper-formalist worldview would claim that when a state strips the fundamental right to vote from its incarcerated citizens, it also strips all rights intertwined with voting—the right to associate in a political party, the ultimate expression in a democratic society, and "the fruits of their association, to wit: their political impact." *Touchston*, 234 F.3d at 1154 (Tjoflat, J., dissenting). It is legal chicanery to argue an individual convicted of a crime loses her First Amendment associational and expressive interests in the political sphere simply because these rights relate to voting. "Encouraging citizens to vote is a legitimate, indeed essential, state objective; for the constitutional order must be preserved by a strong, participatory democratic process." *Cal. Democratic Party*, 530 U.S. at 587

31

(Kennedy, J., concurring). By downgrading *all* former felons into second-class citizens long after serving out their sentences, where escape is only possible through running through a maze of potential viewpoint discrimination, bias, and arbitrary conduct, Florida's scheme does just the opposite.

## III

Turning to Count Two, this Court finds that Florida's vote-restoration scheme permitting unfettered official discretion to restore voting rights also violates the Fourteenth Amendment's Equal Protection Clause.

Plaintiffs largely base their Equal Protection argument on *Bush v. Gore*. 531 U.S. 98 (2000). The Plaintiffs focus on the admonition that "[t]he right to vote is protected in more than the initial allocation of the franchise. . . . Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* at 104–05.

States can disenfranchise felons. *Ramirez,* 418 U.S. at 54–55. *Bush v. Gore*, then, is not entirely apposite because felons have not been "granted the right to vote." 531 U.S. at 104. Rather, it is the *process of granting* that right that Plaintiffs challenge. And that process cannot be arbitrary. *Shepherd*, 575 F.2d at 1114 ("Nor can we believe that section 2 would permit a state to make a completely arbitrary distinction between groups of felons with respect to the right to vote."); *see also Harvey*, 605 F.3d at 1079 (stating that "a state could

32

not choose to re-enfranchise voters of only one particular race" and a state cannot "re-enfranchise only those felons who are more than six-feet tall").

Defendants assert two cases foreclose Plaintiffs' equal protection claim. *Beacham v. Braterman*, 300 F. Supp. 182, 183 (S.D. Fla. 1969) *aff'd* 396 U.S. 12 (1969), *and Shepherd*, 575 F.2d 1110. But this Court finds neither case dispositive.

First, in *Beacham*, the Southern District of Florida rejected a former felon's challenge to Florida's discretionary re-enfranchisement scheme under the equal protection clause. *Beacham*, 300 F. Supp. at 183 ("[T]he discretionary exercise of the pardon power by the executive branch of Florida's government is being challenged"). A three-judge panel cursorily recited established principles about the broad scope of executive clemency and the separation of powers. *Id*. at 184. It declined to evaluate the facts or record present in Beacham's challenge to Florida's discretionary scheme. *Id*. ("The restoration of civil rights is . . . an act of executive clemency not subject to judicial control."). The panel ultimately explained that executive pardon power is "an act of grace" that "should not be subject to judicial intervention." *Id*.

The Supreme Court summarily affirmed. 396 U.S. 12. A "summary affirmance is an affirmance of the judgment only, [so] the rationale of the affirmance may not be gleaned solely from the opinion below." *Mandel v. Bradley*, 432 U.S. 173, 176 (1977). "Summary actions . . . should not be

understood as breaking new ground but as applying principles established by prior decisions to the particular facts involved." *Id*. *Beacham*'s summary affirmance in 1969 did not break any new ground but applied those established principles deferring to executive clemency.

Unlike a fine wine, this summary affirmance has not aged well. More recently, Justice O'Connor, among others, has observed that executive clemency cannot operate outside the bounds of the Constitution. *Woodard*, 523 U.S. at 289; *see also supra* at 25–27. *Beacham*'s statement that once Florida has "conferred *unlimited* pardon power upon the executive branch of their government, the exercise of that power should not be subject to judicial intervention" carries no precedential value because it stands for the flawed presumption that an unconstitutional executive clemency structure is immune from judicial review. *Beacham*, 300 F. Supp. at 184 (emphasis added).

Second, Defendants correctly note that "section 2 of the fourteenth amendment blunts the full force of section 1's equal protection clause with respect to the voting rights of felons." *Shepherd*, 575 F.2d at 1114. States have "a realm of discretion in the . . . reenfranchisement of felons which the states do not possess with respect to limiting the franchise of other citizens." *Id*. But a re-enfranchisement scheme must "bear a rational relationship to the achieving of a legitimate state interest." *Id*. at 1115. Defendants rely on

*Shepherd*'s language to assert that Florida has an interest "in limiting the franchise to responsible voters." *Id*.

These cases do not save Florida's unconstitutional re-enfranchisement scheme. *Beacham* and *Shepherd* stand for different propositions. The former cautions courts to steer clear of executive clemency structures because they enable "act[s] of grace" that courts historically have avoided. *Beacham*, 300 F. Supp. at 184. The latter holds that states only have a "*realm* of discretion" in vote-restoration schemes. *Shepherd*, 575 F.2d at 1114 (emphasis added). But no realm is without boundary.

