In the UNITED STATES DISTRICT COURT for the NORTHERN DISTRICT OF FLORIDA
(TALLAHASSEE DIVISION)

JAMES MICHAEL HAND, et al.,

     *Plaintiffs,*

v.

                                        Case No. 4:17cv128-MW/CAS

RICK SCOTT, in his official
capacity as Governor of
Florida and member of the
State of Florida's Executive
Clemency Board, et al.,

     *Defendants.*

_____/

## <u>AMICUS CURIAE BRIEF OF MARK R. SCHLAKMAN FOR PURPOSES OF ASSISTING THE COURT AS IT CONSIDERS AN APPROPRIATE REMEDY IN THESE PROCEEDINGS</u>

Mark R. Schlakman
Florida Bar No. 0843067
mschlakman@fsu.edu
The Florida State University
Center for the Advancement of Human
Rights (FSU/CAHR)
426 W. Jefferson St.
Tallahassee, FL 32301-1602
tel.# (850) 644-4614/direct
*Amicus Curiae*



## TABLE OF CONTENTS

INTEREST OF AMICUS................................................................................................3

BACKGROUND AND CONTEXT RELATING TO CLEMENCY/CIVIL RIGHTS RESTORATION PROCESS THAT MIGHT OTHERWISE BE ELUSIVE................................................................................4
I.   Irrespective of intent, current Clemency Board civil rights/voting eligibility restoration policy disproportionately impacts minorities. ..............................................................................................4
II.   Common misunderstanding if not misconception relating to aspects of order of magnitude of population affected..................................................................................................5
III.  Clemency Board's current civil rights/voting eligibility restoration policy appears to be at cross-purposes with research conducted by the investigative arm thereof............................................. 7
IV.   Historical perspective -- distinguishing violent from non-violent adjudicated felony offenses for purposes of civil rights/voting eligibility restoration in Florida.................................................7
V.   Relationship between restoration of civil rights/voting eligibility and ex-felon eligibility for various state occupational and professional licenses, and the nexus to public safety.....................7
VI.  Comparing and contrasting three Florida Constitution Revision Commission proposals in terms of scope and remedy (all withdrawn from further consideration by the CRC within the ambit of certification of the corresponding citizen's initiative for the November 2018 ballot)................................8
VII.  Citizen's initiative – exclusions based upon polling data rather than cause.......10
VIII. International norms..................................................................................................11
CONCLUSION..............................................................................................................15

CERTIFICATE OF SERVICE ......................................................................................15

**INTEREST OF AMICUS**

Amicus, a lawyer eligible to practice law in Florida who serves as senior program director at The Florida State University Center for the Advancement of Human Rights, observing the parties in these proceedings are adequately represented, files this *amicus curiae* brief in his capacity as a private citizen for purposes of assisting the Court in its deliberations involving an appropriate remedy focusing on aspects of Florida's largely confidential clemency/civil rights/voting eligibility process including pertinent background and context relating thereto that might be elusive to the Court but for, rather than focus on the parties at bar per se.

Amicus' experience and qualifications for these purposes include his previous service as assistant general counsel and clemency aide to Governor Lawton Chiles, his subsequent role as principal investigator for a bifurcated project entitled Rethinking Civil Rights Restoration in Florida funded in part by Administration of Justice grants awarded by the Florida Bar Foundation, recent opportunity afforded through the chair of The Florida Bar's Public Interest Law Section (PILS) in cooperation with the chair of The Florida Bar's Criminal Law Section (CLS) -- as a member of both sections -- in consultation with the general counsel of The Florida Bar to develop an informal comparative analysis of the three felony disenfranchisement- related proposals considered by the Florida Constitution Revision Commission (CRC)1  which varied in terms of application and scope of remedy -- one of them, in effect, a placeholder for the citizen's initiative; all ultimately withdrawn by their sponsors from further consideration by the commission within the ambit of certification of the citizen's initiative for the November 2018 ballot, and opportunity to incorporate within that informal comparative analysis an overview of other pertinent background and context including reference to this Court's opinion in these proceedings declaring Florida's clemency/civil rights/voting eligibility restoration process in violation of the First and Fourteenth Amendments of the U.S. Constitution, as well as opportunity to engage informally on the margins of an official United States delegation appearance before the United Nations Human Rights Committee in Geneva in March 2014, the treaty body charged with monitoring adherence to principles that underlie the International Covenant on Civil and Political Rights (ICCPR), which the United States and the vast majority of the nations recognized by the United Nations have ratified or acceded to, wherein aspects of felony disenfranchisement in the United States generally and Florida's process specifically were at issue. This brief is not necessarily intended to be prescriptive toward these ends.

---

1 This informal analysis and overview of other pertinent background and context does not constitute an official position of The Florida Bar, or these sections thereof.

