# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

JAMES MICHAEL HAND, et al.,

     *Plaintiffs*,

v.                                            **Case No. 4:17cv128-MW/CAS**

RICK SCOTT, in his official
capacity as Governor of
Florida and member of the
State of Florida's Executive
Clemency Board, et al.,

     *Defendants.*

_____/

## ORDER DIRECTING ENTRY OF JUDGMENT

This Court is not the Vote-Restoration Czar. It does not pick and choose who may receive the right to vote and who may not. Nor does it write the rules and regulations for the Executive Clemency Board. Instead, this Court possesses the well-known and unsurprising "province and duty . . . to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). And this Court possesses the unremarkable discretion to find a means for the Board to comply with the law.

In its Order on Cross-Motions for Summary Judgment, this Court applied longstanding precedent from the Supreme Court and the Eleventh Circuit that invalidated unfettered-discretion schemes to a novel context;

1

namely, that of felon re-enfranchisement. *See generally* ECF No. 144. And, as it has done in the past, this Court invited the parties to recommend appropriate remedial action. Defendants essentially repackage the current scheme into proposed remedies permitting the Governor and Board to do, as the Governor described, "whatever we want" in denying voting rights to hundreds of thousands of their constituents. ECF No. 144, at 2 (citation omitted). This will not do. And Defendants' proposed remedy to abandon the whole vote-restoration scheme does not pass constitutional muster.

If binding precedent spanning decades is to guide this Court—as it must—then an injunction must ensue to prevent further infringement. Florida's vote-restoration scheme can no longer violate Plaintiffs' fundamental First Amendment rights. Accordingly, as even Defendants acknowledge, "this Court may direct the Board 'to find a means of bringing the [State's] scheme into compliance with federal law.'" ECF No. 149, at 14 (quoting *Strahan v. Coxe*, 127 F.3d 155, 170 (1st Cir. 1997)).

# I

Plaintiffs would have this Court restore the right to vote to any former felon who has completed her whole sentence and a uniformly imposed five- or seven-year waiting period. ECF No. 147, at 2–3. But such relief is beyond the scope of this Court's authority. The people of Florida—either through ballot initiatives or through their legislative acts—may cure any perceived policy

weaknesses with Florida's restoration scheme.[1] This Court's task today is to remedy Florida's *current* scheme by cabining government officials' unfettered discretion.

## II

While Defendants oppose any relief and claim the current scheme is all sunshine and rainbows, they agree with Plaintiffs that this Court may provide declaratory relief.[2] *See, e.g.*, ECF No. 157, Ex. A (outlining Plaintiffs' proposed declaratory relief), *and* ECF No. 158, at 15 ("Here, a declaratory judgment would provide an adequate remedy for the specific concerns identified by the Court."). And this Court grants declaratory relief consistent with its prior order.

## III

The parties disagree on the propriety and extent of injunctive relief, which is the primary purpose of this Order. This Court finds injunctive relief is appropriate to ensure that Florida's vote-restoration scheme is no longer based on unfettered discretion.

---

[1] A state constitutional amendment proposing changes to Florida's felony disenfranchisement and re-enfranchisement process will appear on the ballot in November 2018.

[2] "The world ain't all sunshine and rainbows." ROCKY BALBOA (Metro-Goldwyn-Meyer, et al. 2006). The same goes for Florida's current vote-restoration scheme. *See generally* ECF No. 144.

## A

To succeed on a permanent injunction, Plaintiffs "must satisfy a four-factor test." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156 (2010) (internal quotation marks omitted). Plaintiffs must show (1) "irreparable injury"; (2) that "remedies available at law, such as monetary damages, are inadequate to compensate for that injury"; (3) that, "considering the balance of hardships between the plaintiff[s] and defendant[s], a remedy in equity is warranted"; and (4) that the "public interest would not be disserved by a permanent injunction." *Id.* at 156–57 (internal quotation marks omitted).

