## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

JAMES MICHAEL HAND, *et al.*,

    *Plaintiffs*,

v.                                                           Case No. 4:17-CV-128-MW-CAS

RICK SCOTT, in his official capacity as
Governor of Florida and Member of the
State of Florida's Executive Clemency
Board, *et al.*,

    *Defendants*.

_____/

## DEFENDANTS' MOTION FOR STAY PENDING APPEAL AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Rule 8(a)(1) of the Federal Rules of Appellate Procedure, Defendants respectfully move for a stay pending appeal of this Court's final order. In deciding whether to grant a stay, the Court considers "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009). The first two factors are the "most critical." *Id.* For the reasons set forth below, all four factors support the issuance of a stay.

In the alternative, Defendants respectfully move for an order tolling the 30-day deadline in this Court's final order so that it will begin to run only after Defendants have exhausted their rights to seek a stay in the United States Court of Appeals for the Eleventh Circuit and the United States Supreme Court.

## I.   DEFENDANTS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON APPEAL.

### A.   Equal Protection Claim

1. The Court of Appeals is substantially likely to hold that Plaintiffs' equal-protection claim is foreclosed by the Supreme Court's affirmance in *Beacham v. Braterman*, 300 F. Supp. 182 (S.D. Fla. 1969), *aff'd*, 396 U.S. 12 (1969). There, a three-judge panel of the district court held that it was not "a denial of equal protection of law . . . for the Governor of Florida, with the approval of three members of the Cabinet, to restore discretionarily the right to vote to some felons and not to others," *Beacham*, 300 F. Supp. at 184, even though it was undisputed that such restoration decisions were made "in a purely discretionary manner without resort to specific standards," *id.* at 183. Beacham's appeal to the Supreme Court took aim at that holding; one of the questions presented was whether Florida's discretionary re-enfranchisement procedure "violate[s] the Constitution in that there are no ascertainable standards governing the recovery of the fundamental right to vote?" Jurisdictional Statement Question C, *Beacham v. Braterman*, 396 U.S. 12 (1969) (No. 404), 1969 WL 136703 at *3. The Supreme Court resolved that issue by summarily affirming the lower court's judgment. *See Beacham*, 396 U.S. at 12.

A summary affirmance by the Supreme Court prohibits lower courts "from coming to opposite conclusions on the precise issues presented and necessarily decided." *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam); *see also Picou v. Gillum*, 813 F.2d 1121, 1122 (11th Cir. 1987) ("A summary affirmance by the Supreme Court has binding precedential effect."). "If a precedent of [the Supreme Court] has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower courts] should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).

*Beacham* "has direct application" here: In his jurisdictional statement, Beacham asked the Supreme Court to decide whether the Equal Protection Clause required Florida's Governor and Cabinet to adopt "ascertainable standards governing the recovery of the fundamental right to vote," Jurisdictional Statement Question C, *Beacham v. Braterman*, 396 U.S. 12 (1969) (No. 404), 1969 WL 136703 at *3; the Court decided that question in the negative by summarily affirming the three-judge panel's ruling; and Plaintiffs here raised the very same claim, arguing that Florida's re-enfranchisement system violates the Equal Protection Clause because the Clemency Board does not base its decisions on "any codified, objective test or set of criteria," DE43:25.

In assessing the precedential significance of *Beacham*, one must look to the *judgment* of the *Supreme Court*, not the *reasoning* of the *lower court*. *See Picou*, 813 F.2d at

3

1122. This Court did just the opposite. In particular, this Court reasoned that a "statement" made by the three-judge panel "carries no precedential value because it stands for the flawed presumption that an unconstitutional executive clemency structure is immune from judicial review." DE144:34 (citing *Beacham*, 300 F. Supp. at 184). The pertinent question, however, is whether the Supreme Court could have affirmed the panel's judgment if, as Beacham claimed, the Constitution requires vote-restoration decisions to be made pursuant to specific standards. It could not have done so. That was one of "the precise issues presented" to the Supreme Court in Beacham's statement of jurisdiction; and the Court "necessarily decided" that issue against Beacham when it affirmed the lower court's judgment. *See Mandel*, 432 U.S. at 176 ("Summary affirmances . . . without doubt reject the specific challenges presented in the statement of jurisdiction.").

At any rate, it is wrong to say that *Beacham* "has not aged well," DE144:34. Subsequent caselaw approves "unfettered discretion" in clemency proceedings; no case holds or opines that vote-restoration decisions must be made pursuant to specific standards; and a veritable host of states, like the federal government, continue to entrust to high-ranking executive officials the authority to make life-or-death clemency determinations not guided by "specific and neutral criteria," DE160:21.