This Court adheres to the boundaries the Founding Fathers placed in the United States Constitution—not to ethereal concepts like "act[s] of grace." *Beacham*, 300 F. Supp. at 184. One firm boundary is the prohibition on states to deny citizens "equal protection of the laws." U.S. CONST. amend. XIV § 1.

This Court has already explained that executive clemency schemes are not immune from federal court review simply because they are executive clemency schemes.[17] The Eleventh Circuit, as Defendants point out, has relied on Justice O'Connor's reasoning in *Woodard* to find that "[i]n order for a claim of alleged violations of . . . equal protection in a clemency proceeding to succeed, the violation must be grave, such as where 'a state official flipped a coin to

---

[17] *See supra* at 25–27.

determine whether to grant clemency, or in a case where the State arbitrarily denied a prisoner any access to its clemency process.'" *Banks v. Sec'y, Fla. Dep't of Corr.*, 592 F. App'x 771, 773 (11th Cir. 2014) (quoting *Woodard*, 523 U.S. at 289 (O'Connor, J., concurring)). The violation in this case—the substantial risk of arbitrary and discriminatory vote-restoration based on an applicant's identity and perceived voting preferences from partisan government officials— is worse than a coin flip.

Moreover, *Shepherd* binds this Court to excise schemes permitting "a state to make a completely arbitrary distinction between groups of felons with respect to the right to vote." 575 F.2d at 1114; *see also Hunter*, 471 U.S. at 233 ("[W]e are confident that § 2 [of the Fourteenth Amendment] was not designed to permit the purposeful racial discrimination . . . which otherwise violates § 1 of the Fourteenth Amendment."). Even though the Constitution authorizes states to disenfranchise felons, "these granted powers are always subject to the limitation that they may not be exercised in a way that violates other specific provisions of the Constitution." *Rhodes*, 393 U.S. at 29.

States can have a legitimate state interest in limiting the franchise to "responsible voters." *Shepherd*, 575 F.2d at 1115. Florida does this by disenfranchising felons during the entirety of their sentences and then requiring an additional waiting period of five or seven years before these citizens can seek restoration. What is *not* permissible is a scheme unmoored

from any constraints, guidelines, or binding procedures that permit Florida officials to make "completely arbitrary distinction[s] between groups of felons"—or worse. *Id*. at 1114. Partisan officials' unfettered discretion cannot cull "responsible voters" to include only those voters that might benefit their political party. Such a scheme would, at best, be "arbitrary and disparate." *Bush v. Gore*, 531 U.S. at 104. At worst, the scheme would be discriminatory.

In short, Florida's scheme violates the Fourteenth Amendment. Plaintiffs' motion for summary judgment as to Count Two is **GRANTED**. Defendants' motion for summary judgment as to Count Two is **DENIED**.

## IV

In Count Four, Plaintiffs challenge the five and seven-year waiting periods before felons can apply for re-enfranchisement. ECF No. 29, at ¶¶ 113–20. Plaintiffs base their argument on the *Anderson-Burdick* balancing test that courts apply when examining state election regulations. This Court finds these waiting periods are reasonable restrictions under the Constitution.

When a regulation burdens the right to vote "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Burdick*, 504 U.S. at 434 (quoting *Norman*, 502 U.S. at 289). On the other hand, if state election regulations "impose[] only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally

37

sufficient to justify' the restrictions." *Id.* (quoting *Anderson*, 460 U.S. at 788). "Lesser burdens . . . trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (internal citations omitted).

Here, the state uniformly applies the waiting periods to all convicted felons. This application poses little risk of viewpoint discrimination—unlike the Board's unfettered discretion discussed in the preceding sections. Plaintiffs set forth no facts showing that these waiting periods infringe on their First and Fourteenth Amendment rights.

But this Court is concerned about the potential for the Board to pick and choose when to apply these waiting periods. Constitutional problems can arise if the Board bypasses these Rules in a way that violates other constitutional provisions—because of race, religion, gender, or viewpoint, for instance.

Plaintiffs identify one former felon who received re-enfranchisement without a hearing even though the Rules appeared to require a hearing. ECF No. 29, at ¶ 67. Though this felon waited more than the requisite time before applying for restoration, this Court would be remiss if it did not emphasize that rules are rules. Especially when the Board writes them.

The five and seven-year waiting periods do not violate the First and Fourteenth Amendments. Accordingly, Plaintiffs' motion for summary

38

judgment on Count Four is **DENIED** and Defendants' motion as it relates to Count Four is **GRANTED**.

V

Florida's vote-restoration scheme providing government officials' with unfettered discretion and no meaningful time restraints on the exercise of that discretion violates the First and Fourteenth Amendments. Plaintiffs would also have this Court strike Florida's disenfranchisement statutes as unconstitutional. ECF No. 102, at 43. This Court cannot do so because states have an "affirmative sanction" in the Constitution to disenfranchise felons. *Ramirez*, 418 U.S. at 54. It is the Board's process to restore voting rights that this Court finds unconstitutional.