**BACKGROUND AND CONTEXT RELATING TO CLEMENCY/CIVIL RIGHTS/VOTING ELIGIBILTY RESTORATION PROCESS THAT MIGHT OTHERWISE BE ELUSIVE**

Prior to the Court's February 1, 2018, ruling in these proceedings declaring Florida's scheme for restoring voting eligibility of those who completed adjudicated felony convictions violated the First and Fourteenth Amendments of the U.S. Constitution, the prevailing understanding had been Florida's constitution afforded the governor and cabinet sitting as Florida's Board of Executive Clemency essentially with unbridled discretion to restore civil rights/voting eligibility permanently lost upon conviction/adjudication for a felony offense.

Said another way essentially no due process, legislative oversight or judicial review of this largely confidential process seemingly applied. As the Court has been apprised the state of Florida is among only a few states in the United States where convicted felons do not regain the eligibility to vote unless an authorized state official or body takes action to restore such eligibility. Moreover, two states -- Maine and Vermont -- never suspend voting eligibility of those convicted for felony offenses. Inmates in these states can vote from prison underscoring what has been characterized as a fundamental principle of democratic governance and our republican form of government, to ensure that citizens have a voice in their governance regardless of their status or circumstances. Other states vary in terms of where the line is drawn, e.g. whether those subject to probation or alternative forms of supervision versus those who are incarcerated can vote prior to completion of such sentences.

For perspective and attempting to establish order of magnitude as a point of entry, research highlighted through the Sentencing Project in Washington, D.C., indicates there are in excess of 1.5 million people in Florida who have completed sentences for adjudicated felony convictions who haven't regained their civil rights/voting eligibility, representing more than 25% of all felony disenfranchisement in the U.S. today.

I.   **Irrespective of intent, current Clemency Board civil rights/voting eligibility restoration policy disproportionately impacts minorities:**

Irrespective of intent, given the demographics of Florida's correctional population it is incontrovertible that current clemency board civil rights/voting eligibility restoration policy disproportionately impacts minorities. However, certain seemingly popular narratives surrounding this fact are suspect. For instance, pundits and academics alike sometimes speculate how a change in Florida's civil rights/voting eligibility restoration policy might affect future election cycles. While this topic may be irresistible for many it would not necessarily be unreasonable to observe that one's voting eligibility shouldn't be predicated upon how they may vote, or that the underlying premise that certain demographic groups will be more inclined to vote for one party versus another is questionable. Simply put, these narratives are vulnerable to the facts in that such speculation often fails to acknowledge that while this policy disproportionately impacts minorities, larger numbers of those impacted are

4

white.

**II.      Common misunderstanding if not misconception relating to aspects of order of magnitude of population affected:**

Reportedly there is a current backlog of about 10,000 applications for restoration of civil rights/voting eligibility. While this number is significant at face value, it tends to minimize the overall population affected and may suggest that the backlog is attributable more to administrative capacity to process the applications than policy. Generally, while any such backlog clearly may be exacerbated by insufficient administrative capacity to respond the extent to which any governor and cabinet may require background investigations and determine eligibility under the Rules of Executive Clemency, which can be changed by the governor and Cabinet at any time for any reason, are critical elements thereof.

For instance, when the current governor and cabinet adopted new more highly restrictive rules during their initial meeting as the Board of Executive Clemency in March 2011 upon Attorney General Bondi's urging that require, among other things, certain waiting periods after completion of all terms of sentence before one can apply for restoration -- with no guarantee that such civil rights/voting eligibility would be restored at any point, and that people apply for restoration of civil rights, ending a practice initiated during Gov. Jeb Bush's administration whereby information was passed from the Florida Department of Corrections to the then-Florida Parole Commission (now following a name change the Florida Commission on Offender Review) acting as the investigative arm of the Clemency Board upon release from custody or termination from supervision intended to streamline such data transfer rather than support automatic restoration, these new more highly restrictive rules were applied retroactively.

The retroactive application of the new rules effectively "eliminated" a pending backlog of about 100,000 active civil rights/voting eligibility restoration case files that confronted the incoming Clemency Board, "inherited" from their predecessors, rendering the vast majority ineligible under the new rules.

The following chart reflects the actual number of civil rights/voting eligibility restorations granted by the governor and cabinet annually during the past seven years since taking their respective oaths of office at the outset of their first terms in January 2011 – totaling 2807 Restoration(s) of Civil Rights "RCR" as of October 5, 2017, according to the Florida Commission on Offender Review.

| Year | RCR grants Total |
|------|------------------|
| 2011 | 78 |
| 2012 | 342 |
| 2013 | 605 |
| 2014 | 562 |
| 2015 | 427 |
| 2016 | 473 |
| *2017 as of OCT 5 | 320 |

For purposes of attempting to place these numbers in larger context, 155,000 civil rights/voting eligibility restorations were granted by the previous governor and cabinet sitting as the Clemency Board during the preceding four-year period. However, extrapolating from Florida Department of Corrections statistics, approximately 60,000 people complete sentences for adjudicated felony convictions in Florida during any given year (upon release from incarceration or termination from other forms of supervision including probation and parole involving sentences imposed prior to the Florida Legislature abolishing parole during the '80s).