Plaintiffs have satisfied the elements for a permanent injunction. First, Plaintiffs have suffered an irreparable injury.[3] Their right to free association and right to free expression were denied under a fatally flawed scheme of unfettered discretion that was contaminated by the risk of viewpoint discrimination. The Board will revisit some of their decisions at some unknown future date—if at all—based on nebulous criteria, such as the Governor's comfort level. *See, e.g.*, ECF No. 102, at 41. "[I]n the unique context of first amendment challenges upon the facial validity of licensing statutes, it is the very existence of official discretion that gives rise to a threat of injury sufficient to warrant an injunction." *Miami Herald Publ'g Co. v. City of Hallandale*, 734

---

[3] One exception is Plaintiff Yraida Leonides Guanipa, who is not yet eligible for restoration. ECF No. 102, at 11–12. On Plaintiffs' facial challenge, however, the absence of Ms. Guanipa does not impact the contours of this Court's remedy or, for that matter, this Court's Order.

F.2d 666, 674 n.4 (11th Cir. 1984). Plaintiffs, then, have established "an imminent likelihood" that their First Amendment rights to free association and free expression "will be chilled or prevented altogether." *Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

Second, because Plaintiffs suffered an irreparable harm, remedies at law are inadequate. *See Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1229 (11th Cir. 2017) (citing *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B Nov. 1981) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies.")).[4]

Third, the balance of the hardships favors Plaintiffs. Defendants need only redraft rules that align the vote-restoration scheme within the boundaries of the law by cabining official discretion and providing meaningful time constraints for the Board's decision-making. Plaintiffs, meanwhile, are deprived of a voice in directly choosing their elected leaders. They are also deprived of associating with the political party, if any, of their choice. Both are essential First Amendment rights, as this Court described in its prior order. ECF No. 144, at 9–17. Balancing the hardships between protecting First

---

[4] Decisions rendered by Unit B of the former Fifth Circuit constitute binding precedent in the Eleventh Circuit. *Stein v. Reynolds Secs., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

Amendment rights and having a government board that meets four times a year redraft their rules to conform with the United States Constitution weighs unsurprisingly in favor of the former.

Finally, Plaintiffs easily satisfy the fourth factor. "[T]he public interest is always served in promoting First Amendment values." *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1276 (11th Cir. 2001). There are few greater interests than free association and free expression to choose public officials to lead, to represent all people in their jurisdictions, and to advance policy for the common good. These interests are why Americans launched a revolution against perceived unfettered discretion in the hands of one high-ranking official, King George III.

## B

The question turns to the nature and extent of a permanent injunction. "Injunctive relief against a state agency or official must be no broader than necessary to remedy the constitutional violation." *Knop v. Johnson*, 977 F.2d 996, 1008 (6th Cir. 1992) (quoting *Toussaint v. McCarthy*, 801 F.2d 1080, 1086 (9th Cir. 1986)). This Court does not re-enfranchise otherwise eligible citizens. This Court does not operate as a legislature. This Court is not a fifth member of the Board, drafting specific rules and regulations for it, unless it is forced to

do so.[5] "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971).

While this Court again recognizes the novelty of Plaintiffs' claims,[6] this Court's permanent injunction does not surface out of some swamp. Federal courts have regularly held—including other circuits and the Supreme Court—that cabining state officials' discretion so they may not violate First Amendment rights is an appropriate task for federal courts. *See, e.g.*, *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988) (listing a "long line of precedent" outlining the Supreme Court's discomfort with government officials' unfettered discretion over First Amendment rights); *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 133 (1992) ("The First Amendment prohibits the vesting of such unbridled discretion in a government official.");

---

[5] This Court recognizes that in other contexts, as Plaintiffs point out, courts have actively participated in crafting specific remedies. *See* ECF No. 157, at 3–7 (listing redistricting, voting-rights, and school-desegregation cases in which courts have crafted specific remedies when a legislature or other government body abandons its court-ordered duties).