Since *Beacham*, the Supreme Court has reaffirmed prior caselaw holding that "the clemency and pardon powers are *committed*, as is our tradition, to the authority of the executive." *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 276 (1998) (emphasis

added). Consistent with that principle, the Eleventh Circuit has held that "the presence of 'unfettered discretion' in the clemency process does not render the imposition of the death penalty . . . arbitrary and capricious in violation of the Eighth Amendment." *Smith v. Snow*, 722 F.2d 630, 632 (11th Cir. 1983) (per curiam). If a discretionary clemency process is constitutionally valid even in the context of the most severe criminal penalty, it makes little sense to exempt vote-restoration applications from longstanding law approving "unfettered discretion" in clemency proceedings. *See, e.g.*, *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464, 466 (1981).

In almost fifty years, only two courts have disagreed with or sought to distinguish *Beacham*; both decisions were reversed on appeal. *See Ramirez v. Brown*, 507 P.2d 1345, 1353 n.10 (Cal. 1973), *rev'd sub nom. Richardson v. Ramirez*, 418 U.S. 24 (1974); *Allen v. Ellisor*, 477 F. Supp. 321, 325 (D.S.C. 1979), *rev'd*, 664 F.2d 391 (4th Cir. 1981), *cert. granted, judgment vacated*, 454 U.S. 807 (1981). Notably, the Supreme Court did not just reverse the lower court's decision in *Ramirez*; it cited its prior ruling in *Beacham* with approval. *Ramirez*, 418 U.S. at 53; *see also Johnson v. Governor of Fla.*, 405 F.3d 1214, 1225-26 (11th Cir. 2005) (en banc) (citing *Beacham* in discussion relying on "specific precedent from this court and the Supreme Court dealing with criminal disenfranchisement"). Since *Beacham*, moreover, no court has held or implied that the Equal Protection Clause requires a state to make vote-restoration decisions—or, for that matter, any other kinds of clemency determinations—on the basis of specific standards.

The absence of any such authority speaks volumes. Ten other states have discretionary re-enfranchisement procedures, DE103:23 & n.4; and many more states, like the federal government, give executive officers the power to grant other forms of clemency—including life-preserving commutations of death sentences, liberty-conferring pardons, and restoration of the fundamental right to keep and bear arms for self-defense—without resort to specific "standards," "constraints" or "guidelines," DE144:1, 36-37.

2. Assuming *arguendo* that *Beacham* may be set aside, Plaintiffs' claim fails based on generally applicable equal-protection principles. Under the law of this Circuit, a challenge to a State's vote-restoration system fails if that system bears "a rational relationship to the achieving of a legitimate state interest." *Shepherd v. Trevino*, 575 F.2d 1110, 1115 (5th Cir. 1978); *see Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Florida's longstanding system survives rational-basis review. Under *Shepherd*, Florida has a legitimate "interest in limiting the franchise to responsible voters." *Id.* The State's totality-of-the-circumstances approach is rationally calculated to effectuate that interest, because it permits Board members to "gauge the progress and rehabilitation of

a convicted felon" based on the full range of information concerning "the individual defendant and his case." *Id.*[1]

---

[1] Judicially noticeable public reports referenced in the summary-judgment materials confirm that the Board's current procedures more effectively avoid restoring civil rights to applicants who are likely to subsequently re-offend than did the less selective procedures that were previously in place. In its 2016 recidivism report issued pursuant to Rule 18 of the Rules of Executive Clemency, the FCOR reported that by July 1, 2011, 11.1% of applicants granted restoration of civil rights during the two previous calendar years had re-offended and been returned to the custody of the Florida Department of Corrections. *See* FCOR, Restoration of Civil Rights' Recidivism Report for 2014 & 2015 (July 1, 2016), at 4, Table III ("Percentage at Time of Original Report" column), *available at* https://www.fcor.state.fl.us/docs/reports/Recidivism Report2014-2015.pdf; *see also* DE107-3:17 (referencing this RCR recidivism report). Under the Board's current procedures, by contrast, recidivism rates for identical reporting periods fell to 0.0%, 0.1%, 0.3%, and 0.4%. *See* Recidivism Report at 4, Table III ("Percentage at Time of Original Report" column, detailing recidivism rates during identical reporting periods for applicants restored during the 2011-12, 2012-13, 2013-14, and 2014-15 calendar years, respectively). In the years following the original reports, the contrast between the recidivism rates under the prior and current processes has become even more pronounced: as of June 5, 2017, applicants whose civil rights were restored in 2009-2010 and 2010-2011 have re-offended at rates of 28.8% and 27.6%, respectively; under the Board's more heightened review since 2011, however, recidivism rates as of June 5, 2017, have remained 1% *or lower. See* FCOR, Restoration of Civil Rights' Recidivism Report for 2015 & 2016 (July 1, 2017), at 4, Table III ("Percentage as of 6/5/17" column), *available at* https://www.fcor.state.fl.us/docs/reports/ RecidivismReport2015-2016.pdf.