VI

Having determined that Florida's vote-restoration scheme is unconstitutional, this Court must determine the appropriate relief. This Court could simply issue a judgment for declaratory relief. As for injunctive relief, this Court cannot issue an order that is tantamount to saying "act right." *See e.g.*, *Burton v. City of Belle Glade*, 178 F.3d 1175, 1201 (11th Cir. 1999) (stating that "[a] court is incapable of enforcing so broad and vague an injunction" when it amounts to instructing a party to obey the law); *see also* Fed. R. Civ. P. 65(d) (describing how injunctions must state the reasons for its issuance, its specific

39

terms, and a reasonably detailed description of the act(s) restrained or required).

The parties have so far not adequately briefed this Court on remedies. Accordingly, the parties must submit additional briefing as to the contours of injunctive relief, if any, in light of this order by Monday, February, 12, 2018.[18] This Court recognizes that Defendants will likely object to the substance of this order and additional remedies-related briefing will not constitute a waiver of any objections.

This Court does not lightly impose tight timelines on parties. But unique circumstances are at play in this challenge. The vote-restoration process is constitutionally infirm, but in so finding, this Court has effectively prevented otherwise eligible felons from seeking restoration under Florida's unconstitutional scheme.

Such a course of action runs counter to Florida's Constitution. The state constitution authorizes that the Governor "*may* . . . restore civil rights." FLA CONST. art. IV § 8(a) (emphasis added). The Florida Constitution does not start with the presumption that the Governor "may not" restore the right, which this order effectively (though temporarily) does. Rather, the Governor's power is permissive. *See Fla. Bar v. Trazenfeld*, 833 So.2d 734, 738 (Fla. 2002) ("The

---

[18] Plaintiffs shall also submit proposed language for the declaratory judgment in light of this order.

word 'may' when given its ordinary meaning denotes a permissive term rather than the mandatory connotation of the word 'shall.'"). Moreover, Florida's Constitution also expressly bars felons from voting "*until* restoration of civil rights." FLA. CONST. art. VI § 4(a) (emphasis added). The Florida Constitution presumes a restoration process exists. And the state has advanced that express presumption by having in place a restoration scheme for decades. This Court will not prevent—even briefly—the express preferences of Florida's Constitution without giving the parties an opportunity to address the appropriate remedy.

## VII

This Court is not blind to nationwide trends in which the spigot to access the United States' most "precious" and "fundamental" right, the right to vote, depends on who controls the levers of power. *Harper*, 383 U.S. at 670. That spigot is turned on or off depending on whether politicians perceive they will benefit from the expansion or contraction of the electorate. In Florida, more than 154,000 citizens had their voting rights restored during the last gubernatorial administration's four years. Since 2011, a period of seven years, that figure has plummeted—less than 3,000 people have received restoration. The context of these numbers is not lost on this Court. More than *one-tenth* of Florida's voting population—nearly 1.7 million as of 2016—cannot vote

because they have been decimated from the body politic.[19] More than one in five of Florida's African American voting-age population cannot vote.[20]

If any one of these citizens wishes to earn back their fundamental right to vote, they must plod through a gauntlet of constitutionally infirm hurdles. No more. When the risk of state-sanctioned viewpoint discrimination skulks near the franchise, it is the province and duty of this Court to excise such potential bias from infecting the clemency process.

Accordingly,

**IT IS ORDERED**:

1. Plaintiffs' motion for summary judgment as to Counts One, Two, and Three is **GRANTED**. Defendants' motion for summary judgment as to Counts One, Two, and Three is **DENIED**. Plaintiffs' motion for summary judgment as to Count Four is **DENIED**. Defendants' motion for summary judgment as to Count Four is **GRANTED**.

---

[19] Decimation is a more than apt word. The word refers to the rather outmoded practice of "select[ing] by lot and put[ting] to death one in every ten of (a group of soldiers guilty of mutiny or other crime): a practice in the ancient Roman army, sometimes followed in later times." *Decimation*, OXFORD ENGLISH DICTIONARY, Vol. 1, 95 (compact ed. 1971). More than one in ten Florida voters are put to civil death through disenfranchisement—with little hope of resuscitation under the unfettered discretion vote-restoration scheme. *See* The Sentencing Project, *6 Million Lost Voters: State-Level Estimates of Felony Disenfranchisement, 2016*, at 15 (October 2016), *available at* https://www.sentencingproject.org/wp-content/uploads/2016/10/6-Million-Lost-Voters.pdf.

[20] Data gathered from The Sentencing Project, *6 Million Lost Voters: State-Level Estimates of Felony Disenfranchisement, 2016*, at 15–16 (October 2016), *available at* https://www.sentencingproject.org/wp-content/uploads/2016/10/6-Million-Lost-Voters.pdf.

2. Parties shall file briefings related to remedies on or before Monday, February 12, 2018.

3. This Court does not direct entry of final judgment and will not do so until after it has considered the additional briefings as to remedies.

**SO ORDERED on February 1, 2018.**

**s/Mark E. Walker**
**United States District Judge**