Accordingly, while the 155,000 civil rights/voting eligibility restorations granted over the course of the prior four-year period dramatically exceeds the number granted more recently by the current governor and cabinet during the nearly seven years that followed as chart reflects above, even at the previous pace, that is 155,000 within roughly half the time, that elevated number of restorations lags well behind the overall number of people who typically complete sentences for adjudicated felony convictions in Florida over the course of that period -- by more than 50,000.

Expressed another way, extrapolating from Florida Department of Corrections statistics, an estimated 400,000-plus people may have completed sentences for adjudicated felony offenses in Florida since the current governor and cabinet took office while 2,807 civil rights/voting eligibility restorations had been granted as of October 5, 2017. The actual number is not material for purposes of underscoring the implications of this current highly restrictive policy that essentially ensures an already burgeoning population of U.S. citizens in Florida who have completed the legislatively mandated punishment for felony crimes of which they were convicted and have no voice in their governance will continue to expand at an extraordinary rate. Moreover, there does not appear to be any manageable administrative means in place -- or contemplated -- to process this rapidly expanding population which dramatically exceeds reportedly what is a current backlog of about 10,000

applications.

### III.   Clemency Board's current civil rights/voting eligibility restoration policy appears to be at cross-purposes with research conducted by the investigative arm thereof:

Months after the current governor and cabinet approved Florida's more highly restrictive civil rights/voting eligibility restoration criteria in March 2011 the then-Florida Parole Commission acting in its capacity as the investigative arm of the Clemency Board conducted research indicating a positive correlation between restoration of civil rights/voting eligibility and a reduction in recidivism, which appeared to place the Clemency Board's current policy at cross-purposes with the principals' rationale for adopting and maintaining it.

### IV.   Historical perspective -- distinguishing violent from non-violent adjudicated felony offenses for purposes of civil rights/voting eligibility restoration in Florida:

During the 1970's, Gov. Reubin Askew embraced a relatively simple, equitable and seemingly efficient approach toward these ends – restoration of civil rights/voting eligibility upon completion of sentence without out regard to the nature of the underlying adjudicated felony conviction(s). Said another way, irrespective of whether a crime was characterized as violent or non-violent the Clemency Board restored individuals' civil rights/voting eligibility upon completion of sentence, period. As a result, the governor and cabinet avoided investing time they might otherwise have invested reviewing such case files and were able to redirect toward other forms of clemency, or separate and distinct matters of state and substantially less administrative capacity was required to facilitate the corresponding caseload, therefore less taxpayer dollars were required to support that process.

The Florida Bar's Public Interest Law Section has embraced Askew's position, and memorialized the section's support in the form of one of its legislative positions approved by its Executive Council (for those who may be unfamiliar with nomenclature of The Florida Bar a legislative position does not necessarily contemplate proposed legislative action, rather in this instance a resolution of sorts in support of an approach section membership similarly believed to be simple, fair, equitable and efficient).

### V.   Relationship between restoration of civil rights/voting eligibility and ex-felon eligibility for various state occupational and professional licenses, and the nexus to public safety:

Not long after recommending several key elements of the more highly restrictive civil rights/voting eligibility restoration criteria implemented by the governor and cabinet in March 2011, Attorney General Pam Bondi identified separating restoration of civil rights/voting eligibility from considerations regarding ex-felon eligibility for various state occupational and professional licenses as a top legislative priority, conveying such reform was an important complement to the Clemency Board's recent decision to require an application and a

waiting period after completion of sentence before someone can apply for restoration.

That legislation arose out of one of the final recommendations issued by Gov. Bush's Ex-Offender Task Force that attempted to address an unintended consequence of various state agencies and licensing boards requiring civil rights/voting eligibility restoration for purposes of ex-felon eligibility to apply for various state occupational and professional licenses. The stated goal was to remove arbitrary barriers to appropriate employment upon reentry, not to facilitate civil rights/voting eligibility.

While this practice was external to and separate and apart from the executive clemency process it nonetheless affected it at least indirectly, in practical terms conflating public safety concerns that may have attached to certain licensed occupations. This legislation passed and the governor signed it into law within months of the Clemency Board adopting its new more highly restrictive criteria.

The legislation had been championed by Sen. Jim King during previous sessions and previously passed out of that chamber. Senator Smith embraced the bill after Sen. King died. Attorney General Bondi's subsequent support proved to be instrumental in the House and insofar as the governor. Interestingly, Senator Smith sponsored the aforementioned Constitution Revision Commission proposal co-introduced by Senator Arthenia Joyner that served as a placeholder for the language advanced by the citizen's initiative.

As a result of this "de-coupling" legislation, licensing boards and other such entities were prohibited from requiring civil rights/voting eligibility restoration as a threshold test for ex-felon eligibility to apply for such state licenses. However, any such applicants would be subject to appropriate screening depending upon the kind of license sought given the nature of the offense(s). Though the focus of this legislation was external to the clemency process and upon the licensing authorities, it underscored that unlike the licensing process where there is a tangible public safety interest in subjecting applicants to appropriate background screening based upon the nature of occupational license they are seeking and the nature of their offense there is no such tangible public safety interest at issue insofar as civil rights/voting eligibility restoration per se. In any event, the Clemency Board maintains the more highly restrictive civil rights/voting eligibility restoration policy it adopted prior to enactment.