[6] Plaintiffs challenge an executive clemency scheme that, by rule, has "unfettered discretion" to deny or grant critical First Amendment rights. Fla. R. Exec. Clemency 4. But, as this Court emphasized in its prior order, a scheme's placement under an executive-clemency structure does not exempt it from constitutional compliance. ECF No. 144, at 25–27 (discussing the limitations of executive clemency in relation to federal constitutional protections); *see also Hoffa v. Saxbe*, 378 F. Supp. 1221, 1231 (D.D.C. 1974) ("And the [pardon] power is most importantly limited, as are all powers conferred by the Constitution, by the Bill of Rights which expressly reserved to the 'individual' certain fundamental rights."); *see also id.* at 1233 (observing that the President's pardon power "does not exist in a vacuum but rather as part of our total constitutional system").

*Gannett Satellite Info. Network, Inc. v. Berger*, 894 F.2d 61, 69 (3d Cir. 1990) (invalidating scheme that "failed to establish any parameters for the exercise of its authority to regulate a broad category of speech"). The incongruence of officials' unfettered discretion with the First Amendment extends to executive-clemency schemes implicating constitutional rights.

The Eleventh Circuit has previously addressed other unconstitutional unfettered-discretion schemes, which guides this Court on the scope and nature of appropriate injunctive relief. In *Sentinel Communications Co. v. Watts*, the Eleventh Circuit struck down a scheme that gave a Florida official "standardless, unfettered discretion" in distributing newspaper racks at interstate rest areas. 936 F.2d 1189, 1197 (11th Cir. 1991). "Unaided (or unhindered) by any regulations, guidelines, procedures, ordinances, or standards," the government official had "no grounds for granting or denying permits" and was "free to make his decisions on any basis that he deem[ed] appropriate." *Id.* at 1198. Newspapers seeking to exercise their First Amendment rights were "subject to the completely standardless and unfettered discretion of one bureaucrat working . . . in Tallahassee." *Id.* at 1199. To remedy that official's infinite discretion, the court called for "[s]ome neutral criteria" that would "insure" that the government official's decision "is not based on the content or viewpoint of the speech being considered." *Id.* at 1199–1200 (quoting *Lakewood*, 486 U.S. at 760).

8

Similarly, the Eleventh Circuit determined en banc that an Atlanta government agency's unfettered discretion over granting or denying permits for newsrack distribution at Hartsfield Atlanta International Airport violated the First Amendment. *Atlanta Journal & Constitution v. City of Atlanta*, 322 F.3d 1298, 1310–11 (11th Cir. 2003) (en banc). Particularly concerning was the *risk* that the government official would engage in impermissible viewpoint discrimination under the guise of a neutral business-related reason—a sort of "mask for censorship." *Id.* at 1311 n.13. To rectify that risk, "[s]tructural and procedural safeguards can reduce the possibility that an official will use her power to corrupt the protections of the First Amendment." *Id.* at 1311. Therefore, the government official "must be constrained in some form in her exercise of discretion" by "clear standards." *Id.*; *see also id.* at 1312 (holding that official discretion "must be restrained through procedures or instructions designed to reduce or eliminate the possibility of viewpoint discrimination").

So too here. There is no doubt a risk that the Board's officials may engage in viewpoint discrimination through seemingly neutral rationales—such as traffic citations or an applicant's perceived lack of remorse—that serve as impermissible "mask[s] for censorship." *Id.* at 1311 n.13. This sort of unfettered discretion cannot exist under the Federal Constitution—or any well-functioning democracy. Therefore, the Board must promulgate specific standards and neutral criteria to direct its decision-making. *Sentinel*

*Commc'ns*, 936 F.2d at 1199 n.9 ("[T]he doctrine forbidding unbridled discretion requires reasonable and definite standards."); *see also id.* at 1207 (explaining that Florida "simply cannot continue to take an utterly discretionary, 'seat of the pants' regulatory approach towards" First Amendment activity and that written guidelines with "specific criteria" should guide government discretion).