These figures confirm that the current Board's more stringent eligibility criteria, and its exercise of case-by-case discretion—as informed by the CCAs and the testimony offered at Board hearings—are well-calculated to "gauge" applicants' "progress and rehabilitation."

3. Invidious discrimination has no place in the administration of any government program, including a State's vote-restoration scheme. *Shepherd*, 575 F.2d at 1114. Courts will not countenance such discrimination where it is properly alleged and proven. *Compare Hunter v. Underwood*, 471 U.S. 222, 227-33 (1985), *with Johnson*, 405 F.3d at 1222-26. The mere "risk" of discrimination, however, does not render a State's clemency process facially unconstitutional. *See Smith*, 722 F.2d at 631-32; *Beacham*, 300 F. Supp. at 184. Indeed, that risk exists whenever decisionmakers are vested with discretion; and discretion is one of the defining characteristics of executive clemency. *See, e.g.*, *Woodard*, 523 U.S. at 276; *Dumschat*, 452 U.S. at 463-67.

Properly understood, "unfettered discretion" to process clemency applications does not license to Board to violate generally applicable anti-discrimination prohibitions, including those embodied in the Florida and U.S. Constitutions. Like Rule 4 of the Rules of Executive Clemency, many regulations and opinions use the phrase "unfettered discretion" to indicate that a decision is entrusted to the judgment of a properly constituted authority. *E.g.*, *Shin v. Cobb Cnty. Bd. of Educ.*, 248 F.3d 1061, 1065 (11th Cir. 2001) (per curiam) ("We have 'unfettered discretion' to grant or deny a Rule 23(f) petition."); *Jay v. Boyd*, 351 U.S. 345, 357-58 (1956) ("suspension of deportation is not given to deportable aliens as a right, but by congressional direction, it is dispensed according to the unfettered discretion of the Attorney General"); *Dep't of Air Force v. Fed. Labor Relations Auth.*, 844 F.3d 957, 964 (D.C. Cir. 2016) ("hold[ing] that civilian access to commissaries and exchanges is not a proper subject of collective bargaining

8

because Congress has vested the military with 'unfettered discretion' over the matter"). Such references need not and should not be construed to authorize illicit discrimination.

4. In resolving Plaintiffs' facial challenges, the court appears to have relied on unpleaded and unproven allegations of discrimination involving non-parties. DE144:24 (concluding that "Plaintiffs offer more than enough examples for this Court to infer that such discrimination is not some cockamamie idea Plaintiffs cooked up"); *see id.* at 2, 23-24. Reliance on such allegations was improper and unpersuasive, for several reasons.

First, unsubstantiated allegations or insinuations, DE29:46-50, should not be credited at the summary-judgment stage, when the court is required to "draw[] all reasonable inferences in the light most favorable to the non-moving party." *Johnson*, 405 F.3d at 1217.

Second, "[t]he presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chem. Found.*, 272 U.S. 1, 14-15 (1926); *accord Banks v. Dretke*, 540 U.S. 668, 696 (2004). Plaintiffs in this case have not pleaded—much less proven with "clear evidence"—that the duly-elected constitutional officers serving on the Board discriminated against them on the basis of viewpoint or any other impermissible criterion. *See* DE29. Still less have they properly alleged and proven improper discrimination involving non-parties.

Third, even if instances of erroneous decision-making had been alleged or proven, they would not tend to show that Florida's vote-restoration system is *facially* unconstitutional. *See United States v. Salerno*, 481 U.S. 739, 745 (1987); *AFSCME v. Scott*, 717 F.3d 851, 863, 866 (11th Cir. 2013). This Court said as much when it denied Plaintiffs' motion to compel certain confidential case analyses (CCAs) pertaining to non-parties, explaining that those materials "are not relevant to the claims set forth in Plaintiffs' operative complaint." DE62:1; *see also id.* ("To the extent they are marginally relevant, the CCAs only serve as individual examples in support of Plaintiffs' facial claims."); DE76:2 (explaining that documents involving 17 selectively chosen clemency hearings involving non-parties were of only "limited" and "marginal relevance" in the context of "Plaintiffs' facial challenge," but granting "discovery request for [such] marginally relevant materials" based on the "narrow scope" of the request and the "limited burden on Defendants").

Fourth, the Clemency Board has processed more than 4,200 applications for restoration of civil rights since amending its Rules on March 9, 2011. *See* Exh. A, ¶ 6 (Declaration of Julia McCall). The court could not reasonably have concluded that a handful of examples selectively chosen by Plaintiffs provides a statistically significant basis upon which to insinuate the presence of systemic viewpoint or race-based discrimination. *E.g.*, DE144:23-24 (comparing results in six cases). That is particularly so inasmuch as the Board—unlike Plaintiffs and the court—had access to a broad range of applicant-specific information set out in the Confidential Case Analyses. *See* DE62:1.