VI.   **Comparing and contrasting three Florida Constitution Revision Commission proposals in terms of scope and remedy (all withdrawn from further consideration by the CRC within the ambit of certification of the corresponding citizen's initiative for the November 2018 ballot):**

In varying degrees these three commissioner proposals would have restored voting eligibility for Floridians with adjudicated felony convictions after they completed all terms of their sentences including probation or parole. All three proposals would have excluded certain categories of offenses from routine restoration, therefore individuals convicted of such excluded offenses would continue to be permanently barred

from voting unless the Governor and Cabinet, sitting as Florida's Board of Executive Clemency, were to restore on a case by case basis consistent with the current Rules of Executive Clemency. Generally, neither the clemency rules not the process have been subject to legislative oversight or judicial review.

The proposals varied insofar as to whether they focused exclusively on voting eligibility or also addressed other traditional aspects of civil rights restoration in Florida, i.e. eligibility to serve on a jury of one's peers and the right to hold public office in addition to voting eligibility. (Note: As the Court may be apprised, the right to own, possess or use firearms is also lost upon adjudication for a felony offense but restoration thereof is handled separately within the executive clemency process.)

**Proposal #0007 by Smith** (Co-introducer Joyner): The sponsor(s) withdrew this proposal from further consideration by the CRC on January 26, 2018, in deference to the citizen's initiative after the Florida Secretary of State determined the constitutionally required number of verified signatures and distribution thereof by congressional districts had been achieved by February 1, the operative deadline for purposes of proposed amendments being placed on the November 2018 ballot, which the Secretary formalized by issuing a certificate of ballot position to Floridians for a Fair Democracy, Inc.

This proposal like the citizen's initiative focused exclusively upon felony disenfranchisement and served, in effect, as a placeholder for the language advanced by Floridians for a Fair Democracy, Inc., which is why it's referenced first in this instance – the proposal specifically stated "...Except as provided in subsection (b) of this section, any disqualification from voting arising from a felony conviction shall terminate and voting rights shall be restored upon completion of all terms of sentence including parole or probation. -- (b) No person convicted of murder or a felony sexual offense shall be qualified to vote until restoration of civil rights."

**Proposal #0002 by Martinez** (Co-introducers Anna Marie Hernandez Gamez ; Bob Solari): The sponsor communicated his intent to withdraw this proposal after it was placed on the CRC's Ethics and Elections Committee agenda for consideration along with Proposals 0007 and 0021 on January 18, 2018, prior to the committee convening that day, which preceded certification of the citizen's initiative. Accordingly, this proposal was temporarily passed and formally withdrawn from further consideration by the CRC later that same day. The two other above-referenced proposals were approved by the committee pending consideration by the Declaration of Rights Committee.

The effect of this proposed constitutional amendment would have extended beyond voting eligibility encompassing also the bundle of civil rights lost in Florida upon adjudication for a felony offense noted earlier – in addition to voting, eligibility to serve on a jury and the right to hold public office (again, authority to own, possess or use firearms also is lost but restoration thereof is addressed separately within the executive clemency process).

Interestingly, the plain meaning of the language of this proposal arguably could have applied to restoration of firearm authority since there was no express limitation. However, the intent more simply may have been to apply to the bundle of civil rights traditionally restored collectively in Florida, once again voting, eligibility to serve on a jury and the right to hold public office.

In any case, this proposal would have expanded the range of offenses excluded from routine restoration compared to Proposal #0007 (which mirrored the citizen's initiative that was certified for the NOV 2018

ballot). By substituting homicide for murder, various lesser-included offenses like manslaughter and a range of other crimes also would have been excluded. The proposal specifies, "If convicted of a felony other than a felony involving a sexual offense or a felony involving a homicide, the person's civil rights shall be restored upon the person's completion of sentence, including parole or probation if applicable."

**\*Proposal #0021 by Rouson:** The sponsor appeared before the CRC's Declaration of Rights Committee on January 31st, 2018, introduced his proposal and then sought the chair's discretion to make a statement wherein he ultimately advised that he intended to withdraw his proposal in deference to the citizen's initiative notwithstanding his interest in providing voters with an alternative he believed might prove to be more likely to garner 60%+ support. Accordingly, his proposal was temporarily passed and formally withdrawn from further consideration by the CRC on February 2, 2018.

This proposed constitutional amendment also would have extended beyond voting eligibility encompassing the right to hold public office, but did not specifically address eligibility to serve on a jury like Proposal #0002.