These standards and criteria cannot be merely advisory, a Potemkin village for anyone closely reviewing the scheme. *See* ECF No. 144, at 4–5 (outlining the existing non-binding criteria the Board may or may not consider). "Implicit limits on a licensing official's discretion must be made explicit, 'by textual incorporation, binding judicial or administrative construction, or well-established practice.'" *Sentinel Commc'ns*, 936 F.2d at 1199 n.9 (quoting *Lakewood*, 486 U.S. at 770). In other words, the Board cannot rely on whims, passing emotions, or perceptions. Establishing safeguards against viewpoint discrimination should be the Board's paramount goal following this Order. In the future, concrete criteria—not "feel[ing] comfortable," ECF No. 144, at 30—must direct the Board. And its rules must spell these criteria out with precision. *See Atlanta Journal*, 322 F.3d at 1312 (retaining portion of district court's permanent injunction "that prohibited the administration of any plan that did not explicitly constrain official discretion").

Defendants balk at injunctive relief partly because of a "presumption of regularity." ECF No. 149, at 8–9. This argument boils down to "trust us—we got this." But "this is the very presumption that the doctrine forbidding unbridled discretion disallows." *Lakewood*, 486 U.S. at 770. The Eleventh Circuit is again instructive. "[I]t is not enough to presume that officials will act in good faith and adhere to standards absent from a statute or scheme's face." *Sentinel Commc'ns*, 936 F.2d at 1199 n.9. While Defendants invoke the presumption of regularity to avoid a permanent injunction, such a remedy is necessary to cabin Defendants' unfettered discretion—and the broad discretion they claim to have in crafting a remedy. And, as noted before, Defendants concede this point. "[T]his Court may direct the Board 'to find a means of bringing the [State's] scheme into compliance with federal law.'" ECF No. 149, at 14 (quoting *Strahan*, 127 F.3d at 170).

Generally, when a court strikes down unconstitutional grants of unfettered government discretion, it does so because "the problem is not potential abuses but the very existence of broad, censorial power." *Int'l Soc'y for Krishna Consciousness v. Eaves*, 601 F.2d 809, 823 (5th Cir. 1979).[7] Here, there is little doubt that the Board possesses broad, censorial power to prohibit hundreds of thousands of otherwise eligible voters from freely associating with

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

political parties or freely expressing themselves through voting. *And* there are problems of potential abuse—especially when members of the Board, who are elected on a statewide basis and who may be running for re-election or another office, have a personal stake in shaping the electorate to their perceived benefit. "Speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010). Florida's current scheme inverts that important, democratic mechanism. It cannot do so anymore.

In short, the Board is left to the "task of devising a Constitutionally sound program," *Lewis v. Casey*, 518 U.S. 343, 362 (1996) (internal quotation marks omitted), but it must do so within constraints that the Eleventh Circuit has identified; namely, specific, neutral criteria that excise the risk—and, of course, the actual practice of—any impermissible discrimination, such as race, gender, religion, or viewpoint. While this Court does not order any particular vote-restoration scheme nor any specific criteria the Board must consider, Florida's corrected scheme cannot be byzantine or burdensome.

## C

The Board's new criteria would be toothless without meaningful time constraints. In its prior order, this Court found the fuzzy time periods that the Board has invoked in reviewing or re-reviewing former felons' applications unconstitutional. ECF No. 144, at 27–31. Like this Court's conclusions about

the Board's lack of criteria to cabin its decision-making, this Court's conclusions over the absence of meaningful time constraints do not arrive out of thin air. The Supreme Court and the Eleventh Circuit have repeatedly struck down schemes that lack meaningful time constraints as contrary to the First Amendment. *See, e.g.*, *id.* at 28–29 (citing Supreme Court precedent), *and id.* at 29 n.16 (citing Eleventh Circuit precedent).

Binding precedent again instructs the scope and nature of remedies. Recently, the Eleventh Circuit upheld a district court's permanent injunction over a school board's policy that essentially failed to constrain a high-ranking official from granting or denying speaking slots to individuals at school-board meetings. *Barrett*, 872 F.3d at 1229. "[U]nbridled discretion can . . . exist when a permitting official has no time limit within which she must make a decision on a permit application." *Id.* at 1222. The challenged policy "pose[d] enough of a risk that speech w[ould] be chilled or effectively censored on the basis of content or viewpoint" because one portion of the policy "lack[ed] any time limit with which [the government official] must comply." *Id.* at 1229.