An analysis of the principal example on which the court relied helps to illustrate the problems with Plaintiffs' unpleaded and unproven insinuations of improper discrimination. The court's summary-judgment order repeatedly refers to one clemency hearing in which the voting rights of Steven Warner, "a white man," were restored after the applicant volunteered that he voted for the Governor. DE144:2, 23-24. The court cites that incident as an "alarming illustration" of the problems with Florida's system, contrasting it with five other examples of cases in which applicants—including four African Americans—had their applications denied. *Id.* at 2 ("It is not lost on this Court that four of the five rejected applicants are African-American.").

Drawing "all reasonable inferences in the light most favorable to the non-moving party," *Johnson*, 405 F.3d at 1217, the court should have concluded that the Board's disposition of Mr. Warner's application did not tend to show actual or systemic discrimination based on viewpoint, race, or any other improper criterion. Many considerations support that conclusion, including the following:

- The Governor's immediate response to Mr. Warner's unsolicited statement—declining to offer any comment on the applicant's voting history, DE101-159 (3:50:00-3:50:10), *available at* http://thefloridachannel.org/videos/121213-executive-clemency-board-meeting/—cannot reasonably be construed as evidence of partisan bias. *Compare* DE144:2. Indeed, it is far more reasonable to interpret that response as a polite indication that such information was not relevant to the Board's decisionmaking process.

- Notwithstanding the court's repeated statement that "[t]he Governor then granted the former felon his voting rights," DE144:2, 24, Mr. Warner's application could not have been granted without the support of at least two other Cabinet members; and the record shows that two other members agreed. DE101-159 (3:50:15-3:50:25), *available at* http://thefloridachannel.org/

videos/121213-executive-clemency-board-meeting/. Construing that vote in the light most favorable to Defendants, one could reasonably infer that two other Board members—high-ranking constitutional officers whose official actions are entitled to the presumption of regularity—were unlikely to be swayed by an unsolicited and unverifiable statement that Mr. Warner had voted for a different Board member in the past.

·   Record evidence supplies reasonable grounds on which the Board may have granted Mr. Warner's application. *See* DE101-159 (3:47:50-3:50:25), *available at* http://thefloridachannel.org/videos/121213-executive-clemency-board-meeting/. Mr. Warner's offenses were old and relatively non-serious: 20 years ago he had been convicted of simple possession of marijuana, for which he spent no time in prison. 28 years ago, he had been convicted of an offense involving a bar fight; as Mr. Warner explained it, a drunk assailant had grabbed him from behind as he was trying to exit the bar, and Mr. Warner's act of violence was committed while trying to extricate himself from the alleged assaulter's grip. Mr. Warner voted illegally; but, on his telling, only after he had spoken with three or four "representatives" in Tallahassee, and based on his understanding that the relevant conviction had been expunged. *Id.*

·   Record evidence also supplies reasonable grounds on which the Board might have distinguished between the other five applicants and Mr. Warner. *See* DE144:23 ("Similar conduct can lead to different results in front of the Board.").[2] For example, one applicant voted illegally *four times*; appeared to admit, at one point, that he received a letter advising him that his voting rights had *not* been restored; and incorrectly—as established by a staff member in response to Governor Scott's question during the hearing—asserted that he had the "right" to vote over the course of a certain 17-year period. DE89-6:23 (2:09:06-2:16:49), *available at* http://thefloridachannel.org/videos/621111-executive-clemency-

---

[2] At any rate, asserted disparities between selectively identified applicants alleged to be similarly situated does not provide a basis for inferring unconstitutional discrimination. *Cf. McCleskey v. Kemp*, 481 U.S. 279, 306-07 (1987) (Defendants "cannot prove a constitutional violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty." (emphasis in original)); *id.* at 312-13 ("Apparent disparities in sentencing are an inevitable part of our criminal justice system," and the Court will "decline to assume that what is unexplained is invidious." (footnote omitted)); *id.* at 307 n.28 ("The Constitution is not offended by inconsistency in results based on the objective circumstances of the crime.").

12

board-meeting/. Another applicant likewise voted illegally multiple times; volunteered that he had previously registered as a Republican; and had his application denied. DE89-6:38 (2:11:23-2:19:40), *available at* http://thefloridachannel. org/videos/121611-executive-clemency-board-meeting/.

· In resolving the applications of Mr. Warner and the other five applicants discussed above, the Board—unlike the court—had access to confidential case analyses containing a broad range of additional information. Those CCAs are not in the record, because the court found them irrelevant in the context of Plaintiffs' facial challenge. DE62:1.