It also would have further expanded the range of offenses excluded from routine restoration upon completion of sentence compared to the two aforementioned proposals by listing several additional offenses and expressly referencing court costs and court-ordered restitution, specifically that "(a)(1) No person convicted of a life or capital felony, a forcible felony defined under state law as murder; manslaughter; sexual battery; carjacking; home-invasion robbery; robbery; burglary; arson; kidnapping; aggravated assault; aggravated battery; aggravated stalking; aircraft piracy; unlawful throwing; projecting, placing, or discharging of a destructive device or bomb; or any other felony involving the use or threat of physical force or violence against any individual, *or adjudicated in this or any other state to be mentally incompetent*, is ~~shall be~~ qualified *to vote or hold office until restoration of civil rights or removal of disability* [italicized emphasis added to reflect current language]. (2) No person convicted of a felony may vote or hold office until the person has been released from incarceration and any post-conviction supervision, and has paid all court costs and court-ordered restitution or has established a payment plan to pay all court costs and court-ordered restitution."

VII.     **Citizen's initiative – exclusions based upon polling data rather than cause:**

When the Brennan Center and other stakeholders were engaged in the process of shaping what ultimately proved to be the language that now frames the corresponding citizen's initiative that was certified recently for the November 2018 ballot the consensus was no tangible public safety interest would be advanced by separating violent from non-violent offenses for purposes of restoring voting eligibility, and ideally there shouldn't be any exclusions from routine restoration of voting eligibility upon completion of sentence. However, the framers of that language concluded excluding murder and felony sex offenses from routine restoration upon completion of sentence would be prudent based upon significant public opinion polling which was commissioned to determine the path of least resistance to garnering 60+% of the vote if the requisite number of verified signatures could be collected, that is to determine what might be most salable to voters.

The exclusion of these two categories of offenses essentially was perceived to be a "compromise" of sorts that entailed subordinating what might otherwise be regarded as the inalienable rights of these discrete and insular subgroups of offenders even after they completed their sentences given that they were unlikely to resonate

favorably in the mainstream, for the greater good. Accordingly, one could argue that this language is under-inclusive.

A looming complication associated with this strategy is that whenever a line is drawn somewhat arbitrarily, more specifically in this instance based upon polling rather than underlying cause, that line may be vulnerable to attack noting a litany of other offenses deemed to be violent, a "parade of horribles," that weren't excluded for purposes of routine civil rights/voting eligibility restoration upon completion of sentence. Said another way, receding from the Askew approach of restoration upon completion of an adjudicated felony sentence without regard to whether its characterized as violent of nonviolent seemingly skirts a slippery slope – the citizen's initiative excludes murder and sex offenses, but what about or why not XYZ!?

This was Commissioner Rouson's observation, which prompted him to offer a much more restrictive alternative proposal which he concluded might resonate more favorably within the mainstream regardless of the fact that there was no tangible public safety that would be advanced. He ultimately withdrew his proposal after the citizen's initiative was certified for the November 2018 ballot. This observation also may have influenced Commissioner Martinez's alternative proposal that among other things expanded the exclusion for murder to homicide, which he withdrew before the citizen's initiative was certified.

### VIII.   International Norms:

On April 23, 2014, the United Nations Human Rights Committee released its official Concluding Observations based upon the United States delegation's most recent periodic appearance before that body in Geneva in March 2014 involving adherence to the principles articulated by the Universal Declaration of Human Rights which underlie the International Covenant on Civil and Political Rights (ICCPR), a treaty which the U.S. and the vast majority of the nations recognized by the U.N. have ratified. (Note: U.S.-based human rights NGOs also engaged in that proceeding.)

The following comment by the Committee re: Voting rights is supplied simply for perspective only.

*While noting with satisfaction the statement by the Attorney General on 11 February 2014, calling for a reform of state laws on felony disenfranchisement [see below], the Committee reiterates its concern about the persistence of state-level felon disenfranchisement laws, its disproportionate impact on minorities and the lengthy and cumbersome voting restoration procedures in states. The Committee is further concerned that voter identification and other recently introduced eligibility requirements may impose excessive burdens on voters and result in de facto disenfranchisement of large numbers of voters, including members of minority groups. Finally, the Committee reiterates its concern that residents of the District of Columbia (D.C.) are denied the right to vote for and elect voting representatives to the United States Senate and House of Representatives (arts. 2, 10, 25 and 26).*

**The State party should ensure that all states reinstate voting rights to felons who have fully served their sentences; provide inmates with information about their voting restoration options; remove or streamline**

*lengthy and cumbersome voting restoration procedures; as well as review automatic denial of the vote to any imprisoned felon, regardless of the nature of the offence. The State party should also take all necessary measures to ensure that voter identification requirements and the new eligibility requirements do not impose excessive burdens on voters and result in de facto disenfranchisement. The State party should also provide for the full voting rights of residents of Washington, D.C.*

(Note: The extent of felony disenfranchisement in Florida is noted in multiple instances in the following remarks which were noted in the above-referenced comment by the U.N. Human Rights Committee are similarly supplied for perspective only.)

## Attorney General Eric Holder Delivers Remarks on Criminal Justice Reform at Georgetown University Law Center

~

Tuesday, February 11, 2014

Thank you, Wade [Henderson], for those kind words – and thank you all for being here.  It's a privilege to join so many criminal justice leaders, policy experts, public servants, and aspiring legal professionals at today's Forum.  And it's a pleasure to be back at Georgetown University Law Center.