The same risks exist here. As this Court emphasized in its prior order, the Board "cannot . . . kick the can down the road for so long that they violate former felons' rights to free association and free expression." ECF No. 144, at 29. It is no excuse that the Board lacks resources to abide by the Federal Constitution's requirements. If the Board pursues policies that sever hundreds

of thousands of Floridians from the franchise and, at the appropriate time, hundreds of thousands of Floridians want their voting rights back, the Board must shoulder the burden of its policies' consequences. They cannot continue to shrug off restoration applications indefinitely.

Accordingly, the Board must promulgate time constraints that are meaningful, specific, and expeditious. While this Court leaves the specifics of timing to Defendants to outline and justify, the time limits cannot cloak impermissible clock-control. *See Barrett*, 872 F.3d at 1214 ("Control the clock and control the game."). Absent extraordinary circumstances, this Court cannot conceive of any reason why an applicant at any point must wait more than one election cycle after she becomes eligible to apply for restoration.

## D

Defendants cannot end the vote-restoration scheme entirely. *See* ECF No. 149, at 11 (suggesting the Board could adopt a policy "declining to restore any convicted felon's ability to vote, either permanently or as an interim measure . . ."). This Court concluded that Florida's arbitrary slow drip of vote-restorations violates the U.S. Constitution—but that does not mean Defendants can shut off the spigot of voting rights with a wrench, yank it from the plumbing, and throw the whole apparatus into the Gulf of Mexico. In its prior order, this Court reasoned that a state cannot re-enfranchise its citizens arbitrarily because it cannot disenfranchise citizens arbitrarily. *See* ECF No.

14

144, at 6–7 (citing *Shepherd v. Trevino*, 575 F.2d 1110, 1114 (5th Cir. 1978), *and Owens v. Barnes*, 711 F.2d 25, 27 (3d Cir. 1983)); *see also id.* at 7 n.4 (citing *Williams v. Taylor*, 677 F.2d 510 (5th Cir. 1982)). Removing *any* scheme for vote-restoration is the ultimate arbitrary act. Having lost their ability to re-enfranchise citizens at a snail's pace guided by absolutely nothing, Defendants' threats to arbitrarily and completely end the vote-restoration scheme is tantamount to picking up one's marbles and going home.

It is true that "Florida's *discretion* to deny the vote to convicted felons is fixed by the text" of Section Two of the Fourteenth Amendment. *Johnson v. Bush*, 405 F.3d 1214, 1228 (11th Cir. 2005) (emphasis added). States have "a realm of *discretion* in the . . . reenfranchisement of felons which the states do not possess with respect to limiting the franchise of other citizens." *Shepherd*, 575 F.2d at 1114 (emphasis added). In exercising that discretion, Florida pursues an interest "in limiting the franchise to responsible voters." *Id.* at 1115.

In so limiting the franchise, Florida has the ability under existing case law to exercise some—but not unlimited—discretion in re-enfranchisement of former felons. *Id.* at 1114. Florida exercises this discretion by defining what a felony is. It culls from the body politic hundreds of thousands of men and women who have been convicted of those felonies. And it strips voting rights from individuals serving their sentences, their probations, their paroles, and

from those men and women patiently waiting the duration of a uniform five- or seven-year period.

But, as this Court previously stated, "no realm is without boundary." ECF No. 144, at 35. That conclusion unremarkably presupposed the existence of a realm for the state to exercise discretion. Removing *all* discretion by jettisoning the vote-restoration scheme in its entirety is easily outside the "realm of discretion" because such a plan tosses out the "realm." In short, *Shepherd* presumes the existence of a realm for state officials to exercise limited discretion that the absence of a vote-restoration scheme would contravene. Once Florida provides for a realm of discretion through a vote-restoration scheme, it cannot simply discard that scheme after a federal court finds constitutional violations with its current rules.