· Record evidence establishes that the Florida Commission on Offender Review and the Clemency Board routinely solicit a broad range of information from applicants, but do not solicit information about an applicant's political views. Construing those facts in the light most favorable to Defendants, the court could reasonably have inferred that FCOR does not make its recommendations, and the Board does not make its decisions, based on partisan political considerations.

In sum, the court erred insofar as it relied on unsubstantiated insinuations of actual discrimination. *See* DE144:2, 23-24. Such allegations, as the court itself recognized at an earlier phase of the litigation, were "not relevant" to Plaintiffs' facial challenges. DE62:1. Even if they were relevant, the court was not in a position to assess those allegations, as it did not have access to the Confidential Case Analyses available to the Board. *See id.* In any event, the court failed to apply the right law—the familiar summary-judgment standard and the presumption of regularity—to Plaintiffs' unpleaded allegations of wrongdoing, and the court's analysis of Plaintiffs' cherry-picked examples was unpersuasive on its own terms.

B.      First Amendment Claims

The Court of Appeals is substantially likely to hold that Florida's discretionary re-enfranchisement regime does not violate the First Amendment. Because "the exclusion of felons from the vote has an affirmative sanction in § 2 of the Fourteenth Amendment," *Ramirez*, 418 U.S. at 54, "[i]t is clear that the First Amendment does not guarantee felons the right to vote." *Johnson v. Bush*, 214 F. Supp. 2d 1333, 1338 (S.D. Fla. 2002), *aff'd Johnson*, 405 F.3d at 1235. That law is fatal to Plaintiffs' First Amendment claims. Convicted felons are free to engage in any and all forms of expression that are constitutionally protected *as to them*; but alleged expressive interests tied to and derived from the "right to vote" do not apply where, as here, there is no right to vote in the first place.

At a minimum, the First Amendment does not mandate that vote-restoration decisions be made pursuant to specific standards. Consistent with the "affirmative sanction" recognized in *Ramirez*, the law of this Circuit holds that the First Amendment "afford[s] no greater protection for voting rights claims than that already provided by the Fourteenth" Amendment. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1188 n.9 (11th Cir. 1999) (invoking that principle as the sole basis for "conclud[ing] that the district court did not err in dismissing" appellant's voting-rights "claims under the First and Thirteenth Amendments"); *accord Lucas v. Townsend*, 783 F. Supp. 605, 618 (M.D. Ga. 1992) ("To the extent that either the First or Thirteenth Amendments protect voting

rights, that protection does not extend beyond the protection more directly afforded by the Fourteenth and Fifteenth Amendments."), *aff'd* 967 F.2d 549, 556 (11th Cir. 1992).

As explained above, the Fourteenth Amendment does not require vote-restoration decisions to be made pursuant to specific standards, *see supra* at 2-13, or call for the application of strict scrutiny, *Shepherd*, 575 F.2d at 1114-15. The First Amendment "afford[s] no greater protection for [Plaintiffs'] voting rights claims." *Burton*, 178 F.3d at 1188 n.9.

### C.   Remedial Order

It is substantially likely that the Court of Appeals will reverse the grant of injunctive relief. "An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). Where "a less drastic remedy . . . [i]s sufficient to redress [an] injury, no recourse to the additional and extraordinary relief of an injunction [i]s warranted." *Id.* at 165-66. "In addition to ensuring that injunctive relief was necessary," a reviewing court "must also ensure that the scope of the awarded relief does not exceed the identified harm." *Thomas v. Bryant*, 614 F.3d 1288, 1317 (11th Cir. 2010).

Applying those standards here, the Court of Appeals is substantially likely to find this Court's injunction unnecessary and overbroad. Entry of a declaratory judgment, "a less drastic remedy," would have redressed Plaintiffs' injury, so "no recourse to the additional and extraordinary relief of an injunction was warranted." *See Monsanto*, 561 U.S. at 165-66. This Court's invalidation of Florida's re-enfranchisement procedures

leaves a range of options available to the State, any one of which would comport with its ruling. These options include declining to restore voting rights under the system this Court invalidated, enacting new legislation, amending the Florida Constitution, and adopting any number of possible amendments to the Rules of Executive Clemency.

Nothing in the federal Constitution requires Florida to choose one of these options over any other, or to craft and implement any such policy solution within a fixed span of time. Indeed, as this Court recognized, Section 2 of the Fourteenth Amendment authorizes the State to "disenfranchise convicted felons *permanently,*" DE144:9 (emphasis added); therefore, Plaintiffs have no federal constitutional right to any re-enfranchisement system, *see Ramirez*, 418 U.S. at 54; *Johnson*, 405 F.3d at 1217. Still less do they have a right to insist that a new re-enfranchisement system be put in place in a particular way (via Board amendment of its rules) and in a particular time (30 days).