I'd like to thank Dean [William] Treanor and Nick Turner – along with their colleagues from the University, the Vera Institute of Justice, and the Leadership Conference Education Fund – for hosting this important discussion, and bringing this remarkable group together to confront some of the most complex, and urgent, criminal justice challenges of our time.

Today, we gather in recognition of the fact that, although our laws and procedures must be continually updated, our commitment to the cause of justice must remain constant.  From its earliest days, our Republic has been bound together by its extraordinary legal system, and by the enduring values that define it.  These values – of equality, opportunity, and justice under law – were first codified in our founding documents.  And they are put into action every day by leaders like you – and the talented men and women who learn, at great institutions like Georgetown, what it means to be a steward of the law – and an advocate for those whom it protects and empowers.

Although the issues on our agenda this morning are difficult and at times divisive, the diversity of this crowd – and the panelists and Members of Congress you'll be hearing from – is a testament to the fact that criminal justice reform is essentially not a partisan issue.  It's about providing legal professionals and law enforcement leaders with the 21st-century solutions they need to address 21st-century challenges.  It's about shaping a system that deters and punishes crime, keeps us safe, and ensures that those who pay their debts have the chance to become productive citizens. Most importantly, it's about answering fundamental questions – about fairness and equality – that determine who we are, and who we aspire to be, not only as a nation, but as a people – a people resolved to move forward together, and committed to implementing criminal justice policies that work for everyone in this country.

This is the challenge – and the extraordinary opportunity – that brings us together this morning.  And it's the same challenge that drove me, roughly one year ago, to launch a targeted Justice Department review of our criminal justice system: to identify areas for improvement and make this system as efficient, as effective, and as just as possible.

Last August, I announced a new "Smart on Crime" initiative – based on the results of this review – that's already allowing the Justice Department to strengthen the federal system; to increase our emphasis on proven diversion, rehabilitation, and reentry programs; and to reduce unnecessary collateral consequences for those seeking to rejoin their communities.  Among the key changes we're implementing is a modification of the Department's charging policies – to ensure that people who commit certain low-level, nonviolent federal drug crimes will face sentences appropriate to their individual conduct – rather than stringent mandatory minimums, which will now be reserved for the most serious criminals.

As you'll be discussing later today, this change will not only make our system fairer – it will also make our expenditures more productive.  It will enhance our ability to combat crime, reduce drug-fueled violence, and protect our communities.  And it will complement proposals like the bipartisan Smarter Sentencing Act – cosponsored by Senators Dick Durbin, Mike Lee, and Chairman Patrick Leahy, along with Representatives Bobby Scott and Raul Labrador – to give judges more discretion in determining appropriate sentences for those convicted of certain crimes.

As we work with Members of Congress to refine and pass this legislation, my colleagues and I are simultaneously moving forward with a range of other reforms.  We're investing in evidence-based diversion programs – like drug treatment initiatives and veterans courts – that can serve as alternatives to incarceration in appropriate cases.  We're working to target law enforcement resources to the areas where they're needed most.  And we're partnering with state officials, agency leaders, and others – including members of the Federal Interagency Reentry Council, comprised of Cabinet Secretaries and leadership from throughout the Obama Administration – to advance proven strategies to help formerly incarcerated people successfully rejoin their communities.

After all, at some point, 95 percent of all prisoners will be released. And just as we expect everyone who commits a crime to pay their societal debts, we also expect them to remain sober and crime-free upon their release. We expect them to get jobs and find housing. And we expect them to become productive, law-abiding members of society.

Unfortunately, as you know all too well, these expectations are not always met. Rates of recidivism remain unacceptably high. And that's why the Smart on Crime initiative is driving us to tear down unnecessary barriers to economic opportunities and independence. I've directed every United States Attorney to designate a Prevention and Reentry Coordinator in his or her district to ensure that this work will be a top priority throughout the country. And I've ordered our law enforcement components, and asked state Attorneys General, to reconsider policies that impose overly burdensome collateral consequences on formerly incarcerated individuals without meaningfully improving public safety.

This is important because we've seen that maintaining family connections, developing job skills, and fostering community engagement can reduce the likelihood of re-arrest. And we know that restoring basic rights – and encouraging inclusion in all aspects of society – increases the likelihood of successful reintegration. We've taken significant steps forward in improving reentry policies and addressing the unintended collateral consequences of certain convictions.

Yet formerly incarcerated people continue to face significant obstacles. They are frequently deprived of opportunities they need to rebuild their lives. And in far too many places, their rights – including the single most basic right of American citizenship – the right to vote – are either abridged or denied.

As the Leadership Conference Education Fund articulated very clearly in your recent report, "there is no rational reason to take away someone's voting rights for life just because they've committed a crime, especially after they've completed their sentence and made amends." On the contrary: there is evidence to suggest that former prisoners whose voting rights are restored are significantly less likely to return to the criminal justice system. As your report further notes, a study recently conducted by a parole commission in Florida found that, while the overall three-year recidivism rate stood at roughly 33 percent, the rate among those who were re-enfranchised after they'd served their time was just a third of that.