Moreover, the Supreme Court's "prior decisions have voiced particular concern with laws that foreclose an entire medium of expression." *City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994); *see also id.* (listing Supreme Court precedent invalidating total bans on First Amendment activity). For example, a Ladue, Missouri ordinance that was a "virtually complete ban" on all residential signs "almost completely foreclosed a venerable means of communication." *Id.* at 49, 54. The Court observed that bans on whole swaths of First Amendment rights "may be completely free of content or viewpoint discrimination" but "the danger [such prohibitions] pose to the freedom of speech is readily apparent—by

eliminating a common means of speaking, such measures can suppress too much speech." *Id.* at 55. Similarly, the Supreme Court narrowly construed a municipality's law prohibiting some picketing but acknowledged that problems would arise if the law banned *all* picketing. *Frisby v. Schultz*, 487 U.S. 474, 486 (1988) ("The type of focused picketing prohibited by the [municipality's] ordinance is fundamentally different from more generally directed means of communication that may not be completely banned in residential areas.").

Analogous concerns would arise if the Board abandoned its vote-restoration scheme entirely. Once a federal court acknowledges former felons' First Amendment rights to association and expression upon which a restoration scheme of unfettered discretion unconstitutionally infringes, the Board cannot issue a blanket ban on all activity without some pathway out of the prohibition. And while a "particularly punitive state might even disenfranchise convicted felons permanently[,] . . . once a state provides for restoration, its process cannot offend the Constitution." ECF No. 144, at 9.[8] Shutting off the slow drip of vote-restorations in this context would offend the Constitution.

---

[8] Under the Supreme Court's interpretation of the Fourteenth Amendment's Section Two, states have an "affirmative sanction" in disenfranchising men and women convicted of felonies. *Richardson v. Ramirez*, 418 U.S. 24, 54 (1974). This Court is troubled by some courts' "fetishistic" reading of this precedent that strips the constitutional authorization of its context and relies solely on a textual reading. *See* Jessie Allen, *Documentary Disenfranchisement*, 86 TUL. L. REV. 389, 448–59 (2011).

That Florida cannot jettison its whole vote-restoration scheme is also supported as a matter of state law—though, of course, in so analyzing this Court treads carefully through longstanding principles of federalism. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.").

Defendants should heed the existence of a restoration process enshrined in Florida's constitution and in state laws. "No person convicted of a felony . . . shall be qualified to vote or hold office *until* restoration of civil rights." FLA. CONST. art. VI, § 4(a) (emphasis added). "[T]he civil rights of the person convicted shall be suspended in Florida *until such rights are restored . . .*" FLA. STAT. ANN. § 944.292(1) (emphasis added). Defendants acknowledge as much. ECF No. 149, at 7 ("[A] convicted felon loses the right to vote *until* civil rights are restored.") (emphasis added). They helpfully point out that Florida has coupled disenfranchisement with a form of vote-restoration *for the past 150 years*. *Id.* at 18 (explaining how the 1868, 1885, and 1968 state constitutions contained restoration language).

References in Florida's constitution and state laws to restoration are not window dressing. It is a "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant." *Kungys v. United States*, 485 U.S. 759, 778 (1988) (Scalia, J.) (plurality opinion); *see also*

*Vreeland v. Ferrer*, 71 So. 3d 70, 80 (Fla. 2011) ("[I]t is the duty of a court 'to give effect, if possible, to every clause and word of a statute.'") (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)). It is clear, then, that Florida law assumes a vote-restoration scheme, at minimum, exists.

This Court does not enter an injunction pursuant to Florida law. *Pennhurst*, 465 U.S. at 106 (forbidding federal courts from ordering state officials to comply with state law). "Under *Pennhurst* . . . the determinative question is not the relief ordered, but whether the relief was ordered pursuant to state or federal law." *Brown v. Ga. Dep't of Revenue*, 881 F.2d 1018, 1023 (11th Cir. 1989). A federal court can, however, consider a "state law issue that is preliminary to a federal claim against a state official." *Fleet Bank, Nat'l Ass'n v. Burke*, 160 F.3d 883, 891 n.6 (2d Cir. 1998).