In other words, this Court's injunction bars the State from implementing a policy that, according to this Court, has an "'affirmative sanction' in the Constitution." *See* DE144:39; DE160:17, 21. The Court of Appeals is substantially likely to hold that such an injunction is unnecessary, overbroad, and unsupported by federal law. *See Monsanto*, 561 U.S. at 165; *Thomas*, 614 F.3d at 1317.

State law cannot and does not support a federal-court injunction requiring state officials to institute a new state policy. It *cannot* because, as the Supreme Court has explained, "it is difficult to think of a greater intrusion on state sovereignty than when

a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). And it *does not* because Florida law, properly construed, does not require the Clemency Board to continuously solicit and process applications seeking restoration of civil rights. DE149:15-18.

Defendants' understanding of state law does not render "redundant" or meaningless state constitutional and statutory provisions mandating that a convicted felon not be allowed to vote "until" civil rights have been restored. *See* DE160:18. Those provisions *allow* the State to create processes by which civil rights may be restored; they do not *require* any particular process to be created by a date certain or to remain continuously in operation. *See* Fla. Const. art IV, § 8(a); Fla. Const. art. VI, § 4(a); § 940.01(1), Fla. Stat.

In any event, so far as state law is concerned, there already exists a currently available process for restoring a convicted felon's voting rights: the pardon power. This Court's order does not disturb the pardon process. *See* DE144:2 n.1 (leaving other kinds of executive clemency untouched); DE160:21 (court's judgment "does not apply to any other type of executive clemency in Florida"); *see also Bowens v. Quinn*, 561 F.3d 671, 676 (7th Cir. 2009) (Posner, J.) ("[F]or a federal court to run a governor's pardon system would be a step too far."). And a pardon has the legal and practical effect of restoring a convicted felon's right to vote.

That is not just a theoretical possibility. This Court's summary-judgment order was issued on February 1, 2018. DE144. On March 8, the Clemency Board held a

previously-scheduled meeting. In light of the order striking down the State's vote-restoration process, the Board did not consider 62 applications seeking *only* restoration of civil rights. *See* Exh. A, ¶ 4 (Declaration of Julia McCall). However, the Board did hear from 9 applicants who sought a full pardon, including restoration of firearm authority and/or restoration of civil rights. Four applications for a full pardon were granted; and those pardons have the legal and practical effect of restoring the applicant's right to vote. *See id.*

In short, federal law, as authoritatively construed by the Supreme Court, affirmatively authorizes the State not to maintain any vote-restoration system; this Court may not instruct state officials on how to conform their conduct to state law; state law does not require the Board to come up with a new process for considering applications seeking restoration of civil rights; and, even if state law could be construed to require an active and ongoing process by which voting rights may be restored, such a process is already in place. Thus, this Court's injunction improperly prevents the State from pursuing policy options consonant with federal and state law.

At a minimum, Defendants may not be ordered to promulgate new criteria in 30 days. Florida's Constitution has authorized the discretionary restoration of voting rights "*for the past 150 years.*" DE160:18 (emphasis in original; adverting to vote-restoration language in the 1868, 1885, and 1968 constitutions). For the first time in that long history—indeed, for the first time in the history of the Nation—this Court has held that state laws authorizing re-enfranchisement of convicted felons are unconstitutional

insofar as they do not set forth "specific and neutral criteria to direct vote-restoration decisions," DE160:21. To implement this Court's decision, the State's policymakers will have to resolve any number of complicated and difficult questions, including but not limited to the following:

- Which instrumentality of the state government is best positioned to formulate "specific and neutral criteria" that are apt to enjoy broad public support and to withstand the test of time?

- Assuming *arguendo* that the current Board should put new rules in place on an interim basis, how "specific" and "neutral" should the "specific and neutral criteria" be? Should the Board adopt mathematical criteria that are susceptible of mechanical application, even if such criteria work to the disadvantage of convicted felons with presumptively troubling histories? Or should it consider more flexible standards akin to the statutory sentencing factors? *See* 18 U.S.C. § 3553(a).

- Even if each criterion, standing alone, is completely objective, should an applicant's failure to meet *all* the criteria be disqualifying? Or should the rules be crafted so that the Clemency Board may approve an application that meets some but not all of the "specific and neutral criteria" that are put in place?

- Should arrests or convictions for certain kinds of misdemeanor or felony offenses be either relevant or categorically disqualifying? If so, which ones?

- In light of currently available resources, what is a realistic estimate of how long it will take for the Board, on average, to process anticipated applications based on the new criteria? What additional resources should be requested, and are such resources likely to be forthcoming? If the Board is flooded with new applications, what is the consequence for failing to timely process an application? Should time and resource constraints militate in favor of harsher but more objective criteria, even if those criteria preclude careful case-by-case consideration of potentially extenuating circumstances that might otherwise redound to the benefit of some applicants?