Unfortunately, the re-enfranchisement policy that contributed to this stunning result has been inexplicably and unwisely rolled back since that study was completed. And, in other states, officials have raised hurdles to be faced by those with past convictions seeking to regain their access to the ballot box. And that's why I believe that, today – starting here and now – it is time for criminal justice leaders to come together to address this issue. It is time to fundamentally reconsider laws that permanently disenfranchise people who are no longer under federal or state supervision.

These restrictions are not only unnecessary and unjust, they are also counterproductive. By perpetuating the stigma and isolation imposed on formerly incarcerated individuals, these laws increase the likelihood they will commit future crimes. They undermine the reentry process and defy the principles – of accountability and rehabilitation – that guide our criminal justice policies. And however well-intentioned current advocates of felony disenfranchisement may be – the reality is that these measures are, at best, profoundly outdated. At worst, these laws, with their disparate impact on minority communities, echo policies enacted during a deeply troubled period in America's past – a time of post-Civil War repression. And they have their roots in centuries-old conceptions of justice that were too often based on exclusion, animus, and fear.

The history of felony disenfranchisement dates to a time when these policies were employed not to improve public safety, but purely as punitive measures – intended to stigmatize, shame, and shut out a person who had been found guilty of a crime. Over the course of many decades – court by court, state by state – Americans broadly rejected the colonial-era notion that the commission of a crime should result in lifelong exclusion from society.

After Reconstruction, many Southern states enacted disenfranchisement schemes to specifically target African Americans and diminish the electoral strength of newly-freed populations. The resulting system of unequal enforcement – and discriminatory application of the law – led to a situation, in 1890, where ninety percent of the Southern prison population was black. And those swept up in this system too often had their rights rescinded, their dignity diminished, and the full measure of their citizenship revoked for the rest of their lives. They could not vote.

In the years since, thanks to the hard work, and the many sacrifices, of millions throughout our history, we've outlawed legal discrimination, ended "separate but equal," and confronted the evils of slavery and segregation. Particularly during the last half-century, we've brought about historic advances in the cause of civil rights. And we've secured critical protections like the Civil Rights Act of 1964 and the Voting Rights Act of 1965.

Yet – despite this remarkable, once-unimaginable progress – the vestiges, and the direct effects, of outdated practices remain all too real. In many states, felony disenfranchisement laws are still on the books. And the current scope of these policies is not only too significant to ignore – it is also too unjust to tolerate.

Across this country today, an estimated 5.8 million Americans – 5.8 million of our fellow citizens – are prohibited from voting because of current or previous felony convictions. That's more than the individual populations of 31 U.S. states. And although well over a century has passed since post-Reconstruction states used these measures to strip African Americans of their most

fundamental rights, the impact of felony disenfranchisement on modern communities of color remains both disproportionate and unacceptable.

Throughout America, 2.2 million black citizens – or nearly one in 13 African-American adults – are banned from voting because of these laws.  In three states – Florida, Kentucky, and Virginia – that ratio climbs to one in five. These individuals and many others – of all races, backgrounds, and walks of life – are routinely denied the chance to participate in the most fundamental and important act of self-governance.  They are prevented from exercising an essential right.  And they are locked out from achieving complete rehabilitation and reentry – even after they've served the time, and paid the fines, that they owe.

Fortunately – despite unfortunate steps backward in a few jurisdictions, and thanks to the leadership of policymakers from both parties and criminal justice professionals like you – in recent years we have begun to see a trend in the right direction.  Since 1997, a total of 23 states – including Nebraska, Nevada, Texas, and Washington State – have enacted meaningful reforms.  In Virginia, just last year, former Governor McDonnell adopted a policy that began to automatically restore the voting rights of former prisoners with non-violent felony convictions.

These are positive developments.  But many of these changes are incremental in nature.  They stop well short of confronting this problem head-on.  And although we can be encouraged by the promising indications we've seen, a great deal of work remains to be done.  Given what is at stake, the time for incrementalism is clearly over.

Eleven states continue to restrict voting rights, to varying degrees, even after a person has served his or her prison sentence and is no longer on probation or parole – including the State of Florida, where approximately 10 percent of the entire population is disenfranchised as a result.  In Mississippi, roughly 8 percent of the population cannot vote because of past involvement with the criminal justice system. In Iowa, action by the governor in 2011 caused the state to move from automatic restoration of rights – following the completion of a criminal sentence – to an arduous process that requires direct intervention by the governor himself in every individual case.  It's no surprise that, two years after this change – of the 8,000 people who had completed their sentences during that governor's tenure – voting rights had been restored to fewer than 12.

That's moving backwards – not forward. It is unwise, it is unjust, and it is not in keeping with our democratic values.  These laws deserve to be not only reconsidered, but repealed.  And so today, I call upon state leaders and other elected officials across the country to pass clear and consistent reforms to restore the voting rights of all who have served their terms in prison or jail, completed their parole or probation, and paid their fines.