This Court reads the cited provisions of the Florida Constitution and state law as preliminary to *Shepherd*'s direction that states have a "realm of discretion" in re-enfranchising their citizens. *Shepherd*, 575 F.2d at 1114. In other words, the cited provisions codify the constitutional requirements that appellate courts have identified; namely, the existence of a state's realm of discretion in re-enfranchisement. *Johnson v. Bush*, 405 F.3d at 1228; *Shepherd*, 575 F.2d at 1114. Abandoning that discretion by ceasing all vote-

restoration runs afoul of these cases.[9] This Court is guided by federal constitutional law in prohibiting the Board from ending all vote-restorations; accordingly, its consideration of relevant state law does not violate *Pennhurst*.

## IV

These remedies are prophylactic. They construct guardrails so state officials' discretion remains on the road of constitutionality. This Court recognizes that "pardon and commutation *decisions* have not traditionally been the business of courts; as such, they are rarely, if ever, appropriate subjects for judicial review." *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464 (1981) (emphasis added). At the same time, clear standards "provide the guideposts that check" the government official granting or denying First Amendment rights and prevent "*post hoc* rationalizations" clouded by "shifting or illegitimate criteria." *Lakewood*, 486 U.S. at 758. Simply put, the Board must create some preventative rules, criteria, and standards without any "shifting or illegitimate criteria." *Id.* Since clemency decisions are "rarely, if ever, appropriate subjects for judicial review," *Dumschat*, 452 U.S. at 464, prophylactic protections must be robust and meaningful.

---

[9] This is not to say that a scheme of automatic re-enfranchisement for certain classes of convicted felons would run afoul of *Shepherd*'s grant of a "realm of discretion" to the state. *Shepherd*, 575 F.2d at 1114. It would be the state, after all, that would choose to grant the right to vote to some former felons but not all. Discretion would remain in such a scheme.

**IT IS ORDERED:**

1. For the reasons set forth in its prior order, ECF No. 144, dated February 1, 2018, and this Order, the Clerk shall enter judgment stating:

   a. "FLA. CONST. art. VI, § 4(a), FLA. CONST. art. IV § 8, FLA. STAT. § 97.041(2)(b), FLA. STAT. § 944.292(1), and the Florida Rules of Executive Clemency, violate the First and Fourteenth Amendments of the United States Constitution to the extent these provisions provide the Executive Clemency Board unfettered discretion to grant or deny restoration of voting rights to persons with felony convictions, and violate the First Amendment to the extent these provisions lack any time constraints for processing and making final decisions. This **DECLARATORY JUDGMENT** applies only to the right to vote, not to any other civil right. It does not apply to any other type of executive clemency in Florida."

   b. "Defendants are **PERMANENTLY ENJOINED** from enforcing the current unconstitutional vote-restoration scheme. Defendants are also **PERMANENTLY ENJOINED** from ending all vote-restoration processes. On or before April 26, 2018, Defendants shall promulgate specific and neutral criteria to direct vote-restoration decisions in accordance with this Order. On or before April 26, 2018, Defendants shall also promulgate meaningful, specific, and expeditious time constraints in accordance with this Order. Defendants shall file with this Court its modified rules on or before April 26, 2018."

2. Nothing in this Order Directing Entry of Judgment granting declaratory and injunctive relief against Defendants shall be construed to preclude or limit future modification or elimination of

the pre-restoration waiting period(s) by any lawful means, such as constitutional amendment, legislation, or Board rulemaking.

3. The Board shall reconsider any applicants who were denied a meaningful hearing during the pendency of this Order's writing, i.e., between February 1, 2018 and today, under its new rules.

4. This Court shall retain jurisdiction to monitor Defendants' compliance and to entertain any motion for attorneys' fees and costs.

**SO ORDERED on March 27, 2018.**

**s/Mark E. Walker**
**United States District Judge**