- How should the vote-restoration criteria relate to the process by which other kinds of executive clemency applications are resolved, including applications for pardons, commutations, and restoration of firearm authority? Should the Board

create a newly bifurcated system for processing applications involving civil rights other than voting rights, such as the right to serve on a jury or to hold or run for public office; or should the "specific and neutral criteria" it promulgates apply to all applicants seeking restoration of civil rights?

· Should the Board discontinue its current process of holding hearings for certain kinds of applicants seeking restoration of civil rights? What about applicants who simultaneously apply for restoration of voting rights and other forms of executive clemency?

· What kinds of rules have other States put in place, how were they instituted, and how have they worked in practice?

Those and many other questions warrant careful consideration. Before resolving such questions, the Board should have adequate opportunity to consult with, and learn from, interested and knowledgeable parties—including affected state and local governmental agencies, members of the Florida Legislature, law-enforcement authorities, legal experts, victim's rights groups, community leaders, concerned citizens, and executive officers serving in other states. Following such consultation, the Board should have adequate time to debate the various options and to carefully craft rules that are likely to engender public confidence, withstand the test of time, and strike an appropriate balance between the diverse and competing interests at stake. Finally, the timetable for doing all that should take into account the full scope and importance of the other pressing duties entrusted to the State's highest executive officers.

An order directing the Governor, Attorney General, Chief Financial Officer, and Commissioner of Agriculture and Consumer Services to create a new system for

restoration of voting rights in 30 days is not reasonably calculated to effectuate those
objectives.

## II.   DEFENDANTS WILL BE IRREPARABLY INJURED ABSENT A STAY.

"[A]ny time a State is enjoined by a court from effectuating statutes enacted by
representatives of its people, it suffers a form of irreparable injury." *New Motor Vehicle
Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers);
*accord, e.g., Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers);
*Veasey v. Perry*, 769 F.3d 890, 895-96 (5th Cir. 2014). That commonsense principle
applies here. This Court's judgment enjoins the State of Florida, acting through its duly-
elected constitutional officers, from effectuating its "current . . . vote-restoration
scheme." DE160:21. And that vote-restoration system, as the court made clear, is based
on multiple state constitutional and statutory provisions. *Id.* ("FLA. CONST. art. VI, §4(a),
FLA. CONST. art. IV § 8, FLA. STAT. § 97.041(2)(b), FLA. STAT. § 944.292(1), and the
Florida Rules of Executive Clemency, violate the First and Fourteenth Amendments of
the United States Constitution to the extent these provisions provide the Executive
Clemency Board unfettered discretion to grant or deny restoration of voting rights to
persons with felony convictions . . . .").

The harm to the State's interest as a result of this Court's order is not
hypothetical. The Court's order has already had the unintended consequence of
preventing the State from restoring voting rights to eligible Florida citizens. At its last
meeting, the Clemency Board was scheduled to consider 62 hearing-based applications

seeking only the restoration of civil rights (including but not limited to voting rights); in light of this Court's order striking down the State's vote-restoration system, none of those applications was considered. *See* Exh. A, ¶ 4 (Declaration of Julia McCall). The Board has also been forced to discontinue its practice of considering, on an ongoing basis, non-hearing-based applications for restoration of civil rights. As of the date of this filing, a total of 122 such applications are on hold. *See id.* ¶ 5.

Finally, the injunction in this case does not just *prevent* the State from effectuating state law. *Compare Veasey*, 769 F.3d at 895 ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." (quotation marks omitted)). It also *directs* four of the State's highest-ranking executive officers to revamp a 150-year-old vote-restoration scheme in 30 days. A federal court order requiring state officials to come up with new state policies impinges on the sovereignty and autonomy of the State. *See F.E.R.C. v. Mississippi*, 456 U.S. 742, 761 (1982) (explaining that the authority to make fundamental policy decisions "is perhaps the quintessential attribute of sovereignty," inasmuch as "having the power to make decisions and to set policy is what gives the State its sovereign nature"); *see also Alden v. Maine*, 527 U.S. 706, 751 (1999); *Printz v. United States*, 521 U.S. 898, 929 (1997). That constitutional injury is particularly acute where, as here, federal law affirmatively authorizes the state *not* to promulgate any such policy. *See Johnson*, 405 F.3d at 1217.

### III.   A STAY WILL NOT SUBSTANTIALLY INJURE PLAINTIFFS.

1. A stay would not thwart Plaintiffs' rights. As convicted felons, Plaintiffs have no constitutional right to vote; nor do they have a right to insist that the State put in place any system for restoring their right to vote. *See* DE144:9. Rather, Plaintiffs assert the right not to have a vote-restoration application denied based upon the exercise of discretion pursuant to an allegedly unconstitutional process. *See id.* at 39 ("It is the Board's *process* to restore voting rights that this Court finds unconstitutional.") (emphasis added). A stay of the court's injunction would not impair any such right, because there is no basis for concluding that the State will create a new process incompatible with the requirements of this Court's order.