I call upon experts and legislators to stand together in overturning an unfortunate and outdated status quo.

And I call upon the American people – who overwhelmingly oppose felony disenfranchisement – to join us in bringing about the end of misguided policies that unjustly restrict what's been called the "most basic right" of American citizenship.

I applaud those who have already shown leadership in raising awareness and helping to address this issue.  Later today, this conference will hear from Senator Rand Paul, who has been a leader on this matter.  His vocal support for restoring voting rights for former inmates shows that this issue need not break down along partisan lines.

Bipartisan support will be critical going forward because, even in states where reforms are currently taking hold, we need to do even more.  And we need to make sure these positive changes are expanded upon – and made permanent.

Virginia's progress has come through the executive power of its former governor, rather than the legislature – meaning that, without action by state lawmakers, these reforms can be reversed by any future executive with the stroke of a pen.  More broadly, the inconsistent patchwork of laws affecting felony disenfranchisement varies so widely between states – and, in some places, between cities and counties – that even those who administer the laws are sometimes unfamiliar with how to apply them. The New York Times noted in 2012 that this kind of confusion means that many who are legally allowed to vote erroneously believe that their rights are restricted.  And too often, those who do understand their rights are wrongfully turned away.

Today – together – we need to correct this injustice.  As the evidence has shown, and as I pointed out in an amicus brief – filed more than a decade ago, in a case challenging Florida's disenfranchisement law – permanent exclusion from the civic community does not advance any objective of our criminal justice system.  It has never been shown to prevent new crimes or deter future misconduct.   And there's no indication that those who have completed their sentences are more likely to commit electoral crimes of any type – or even to vote against pro-law enforcement candidates.

What is clear – and abundantly so – is that these laws sever a formerly incarcerated person's most direct link to civic participation.  They cause further alienation and disillusionment between these individuals and the communities that our Smart on Crime policies encourage them to rejoin. And particularly at a time when our prisons are overflowing – and many who are serving sentences for nonviolent drug crimes find themselves trapped in a vicious cycle of poverty and incarceration – it is counterproductive to exclude these individuals from the voting franchise once their involvement with the corrections system is at an end.  It is contrary to the goals that bring us together today.  And it is not consistent with the cherished ideals that once led Supreme Court Justice William Brennan to call disenfranchisement "the very antithesis of rehabilitation."

14

Whenever we tell citizens who have paid their debts and rejoined their communities that they are not entitled to take part in the democratic process, we fall short of the bedrock promise – of equal opportunity and equal justice – that has always served as the foundation of our legal system. So it's time to renew our commitment – here and now – to the notion that the free exercise of our fundamental rights should never be subject to politics, or geography, or the lingering effects of flawed and unjust policies.

After all, at its most basic level, this isn't just about fairness for those who are released from prison. It's about who we are as a nation. It's about confronting – with clear eyes, and in frank terms – disparities and divisions that are unworthy of the greatest justice system the world has ever known. It's about ensuring that we hold accountable those who do wrong – while preserving the values our nation has always held sacred. And it's about protecting the American people and strengthening our communities – while enabling all of our citizens, no matter who they are or where they're from, to make their voices heard.

Throughout America's long history of progress, struggle, and sacrifice – as generation after generation has come together to move our nation closer to the ideals our founders envisioned and to advance our pursuit of a more perfect Union – this country has always looked to its legal system to answer questions of right and wrong; of truth and justice.

This morning, these questions remain before us – and the pursuit of a more perfect Union goes on. Although I recognize, as you do, that the progress we seek will not be easy – and the reforms we need will not take hold overnight – I am proud to join and, where necessary, lead, this bipartisan group in seeking solutions to these urgent issues. I am honored to count you as colleagues in the work of forging a more just society that reflects our conviction that all are created equal. And despite the difficulties, the opposition, and the resistance we will undoubtedly face – as I look around this room – I cannot help but feel confident in where today's experts, and tomorrow's leaders, will take us in the months and years to come.

Thank you.                                    ###

## CONCLUSION

Amicus files this brief in his capacity as a private citizen for purposes of assisting the Court in its deliberations involving an appropriate remedy focusing on aspects of Florida's largely confidential clemency/civil rights/voting eligibility process including pertinent background and context relating thereto that might be elusive to the Court but for, rather than focus on the parties at bar per se.

Respectfully submitted,

_____
Mark R. Schlakman
Florida Bar No. 0843067
senior program director
The Florida State University
Center for the Advancement of Human Rights (FSU/CAHR)
426 W. Jefferson St.
Tallahassee, FL 32301-1602
Email: mschlakman@fsu.edu
tel.# (850) 644-4614/direct

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2018, a true and correct copy of the foregoing document was furnished to counsel for the respective parties, including specifically those referenced in Order Granting Motion for Leave to File this Amicus Brief via email.

Mark R. Schlakman
Fla. Bar No. 0843067