2. Plaintiffs have an interest in regaining the franchise sooner rather than later. However, they cannot show that a stay will postpone the likely date on which a renewed application for restoration of voting rights would be either considered or granted. Indeed, the Court's remedial order might well have the unfortunate and unintended consequence of making it harder for Plaintiffs to get back the right to vote. Under the current rules, for example, a convicted felon satisfying certain neutral eligibility criteria may apply to have civil rights restored seven years (but not five years) after the completion of the sentence, even if the applicant has been "arrested for a misdemeanor or felony" within five years of completing the sentence or "convicted" of a crime set out in a list of enumerated—and presumptively troubling—offenses. *See* DE107-1:10-12, 14 (Rules 9(A), 10(A)). New rules might extend the seven-year waiting period, make

23

such misdemeanor arrests or offense-specific convictions categorically disqualifying, or both.

It would be altogether reasonable for the Clemency Board to tighten *threshold* eligibility criteria (under the current system) if, as the Court has ruled, the Board will no longer retain its *subsequent* discretion to reject the applications of convicted felons who satisfy the "specific and neutral criteria" the Board must now put in place. In addition, the Court has directed the Board to revamp the State's vote-restoration system in 30 days. To comply with that tight deadline, the Board might reasonably be inclined to err on the side of caution. Indeed, such caution might seem particularly prudent in light of the court's suggestion that discretionary policy choices, once made, may never be retracted. *See* DE160:17. In any event, to avoid the risks of violating a federal injunction, the Board may have little choice but to come to a quick consensus by settling on the least common denominator agreeable to a sufficient number of Board members in the short time allotted. It is far from clear that the rules resulting from such a rushed and haphazard process will make it easier or faster for Plaintiffs to obtain restoration of civil rights.

## IV.   THE PUBLIC INTEREST WOULD BE SERVED BY A STAY.

As discussed at length above, a stay of the Court's order would serve any number of compelling public interests: allowing continued effectuation of longstanding state law authorizing restoration of voting rights to convicted felons; ensuring proper consultation and careful deliberation before making major changes to the State's voter-

24

eligibility requirements; and preserving the autonomy of the States in our federal system. The significance of that last interest should not be underestimated. When "fundamental questions of federalism" are at stake, "considerations of comity [should] prevent this Court from determining that the interests of the State of Florida are either outweighed by any threatened harm to [private litigants], or are inconsistent with 'public policy.'" *Jupiter Wreck, Inc. v. Unidentified, Wrecked & Abandoned Sailing Vessel,* 691 F. Supp. 1377, 1390 (S.D. Fla. 1988) (Marcus, J.).

Plaintiffs themselves have conceded that a stay of injunctive relief is "*necessary* if the relief would tend to sow public confusion by going in and out of effect during the course of the full appeals process." DE157:7 (emphasis added). That is the case here. As explained above, Defendants are substantially likely to prevail on appeal. *See supra* at 2-20. Accordingly, immediate implementation of this Court's order is apt to "sow public confusion" about the state of Florida law. Such confusion is particularly problematic insofar as it threatens to undermine public confidence in, and understanding of, rules governing the conduct of elections. *See, e.g., Purcell v. Gonzalez,* 549 U.S. 1, 4-5 (2006) ("Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls.").

## CONCLUSION

This Court's judgment should be stayed pending appeal. In the alternative, the Court should toll the 30-day deadline in its final order so that it will begin to run only after Defendants have exhausted their rights to seek a stay in the United States Court of Appeals for the Eleventh Circuit and the United States Supreme Court.

Respectfully submitted,

PAMELA JO BONDI
ATTORNEY GENERAL

*/s/ Amit Agarwal*
Amit Agarwal (FBN 125637)
Solicitor General

Edward M. Wenger (FBN 85568)
Chief Deputy Solicitor General

Jordan E. Pratt (FBN 100958)
Deputy Solicitor General

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3681
(850) 410-2672 (fax)
amit.agarwal@myfloridalegal.com
edward.wenger@myfloridalegal.com
jordan.pratt@myfloridalegal.com

*Counsel for All Defendants*

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)**

Pursuant to Local Rule 7.1(B), the undersigned has conferred with counsel for Plaintiffs regarding the relief requested in this motion. Plaintiffs, through their counsel, indicated that they oppose this Motion.

/s/ Amit Agarwal
Solicitor General

**CERTIFICATE OF SERVICE**

I certify that on this 4th day of April, 2018, a copy of the foregoing was served on all counsel of record through the Court's CM/ECF Notice of Electronic Filing System.

/s/ Amit Agarwal
Solicitor General

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 7.1(F) of the Local Rules of the Northern District of Florida, I certify that the foregoing Brief contains 6,637 words.

/s/ Amit Agarwal
Solicitor General